Richard L. Medd and Alberta E. Medd, et al. [1] v. Commissioner. Medd v. Commissioner
Docket Nos. 4576-63-4580-63, 4582-63.
United States Tax Court
T.C. Memo 1968-244; 1968 Tax Ct. Memo LEXIS 55; 27 T.C.M. (CCH) 1224; T.C.M. (RIA) 68244; October 22, 1968, Filed Francis B. Stine, 135 S. LaSalle St., Chicago, Ill., for the petitioners in docket Nos. 4576-63 through 4580-63. John F. Kelly and Duane P. Benson, for the petitioner in docket No. 4582-63. Donald J. Forman, for the respondent. 1226 WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of the petitioners for the indicated years as follows: Petitioners
Docket No.
Year
Deficiency
Richard and Alberta Medd
4576-63
1955
$ 5,086.48
Cecil and Mildred Medd
4577-63
1955
16,434.27
Robert and Nancy Medd
4578-63
1955
5,120.66
Ralph and Jean Medd
4579-63
1955
5,290.48
Ronald and Roma Medd
4580-63
1955
5,216.48
Lark Sales Company
4582-63
1955
109,791.04
1956
93,635.42
1957
69,875.71
1958
52,118.70
*57 As a result of concessions by the parties, the issues presented for determination are as follows: In the cases of petitioners Medd, docket Nos. 4576-63 through 4580-63 (1) Whether the gain realized in 1955 by Ohio Dairy Queen, a partnership, sometimes hereinafter referred to as the Medd Partnership, from the sale of its Dairy Queen businesses and properties in Ohio and Eastern New York to Lark Sales Company constituted capital gain or ordinary income, and (2) whether a deduction of $39,503.83 taken by Medd Partnership in its partnership return of income for 1955 for legal expenses constituted an obligation of Lark Sales Company and therefore was not deductible as a business expense by the partnership. In the case of Lark Sales Company, docket No. 4582-63 (1) Whether Lark's taxable income for 1955 should be increased by an amount of $150,000 as representing the purchase price of the Medd Partnership's Ohio and Eastern New York Dairy Queen businesses and properties which was written off by Lark on its books and used by it in its income tax return for 1955 to reduce its taxable income for that year, and (2) whether a deduction of $39,503.83 taken by Lark for 1955 for legal *58 fees constituted a capital expenditure incurred by it in its acquisition of the Medd Partnership's Dairy Queen businesses and properties in Ohio and Eastern New York. Additional Issues in the case of Lark Sales Company, docket No. 4582-63 (3) Whether during 1956, 1957, and 1958, the petitioner was the owner of the property interest of "2( East" and thereby realized taxable income from Dairy Queen royalties in the amounts of $53,795.04, $62,079.19, and $44,938.09 during the respective years, (4) whether the petitioner purchased the property interests of the Medd Partnership in 1955 in Ohio and Eastern New York and thereby realized income from Dairy Queen royalties and other receipts from those areas in the amounts of $56,597.69, $45,787.99, and $46,342.76 during 1956, 1957, and 1958, respectively, (5) whether income accruals by petitioner for expense charges to Ar-Tik Systems, Incorporated, during 1955, 1956, 1957, and 1958 in the amounts of $93,053.35, $53,568.20, $27,140.73, and $12,279.19, respectively, and reported by petitioner as sales for such years, should be eliminated from the income reported by petitioner in its income tax returns for those years, (6) whether the petitioner *59 was entitled to deduct as ordinary and necessary business expenses for 1956, 1957, and 1958 the amounts of $59,913.50, $29,408.25, and $13,570.50, respectively, which were accrued by petitioner as payable to L.S. Murchie & Company as accounting fees, (7) whether petitioner is entitled to a reduction of its income for 1955 of $8,538.95, representing a portion of an amount of $17,077.91 (so-called Grafton expenditures), deducted by petitioner as part of its cost of goods sold, and which was disallowed by respondent, (8) whether petitioner is entitled to a deduction from its income for 1955 of $4,155.35, representing expenditures, hereinafter referred to as the Rockford expenditures, which the petitioner in its income tax return deducted as cost of goods sold and which respondent disallowed, and (9) whether petitioner sustained a net operating loss in 1958 of $186,906.43 which was available for being carried back and allowed as a net operating loss deduction in 1955, 1956, and 1957. 1227 Findings of Fact In the cases of petitioners Medd and in the case of Lark Sales Company Issues 1 and 2 Some of the facts have been stipulated and are found accordingly. Petitioners Cecil *60 R. Medd and Mildred I. Medd are husband and wife and the parents of four sons, namely, Richard L. Medd, Robert R. Medd, Ralph C. Meed, and Ronald A. Medd. Cecil R. and Mildred I. Medd filed their Federal joint income tax return for 1955 with the district director in Chicago, Illinois. Petitioners Richard L. Medd and Alberta E. Medd are husband and wife. They filed their Federal joint income tax return for 1955 with the district director in Chicago, Illinois. Alberta is a petitioner in this case only by reason of her signing the joint income tax return. Petitioners Robert and Nancy Medd are husband and wife. They filed their Federal joint income tax return for 1955 with the district director in Chicago, Illinois. Nancy is a petitioner in this case only by reason of her signing the joint income tax return. Petitioners Ralph and Jean Medd are husband and wife. They filed their Federal joint income tax returns for 1955 with the district director in Chicago, Illinois. Jean is a petitioner in this case only by reason of her signing the joint income tax return. Petitioners Ronald and Roma Medd are husband and wife. They filed their Federal joint income tax return for 1955 with the *61 district director in Chicago, Illinois. Roma is a petitioner in this case only by reason of her signing the joint income tax return. At all times here material, Ohio Dairy Queen (sometimes known as Cecil R. or C.R. Medd and Sons) was a partnership, and sometimes hereinafter is referred to as the Medd Partnership. The members of the partnership were Cecil R. Medd, Mildred I. Medd, Richard L. Medd, Robert R. Medd, Ralph C. Medd, and Ronald A. Medd. The partnership through predecessors in interest was formed in 1946. It reported its income on the basis of a calendar year and filed its Federal partnership return of income for 1955 with the district director in Chicago, Illinois. Tasty Bakery, Inc., an Illinois corporation, was organized on or about December 28, 1945. On or about January 20, 1950, the corporate name was changed to Lark Sales Company, which sometimes hereinafter is referred to as Lark. At all times material herein, the principal office of a Dairy Queen business conducted by Lark was in the Moline National Bank Building, Moline, Illinois. Lark filed its Federal income tax returns for 1955 on the calendar year basis with the district director in Chicago, Illinois. *62 Leland S. Murchie, sometimes hereinafter referred to as L.S. Murchie or as Murchie, has been a certified public accountant since 1934. He is certified to practice in the State of Illinois. At all times here material, Murchie operated his accounting business in Illinois under the name of L.S. Murchie & Company. Prior to opening his own firm, he was associated with a nationally known firm of certified public accountants for 16 years. In 1938, Murchie was admitted to practice before the Tax Court of the United States and presently is authorized to practice before it. Murchie prepared the Federal income tax returns of the Medds for the years 1949 through 1954 and from time to time during those years advised them as to their business and financial affairs. He also collaborated in the preparation of a partnership agreement for the Medds who placed trust and confidence in him. Murchie acquired all of the issued and outstanding common stock of Lark, consisting of 64 shares, which were issued to him on January 2, 1952. At all times here material, he was the sole owner of all of the issued and outstanding shares of common stock of Lark. McCulloughs Dairy Queen, Inc., an Illinois corporation, *63 was organized on or about April 1, 1954. All of its issued and outstanding common stock, consisting of 100 shares, was issued to Murchie on April 2, 1954, who paid $1,000 therefor. McCulloughs Dairy Queen, Inc., was organized solely for the purpose of holding title to the trademark "Dairy Queen." It was never intended that it engage in other operations. On or about May 18, 1937, Harry M. Oltz became the owner of United States patent No. 2080971, sometimes hereinafter referred to as the Oltz patent, on a machine, sometimes hereinafter referred to as a freezer, designed to produce a soft frozen product from milk with sweetener, stabilizer, and flavor added, which product has become known as soft ice cream or ice milk. The Oltz patent expired May 18, 1954. 1228 On or about July 31, 1939, Oltz entered into an agreement, sometimes hereinafter referred to as the Western Agreement, with H.A. McCullough pursuant to which, among other things, the latter acquired the exclusive license to use, manufacture, and sell the above-mentioned freezer in the following States: Minnesota, Wisconsin, Illinois, Missouri, Iowa, Arkansas, Louisiana, Texas, Oklahoma, Kansas, Nebraska, North Dakota, *64 South Dakota, Montana, Wyoming, Colorado, New Mexico, Arizona, Utah, Idaho, Washington, Oregon, Nevada, and California. In 1939, McCullough originated the name "Dairy Queen" and thereafter used the name as a trade name in connection with the retail sale in the aforementioned States by him or by others licensed by him, or his sublicensees, of the soft frozen ice milk product made by freezers manufactured under the Oltz patent. On or about June 11, 1940, Oltz assigned, transferred, and set over to Ar-Tik Systems, Incorporated, an Indiana corporation, hereinafter sometimes referred to as Ar-Tik, all his right, title, and interest in the Oltz patent. On or about September 7, 1946, Ar-Tik entered into an agreement with McCullough by which Ar-Tik licensed McCullough to use, manufacture, and sell, and to permit others to use, manufacture, and sell, freezers manufactured under the Oltz patent, until the expiration of that patent, in certain States of the United States lying east of the Mississippi River, including the States of Ohio and New York. On or about November 7, 1946, McCullough registered the name Dairy Queen under the Ohio General Code by filing in the office of the Secretary *65 of State of the State of Ohio, a proof of publication of the name Dairy Queen as a trade name. On or about December 30, 1946, H.A. McCullough, together with J.F. McCullough (Sellers), entered into a patent license agreement by which they granted to Cecil, Mildred, Richard, and Robert Medd (Buyers), the exclusive right to use the Oltz patent in the State of Ohio for the life of the patent. In consideration for these rights and privileges, the buyers agreed, inter alia, to pay the sellers the sum of $40,000 of which $10,000 was payable upon execution of the agreement. The balance, $30,000, which was paid in full prior to 1954, was payable at the rate of 15 cents per gallon on all mix used or sold in the State of Ohio, with a minimum payment per season of $750 for each retail store in the State. In addition, the buyers agreed to pay to Ar-Tik monthly, the sum of 4 cents per gallon in the nature of a royalty on all mix thereafter used in the State of Ohio. These payments to Ar-Tik were to continue for the life of the contract and so long as the buyers had the rights granted to them in said contract. Under an agreement between Ar-Tik and the McCulloughs, Ar-Tik, upon receipt of the 4 *66 cents per gallon, was to pay one-half thereof to the McCulloughs. About the same time as their execution of the aforesaid patent license agreement with the Medds, H.A. McCullough and J.F. McCullough, assigned all their right, title, and interest in the trademark and trade name Dairy Queen in the State of Ohio to Cecil and Richard Medd. At the time of the foregoing assignment, the name Dairy Queen had achieved a significance in the minds of the general consuming public in Illinois, Iowa, and other States in the United States lying west of the Mississippi River, as being descriptive of a soft frozen ice milk product dispensed in retail stores and displaying and conducting business under the name Dairy Queen as well as a style and mode of a store operation. Cecil, Mildred, Richard, and Robert Medd assigned all their rights, titles, and interest in property, including the trade name Dairy Queen, acquired from H.A. McCullough and J.F. McCullough, to the Medd Partnership. From and after December 30, 1946, the Medd Partnership continuously used the name Dairy Queen as a trade name in connection with the sale to the public at retail of ice milk made in freezers manufactured under the *67 Oltz patent. On July 31, 1952, the Medd Partnership registered the name, title, or designation Dairy Queen with the Secretary of State of the State of Ohio in accordance with the provisions of the General Code of that State. Upon acquiring the exclusive right to use the aforesaid freezer patent and trade name Dairy Queen in the State of Ohio, the Medd Partnership entered into franchise agreements with district franchise operators, sometimes hereinafter referred to as Ohio district operators, under which the latter were granted the right to use freezers built under the Oltz patent during 1229 the life of the patent in specified counties of the State of Ohio. Contemporaneously therewith, the Medd Partnership granted and licensed to each Ohio district operator the right to use the trade name Dairy Queen in connection with the sale of such soft frozen ice milk during the period covered by the franchise agreement. Each Ohio district operator franchise agreement entered into with the Medd Partnership also provided that the district operator could by subcontract assign or transfer his interests under the contract to third persons. The Ohio district operator franchise agreements all *68 expired by their terms on May 18, 1954, the date of the expiration of the Oltz patent. In turn, each Ohio district operator (some of whom operated retail stores directly) entered into written subfranchise agreements with retail store operators, hereinafter sometimes referred to as Ohio store operators, in his respective territory, authorizing the latter persons to use the freezers built under the Oltz patent and also to use the name Dairy Queen as a trade name in connection with the sale of the soft frozen ice milk produced and sold by the Ohio store operators in a specified area within the Ohio district operator's territory. The monthly mix payments required of the store operators varied from 34 cents or 35 cents a gallon to 45 cents a gallon in the main, and in one instance, 50 cents a gallon was required. Except as the Medds licensed and franchised district operators and except as the latter, in turn, licensed and franchised retail store operators, the Medds continued from December 30, 1946, until September 1, 1955, to be the sole users of the trade name Dairy Queen in the State of Ohio in connection with the merchandising and sale of soft frozen ice milk. Boyd Wagner, Incorporated, *69 sometimes hereinafter referred to as Wagner, at all times here material was an Ohio district operator. It became a district operator for the Medds on July 22, 1948. A typical Ohio store operator's subfranchise agreement made prior to May 18, 1954, is one entered into between Wagner and Harold E. Peters and Clarence E. Rensch, Ohio store operators, on January 26, 1950. Under this type of agreement, each Ohio store operator was licensed to use the patented freezer and the trade name Dairy Queen. Each Ohio store operator agreed that the Ohio district operator owned the exclusive right to the use of the trade name Dairy Queen in the area covered by the agreement; that the store operator desired to purchase the exclusive right of the trade name; and that the district operator agreed to sell and transfer to the store operator the exclusive right to use the name Dairy Queen, subject to certain specified conditions. The store operator further agreed as follows: Both Parties agree that said trade name "Dairy Queen" has substantial value, that it is being used in many localities throughout the country, and that the restrictions, limitations, and conditions herein imposed are necessary, equitable, *70 and reasonable for the general benefit of the parties to this contract and all other parties enjoying any lawful interest in said trade name. Upon breach by the licensee of the license agreement, each Ohio district operator could immediately terminate the contract whereupon all rights of the licensee in the trade name Dairy Queen would cease. In 1949, the Medds were already, through their licensees, carrying on a large and successful business of vending soft frozen ice milk under the trade name Dairy Queen in Ohio. By this time, the Medds had entered into 15 district operator franchise agreements covering 22 counties in Ohio, in addition to 21 counties in Ohio covered by the contract with Wagner. Each Ohio store operator paid to the Ohio district operator from whom he received his license and in whose territory he operated, a royalty of a certain amount of money per gallon of mix used to produce the ice milk, which royalty was prescribed in the license agreement between him and his Ohio district operator. Each Ohio district operator in turn paid to the Medd Partnership a royalty of a certain amount of money per gallon on mix used by Dairy Queen stores located in his district *71 and sublicensed by him, which royalty was prescribed in the contract between him and the partnership. During the year 1947, C.R. Medd originated the trade phrase "The Cone with the Curl on Top" to describe the ice milk cone made with Dairy Queen ice milk and sold in Dairy Queen prototype stores. The Medd Partnership had an engraving made of an advertisement in which the phrase was employed in conjunction with the name Dairy Queen as descriptive of the ice milk product and the places or establishments at which it could be obtained. From the engraving the Medd Partnership 1230 prepared ad mats for distribution to and use by Ohio store operators. The Medd Partnership authorized their Ohio district operators and Ohio store operators to use the phrase in connection with the merchandising of ice milk and made the mats available to them. The Ohio district and store operators have since then continuously so used that phrase in the State of Ohio. On or about August 17, 1949, the Medd Partnership assigned its right, title, and interest in the phrase "The Cone with the Curl on Top" to the Dairy Queen National Trade Association, Inc., reserving to itself the exclusive right to use the *72 phrase in the State of Ohio. The Dairy Queen National Trade Association then registered the phrase with the United States copyright office on August 17, 1949, and has used that phrase on advertising throughout the United States. All retail Dairy Queens stores, as well as all Dairy Queen state and district operators throughout the United States and in Canada and Mexico, put the phrase to use as a trade phrase in conducting Dairy Queen business. Prior to the time C.R. Medd conceived the trade phrase "The Cone with the Curl on Top" there had been developed and placed in use in all Dairy Queen stores a method of drawing the ice milk from the freezer so as to achieve a particular configuration of the ice milk in the cone, cup, dish, or other receptacle in which the product was dispensed. This cone curl configuration has ever since been employed in all Dairy Queen stores in other promotional and advertising materials. District and store operators were trained and instructed in the appropriate method of drawing the ice milk product from the freezers and a uniform configuration was employed in all Dairy Queen stores. A distinctive feature of the configuration is a looped "doughnut hole" *73 curl on the top of the ice milk. The configuration with this closed loop curl has been at all times here material employed in all Dairy Queen stores in Ohio and elsewhere in roof and road signs, billboards, and placards as a label or identification of the Dairy Queen store and of the ice milk known to the public as Dairy Queen which was dispensed in those stores. The configuration and curl have become in the minds of the consuming public in Ohio and elsewhere in the United States, Canada, and Mexico a means of identifying the ice milk and the source or place the same may be obtained. Up until it was sold to Lark on September 1, 1955, the configuration and curl on the top thereof was a valuable property right of the Medds in Ohio as a means of identification and source of the Dairy Queen product. Prior to the opening of the first Dairy Queen stores in Ohio, the Medds had prepared plans and specifications of a distinctive prototype building on which the name Dairy Queen was prominently displayed and to be used by all Dairy Queen retail stores in Ohio. The Medds supplied blueprint copies of these plans and specifications to each Ohio district operator to be delivered by him to each *74 Ohio store operator in his territory and to be used by them in the construction of the store buildings in which the Dairy Queen ice milk was to be sold. Each Ohio district operator delivered the plans and specifications to his store franchise operators and they used and followed them in the construction of their stores. Substantially all of the more than 200 Dairy Queen operated stores in Ohio have been built on the basis of these plans and specifications developed and distributed by the Medds and, as a result, the Ohio Dairy Queen stores are of a distinctive style, architecture, shape, design, and appearance. The name Dairy Queen and the distinctive curl configuration have been prominently displayed upon the outside of each store structure and the size and conformity of lettering is uniform as to each store structure. After December 30, 1946, the Medds spent large sums of money advertising and promoting the name Dairy Queen and the distinctive cone configuration and since 1947, the phrase "The Cone with the Curl on Top" in Ohio. The Medds and their district operators as well, devoted substantial amounts of their time, energy, skill, and competence to the inspection and supervision *75 of all Dairy Queen retail stores operating in Ohio in order to insure the maintenance of uniformity and high standard of merchandising methods and uniform cleanliness and attractiveness of the stores themselves. The Medds also made substantial expenditures of time and money: in the development, improvement, and inspection of freezers used in the making and sale of ice milk at retail for the purpose of maintaining and improving the quality of the ice milk product sold at Dairy Queen 1231 stores; in the development of methods of improving the quality, taste, and uniformity of the ice milk sold at Dairy Queen stores in Ohio; in the development of uniform designs and markings for containers in which the product is sold; in the training and education of franchise store operators and their employees in the proper operation of Dairy Queen stores; and in identifying the trade name Dairy Queen in the minds of the public in Ohio as describing and identifying an ice milk product of uniform and excellent quality, texture, taste, and appearance sold in the distinctive and uniform appearing and operated prototype retail stores using Dairy Queen and "The Cone with the Curl on Top" as trade *76 names and the distinctive cone configuration as a mark of identification of Dairy Queen stores and the ice milk product known as Dairy Queen dispensed in those stores. Except as hereinafter found, all Ohio store operators paid royalties to their respective Ohio district operators and their respective Ohio district operators, in turn, paid the Medds royalties on ice milk produced and sold in Ohio. On or about March 14, 1950, H.A. McCullough and J.F. McCullough, doing business as McCulloughs Dairy Queen, entered into a freezer and territory agreement by which they granted to the Medd Partnership, the exclusive right to purchase and use freezers manufactured under the Oltz patent in a certain described territory located in the eastern part of the State of New York for the life of the patent. In addition thereto, the Medd Partnership was given the exclusive right to use the trademark Dairy Queen in the development of that territory. In consideration for such exclusive rights and privileges granted by McCulloughs Dairy Queen, the Medd Partnership agreed, inter alia, to pay McCulloughs Dairy Queen the sum of 10 cents per gallon on all mix used or sold within the above-mentioned territory. *77 In addition, the Medd Partnership agreed to pay to Ar-Tik the sum of 4 cents per gallon in the nature of a royalty on all mix thereafter used within the abovementioned territory. The Medd Partnership also agreed to collect not less than $1,000 and not more than $3,000 from each subcontractor for each retail store operated in that territory; and further agreed to pay to McCulloughs Dairy Queen one-third of such amounts as they were received. Sometime in August 1951, the agreement referred to in the preceding two paragraphs was amended to provide that where the Medd Partnership entered into contracts with third persons for the sale of Dairy Queen rights in the areas covered thereby, such contracts contemplated that the third person subfranchise out, all or a substantial part of his rights thereunder, to other parties. Then and in such case, the following changes were to apply: (1) in lieu of a royalty of 10 cents per gallon of mix used, McCulloughs Dairy Queen was to receive one-half of all royalties received by the Medd Partnership under such contracts, provided however, that the minimum royalty to be thus received by McCulloughs Dairy Queen was to be 8 cents per gallon of mix used, *78 and (2) McCulloughs Dairy Queen was to receive one-half instead of one-third of the amount charged by the Medd Partnership to each subcontractor for each retail store operated in that territory. On or about August 1, 1952, the agreement was further amended to provide that the territory encompassed in the original agreement was to be extended so as to include the counties of Queens, Albany, and Schenectady in the State of New York. On May 18, 1954, the Oltz patent expired. Thereafter, certain store franchise operators in the State of Ohio announced that they would and, in fact, did under claim of their own right, use the trade name Dairy Queen, the trade phrase "The Cone with the Curl on Top," and the distinctive cone-curl configuration in connection with the sale by them of ice milk products in their franchise territories in the State of Ohio without paying to the Medd Partnership, or persons authorized by that partnership to use or license the use of such name, phrase, and distinctive configuration, the usual royalty paid by franchised operators of Dairy Queen stores and without recognizing their obligation to accept the supervision and direction of the partnership as to the manner *79 of operating their business and the maintenance of standards prescribed for the operation of Dairy Queen stores. In 1954, there were approximately 200 retail Dairy Queen stores in Ohio. After May 18, 1954, when the freezer patent expired, about one-third of those stores ceased paying royalties. On June 9, 1954, the Medd Partnership in Medd v. Boyd Wagner, Incorporated, et al., 139 F. Supp. 399 (1955), filed a complaint in the United States District Court for the 1232 Northern District of Ohio, Western Division, at Toledo, Ohio (Civil No. 7214) against Wagner and certain named individuals who were Ohio store operators in one or more of the 21 counties in Ohio that had been sublicensed to Wagner by the partnership, to restrain the unauthorized use of the trade name Dairy Queen and of the trade phrase "The Cone with the Curl on Top." In the civil action referred to in the preceding paragraph, the Medd Partnership sought to prevent the defendants, in the absence of consent of the partnership, from using the trade name Dairy Queen and the trade phrase in the vending of soft frozen ice milk and from representing to the public that they were part of the Dairy Queen *80 organization, in Ohio and elsewhere, vending Dairy Oueen ice milk. The primary basis of and the theory of the complaint were that the Medds were the exclusive owners in the State of Ohio of the trade name and trade phrase, that use of this name and phrase by the defendants was common-law unfair competition, and that defendants were using the property of the Medds without permission. The defendants' primary basis of and the theory of defense were that the trade name and trade phrase were so coupled with the freezer manufactured under the Oltz patent that the right to the exclusive use of the trade name and trade phrase expired with that patent. On June 25, 1954, defendant Wagner filed its answer and on June 28 the court issued an Order of Injunction Pendente Lite, whereby the defendants were ordered and directed to pay into the registry of the court during the pendency of the action, the royalties required under the terms of the contracts. On July 30, the Medd Partnership filed an amendment and supplement to the complaint in which it joined additional Ohio store operators who were operating under subfranchise agreements from Wagner as party defendants, and the injunction was extended *81 to apply to these additional defendants. On September 9, 1954, the five original individual defendants each filed separate answers and thereafter, through their counsel, stated to the court that they had no right to the continued use of the trade name and trade phrase without permission from the plaintiff, Medd Partnership, or the designated rightful owner, and that they would continue to operate and pay their stipulated royalties into the registry of the court and would abide by the eventual decision of the court. On October 4, 1954, the individual defendants named in the amended supplemental complaint who were operators of sixteen retail stores, filed their answers in which they set up nine separate defenses to the complaint. On December 2, 1954, Wagner filed its offer to confess judgment in which it recited that its subfranchise agreement, as well as all subagreements entered into by it with the individual store operators who were defendants, were assigned to the Medd Partnership. On the same date, the offer was accepted by the partnership which acquired any and all right, title, and interest of Wagner in the subject matter of the litigation. The Wagner case was tried in December *82 1954. On June 10, 1955, the United States District Court filed its opinion and found for the Medd Partnership. Contemporaneously therewith, the court retained jurisdiction over any accounting claimed by the Medd Partnership for damages suffered by reason of the acts complained of. The District Court's final decree was entered on August 5, 1955. To the extent pertinent hereto, the court's findings and conclusions were as follows: 1. The expiration of United States patent No. 2080971 relating to the freezer did not affect plaintiffs' title to and right of exclusive use of the trade name Dairy Queen, the trade phrase "The Cone with the Curl on Top," or the distinctive cone-curl configuration, or their rights to license the exclusive use thereof in Ohio. 2. The district operator franchise agreement between the partnership and Wagner expired on May 18, 1954, the date on which the patent expired. 3. Each of the store operator franchise agreements between Wagner and the store operators expired on May 18, 1954. As of that date, any and all rights granted the respective store operators by such franchise agreements ceased and thereupon became and were again vested exclusively in plaintiffs. *83 4. The franchise agreements entered into subsequent to May 18, 1954, between Wagner and store operators were of no force and effect. 1233 5. Plaintiffs were the owners of and had the exclusive right to use the trade name Dairy Queen, the trade phrase "The Cone with the Curl on Top," and the distinctive cone-curl configuration in the State of Ohio in connection with the promotion, sale, and merchandising of ice milk. 6. Plaintiffs had shown that they were entitled to a permanent injunction enjoining the defendants from the use, in connection with the merchandising, promotion, and sale of ice milk, of the name Dairy Queen, the phrase "The Cone with the Curl on Top," and the distinctive cone-curl configuration, in the State of Ohio, without express permission of plaintiffs. 7. Plaintiffs had shown that they were entitled to an accounting from the defendants of all the gains and profits made by them by reason of the acts of defendants complained of by plaintiffs, and to recover of defendants all damages suffered by plaintiffs from the acts of defendants, and the costs of the action. 8. Each of the defendants (other than Wagner), was ordered to pay to plaintiffs the sum *84 of 37 1/2 cents for each gallon of mix by him used or sold while he was (1) operating his store under the name Dairy Queen, or (2) using in his operation the phrase "The Cone with the Curl on Top," or (3) selling ice milk in the form of a distinctive Dairy Queen configuration with a looped "doughnut hole" curl on top of the portion of the ice milk sold, except for mix on which royalties or license fees at the rate of 37 1/2 cents per gallon of mix, or at some other return agreed upon by and between the particular defendants and Wagner or plaintiffs, had already been paid by that defendant to plaintiffs or to Wagner. 9. The clerk of the court was ordered to pay to plaintiffs the moneys which had been deposited with him pendente lite pursuant to the orders of the court. Shortly after the Medd Partnership filed its complaint in the Wagner suit, the partnership instituted in the Federal courts of Ohio two similar suits, Medd, et al. v. Abner Smith, et al. (No. 7240), and Medd, et al. v. Kenneth Conoway, et al. (No. 3417). The Abner Smith suit was filed in the same court as the Wagner suit and involved two district operators (Abner Smith who operated four stores and John Mulberin *85 who operated one store), as well as the operators of seven retail stores, several of whose district operators were not joined. The Conoway action was solely against 26 store operators representing a total of 17 stores. While a temporary injunction similar to that obtained in the Wagner case was entered in the Smith action, none was ever entered in the Conoway case. Notice of appeal of the court's decision in the Wagner case was due on October 9, 1955. Since notice of appeal was never filed, the right of appeal expired on that date. By an undated instrument entitled "Assignment of Trade-Mark and Trade-Name," Cecil and Richard Medd, on behalf of all the members of the Medd Partnership, purportedly sold and assigned to McCulloughs Dairy Queen, Inc., all their right, title, and interest in and to the trademark and tradename Dairy Queen as used on and in association with the sale of the frozen ice milk product, together with the goodwill of the business in connection with which the trademark and trade name was used. While the signatures of Cecil and Richard Medd appearing on this instrument are theirs, such signatures were never acknowledged. Neither McCulloughs Dairy Queen, Inc. *86 , nor Lark or Murchie paid any cash or property to the Medds in connection with the purported "assignment" referred to in the preceding paragraph. Contemporaneously with the execution of the above assignment, Cecil and Richard Medd, on behalf of all the members of the Medd Partnership, signed an undated second instrument entitled "Territory Agreement" under the terms of which Lark, as an alleged licensee of McCulloughs Dairy Queen, Inc., purported to assign and transfer to the Medds the exclusive right to use the trademark and trade name Dairy Queen in the State of Ohio, and the Medds agreed to pay to Lark the sum of 4 cents per gallon of mix used in the preparation of the soft frozen ice milk product sold under that name. This undated instrument was signed for Lark by H. A. McCullough, Agent, and contained his acknowledgment, and also contained his individual acknowledgment dated September 20, 1954. There is no acknowledgment of either Cecil or Richard Medd contained in this instrument. Neither Lark nor Murchie received any cash or other property from the Medds in connection with this instrument. Nothing of value exchanged hands between the parties and the Medds have made no payments *87 to Lark pursuant to its terms. 1234 The two undated instruments referred to above were prepared by Murchie. They were not intended to have any force or effect but were intended to be held in "escrow" by Murchie and used by him solely in an effort to effect settlement of the Ohio litigation. On October 30, 1954, the Medd Partnership entered into an executory agreement with McCulloughs Dairy Queen, Inc., and Lark. The agreement provided, in pertinent part, that the Medds owned the exclusive right to use the name Dairy Queen in the State of Ohio in connection with the sale of ice milk products; that the Medds had licensed by written contracts various district operators in Ohio to use the name Dairy Queen in designated areas in that State, subject however to the supervision and control of the Medds; and that the Medds had been engaged in the business of merchandising the ice milk products in Ohio under the trade name Dairy Queen by means of licensing, franchising, supervising, and furnishing of services to franchise operators. The parties thereto also agreed that the Medd Partnership immediately upon the entry of a final decree in the case of Medd, et al. v. Boyd Wagner, Incorporated, *88 et al., or at such prior time as the Medds might elect, would sell and transfer to McCulloughs Dairy Queen, Inc., their entire Dairy Queen business in the State of Ohio, including all of their rights under their license and franchise agreements with third persons, their obligation and right to supervise, inspect, and supply various other services to franchised operators and their entire right, title, and ownership in and to the name Dairy Queen in the State of Ohio. In consideration for these rights, Lark agreed, inter alia, to pay to the Medds the sum of 3 cents per gallon for all mix used in the State of Ohio in the production of the Dairy Queen product, from and after the date of transfer. This agreement was signed by Cecil Medd on behalf of the Medd Partnership. McCulloughs Dairy Queen, Inc., and Lark were signed for by "L. S. Murchie, Attorney in Fact." Contemporaneously with the execution of the agreement referred to in the preceding paragraph, and in further consideration of the rights to be transferred under that agreement. Lark executed a second agreement which provided, in effect, that from the royalties or license or franchise fees collected by Lark for the use of the *89 name Dairy Queen in the State of Ohio from and after the date of the transfer, it would set aside the sum of 1 cent per gallon of mix used in Ohio, such moneys to be used by Lark for the furnishing of services to or for the benefit of Dairy Queen store operators in Ohio. The executory agreements of October 30, 1954, referred to in the preceding two paragraphs were never consummated. On October 4, 1955, and to be effective from and after September 1, 1955, the Medds, individually and as copartners, doing business as Dairy Queen Stores of Ohio, and doing business as Dairy Queen Stores of Eastern New York (as Sellers), and Lark Sales Company (as Buyer), entered into an agreement entitled "Contract of Sale," which sometimes hereinafter is referred to as the September 1, 1955, Contract of Sale. The agreement provided as follows: WITNESSETH: WHEREAS, Sellers [Medd Partnership] have agreed to sell, convey and transfer to Buyer [Lark] their entire Dairy Queen business in the State of Ohio and State of New York, NOW, THEREFORE, Sellers for and in consideration of the sum of One Dollar ($1.00) and other valuable consideration in hand paid, the receipt and sufficiency whereof is *90 hereby acknowledged, do hereby sell, assign, transfer and deliver unto Buyer all rights, title, and interest in and to their businesses known as Dairy Queen Stores of Ohio and Dairy Queen Stores of Eastern New York, which include the entire Dairy Queen businesses of the Sellers in the State of Ohio and in the State of New York, including the trade name "Dairy Queen Stores of Ohio" and the trade name "Dairy Queen Stores of Ohio" and Eastern New York", together with the good-will in connection therewith, and including, not by way of limitation, all their rights under licenses and franchise agreements to and with third parties, and with the Buyer or its assignors, and all their right, title, interest and ownership in and to the trade mark and trade name "Dairy Queen", and the trade phrase, "The Cone with the Curl on Top," and the distinctive cone-curl configuration identified with the Dairy Queen product and store operation in the State of Ohio and the State of New York, as used on, and in association with, the sale of a frozen dairy product by the Sellers, and their licensees, together with the goodwill of said businesses in connection with 1235 which the said trade mark and trade *91 name "Dairy Queen" and the said trade phrase, "The Cone with the Curl on Top," and the distinctive cone-curl configuration are used, together with all assets of every kind and nature of said businesses, exclusive, however, of all automobiles, trucks, equipment, office furniture and fixtures, and cash not required by this Contract to be paid to Buyer. Sellers may retain the books and records of said businesses for the years 1953, 1954 and 1955, and furnish copies thereof to Buyer. Said original books and records shall be turned over to Buyer after the final determination of Seller's Federal Income Tax for the years 1953, 1954 and 1955. Buyer shall keep and preserve all the books and records of the businesses turned over to Buyer under this Contract and shall, upon the request of Sellers, make said books and records available to Sellers or persons dedignated by them, for inspection or copying. Sellers thereby transfer to Buyer, in addition to the aforesaid businesses, goodwill, and interests in trade, trade phrase and distinctive configuration, and other assets, the following rights: (a) all rights in and to funds deposited in the United States District Courts in Toledo, Ohio, *92 in connection with the case of Medd, et al., v. Boyd Wagner, et al., now pending therein, which are in the amount of $7,461.28, of which $3,730.64 is the property of Buyer, and in addition, all right in and to all moneys paid voluntarily or otherwise, by the defendants in said action, in accordance with said action; (b) all rights in and to royalties and license fees and damages for unfair competition which may be received or receivable, in connection with actions by Sellers now pending undetermined in the United States District Courts in Toledo, Ohio (Medd, et al. v. Smith, et al.), and Cincinnati, Ohio (Medd, et al. v. Conoway, et al.), including the amount which will or would upon receipt of said amount by Sellers, be the property of Buyer; (c) all rights in and to moneys owed Sellers by Boyd Wagner, Inc., by reason of its receipts from store operators on and before June 30, 1955, which are in the amount of $3,210.00, of which $1,605.00 is the property of Buyer; (d) all rights in and to moneys owed Sellers by Ron Baker, by reason of his operations for the year 1954, in the amount of $6,214.70, of which $3,754.40 is the property of Buyer; (e) all rights in and to moneys owed *93 Sellers by reason of the operations of Joseph Florentine and Glenn Vore, and by reason of the operations of said other store operators in eastern New York during the winter of 1954-1955, which other store operators have not paid royalties or franchise fees with respect to such winter operations. In addition, Sellers will transfer and deliver to Buyer 120 Capital Shares of National Dairy Queen Development Company. Sellers will deliver to Buyer, on the execution of this Contract, the sum of $42,126.52 attributable to operations in Ohio, which sum is now held by Sellers but is the property of Buyer, and Sellers will deliver to Buyer Four Cents (4() per gallon on any mix used or sold in Ohio during the month of August, 1955, which has not been accounted for in said $42,126.52. Sellers will deliver to Buyer the sum of $11,624.00, which is the property of Buyer as its share of royalties and franchise payments collected from operators in eastern New York for operations prior to September 1st, 1955, and which amount Sellers warrant is the amount due Buyer under a complete accounting, to the extent they were received, of all sums due Buyer to said date from said area. Sellers acknowledge *94 that the sums referred to in the next preceding paragraphs, and all sums derived from collections of the above described Four Cents (4() payment, are the property of Buyer, and that Sellers neither have nor ever have had any right, title or interest in said sums. IT IS HEREBY UNDERSTOOD AND AGREED by the parties hereto that except for the items described above, Sellers are retaining as their own property, all cash on hand, and are entitled to retain or receive, as the case may be, amounts due Sellers from other persons arising from operations by said other persons during the months of July and August, 1955. That said months due Sellers do not include the amounts which are the property of Buyer as received. That the sums listed herein as the property of Buyer constitute a full and complete accounting, to the extent received, all sums due Buyer as Assignee of McCullough's Dairy Queen and Ar-Tik Systems, Incorporated. It is further warranted by Sellers, with reference to the assets described herein, which are to be transferred to Buyer by Sellers, that there are no liens thereon, or actions or causes of action pending against the said partnerships or members thereof, except for *95 the claims involved in the actions pending in the United States District Courts in Toledo and Cincinnati referred to herein as against any of the 1236 said assets; and that Sellers have full right to deliver unto Buyer said assets at the present time or at the time they are received, except as may be determined by the Courts in the actions described above. It is further warranted by the Sellers that none of said assets have been pledged and/or anticipated, nor have the aforesaid partnerships, nor any of the members thereof, pledged any of the assets of said partnerships. In furtherance of Sellers' desire to discontinue their business activities in Ohio and Eastern New York, the Sellers, individually and collectively, agree that they will not, for a period of two (2) years from the date hereof, engage, directly or indirectly, in the business of selling a frozen dairy product in the State of Ohio or in the State of New York under the present trade name or any other name. That the Buyer shall have and hold the aforesaid unto itself, its successors and assigns, to its own proper use and benefit forever. That in further consideration of the aforesaid Contract of Sale, Buyer hereby *96 agrees that the aforesaid partnership, Dairy Queen Stores of Ohio, is obligated to pay the legal fees, costs and disbursements of the firm of Johnston, Thompson, Raymond and Mayer, of Chicago, Illinois, and the firm of Fuller, Harrington, Seney and Henry, of Toledo, Ohio, for services rendered in connection with the prosecution of certain litigation in the State of Ohio in the Federal District Courts thereof, not to exceed [$]39,503.83, on the effective date of this Contract of Sale, and the Buyer represents that said sum shall be paid from the assets acquired under this Contract, and guarantees that said sum shall be paid. Sellers, having accounted to Buyer in full for the payments required of Sellers, to the extent received by Sellers, under an Agreement relating to Ohio between Sellers' predecessors and Buyer's assignors, and an Agreement relating to Eastern New York between Sellers and Buyer's assignors, which Agreements are herein assigned and transferred to Buyer, it is hereby understood and agreed that Sellers are hereby relieved of further obligations for payments otherwise required under, or by reason of, said agreements, except as otherwise specifically provided herein; *97 and, in connection therewith, Buyer shall save Sellers harmless from any and all claims against Sellers by Ar-Tik Systems, Incorporated, arising out of, or by reason of, the aforesaid Agreements. That this Contract of Sale is to be effective from and after the first day of September, A.D. 1955. That the Sellers will execute and deliver to the Buyer any and all further documents which the Buyer may require for the consummation of this Contract. That the Sellers shall in no way do any act or thing which will hinder or impede the Buyer from negotiating with district and retail operators in the State of Ohio and the State of New York; and that Sellers will use their best efforts to persuade district and retail operators in said territories to negotiate with and to enter into contract with Lark Sales Company, or persons licensed by Lark Sales Company, on the request of Buyer and its agreeing to pay Sellers the reasonable value of services rendered and expenses to be incurred in connection therewith. The formulation and execution of the foregoing contract was the culmination of an arm's length transaction which had been entered into by the parties thereto following various controversies, *98 conferences, and negotiations between them or their representatives, all of whom were conversant with the subject matter and terms of the contract and its objective to place in Lark the ownership of the properties and rights transferred by Medd Partnership. Contemporaneously with the execution of the September 1, 1955, Contract of Sale and in the further consideration of that contract, the Medds, individually, and as copartners, doing business as Davenport Dairy Queen Stores of Scott County, Iowa, executed a second instrument entitled "Agreement" in which they agreed that so long as they should continue to use the trademark and/or trade name Dairy Queen in connection with their business in Scott County, Iowa, they would pay, without interruption, to Lark Sales Company, the sum of 4 cents per gallon on all mix used in the sale of the frozen dairy product in such business in such county. In pursuance of the September 1, 1955, Contract of Sale, Lark, on October 4, 1955, made payment by check of a lump sum amount of $150,000 to the Medd Partnership. The voucher attached to the check contained the following explanation: "9-1-55 Contract of sale of Businesses Ohio & E.N.Y. $150,000.00." *99 Likewise in pursuance of the foregoing Contract of Sale, Lark, on October 4, 1955, made payment by check of $35,410.17 to Johnston, Thompson, Raymond and Mayer, attorneys of Chicago, Illinois, for their unpaid legal fees and expenses through August 31, 1955, incurred by Medd Partnership in its litigation 1237 involved in the Wagner, Smith, and Conoway cases. The voucher attached to the check contained the following explanation: "9-1-55 Contract of Sale - Medds-Lark re businesses in Ohio & E.N.Y. Legal services and expenses (Statement dated 9-30-55) $35,410.17." Also on October 4, 1955, and in pursuance of the above-mentioned Contract of Sale, Lark made payment by check of $4,093.66 to Fuller, Harrington, Seney & Henry, attorneys of Toledo, Ohio, for their unpaid legal services and expenses incurred by Medd Partnership in its litigation involved in the Wagner, Smith, and Conoway cases. The voucher attached to the check contained the following explanation: "9-1-55 Contract of Sale - Medds-Lark re Businesses in Ohio & E.N.Y. Services and expenses per statement dated 9-20-55 $4,093.66." Each of the checks to which the above-mentioned respective vouchers were attached was signed by *100 Murchie on behalf of Lark. Despite the fact that the unpaid amounts owing to the above-mentioned law firms were the obligations of the Medd Partnership, at the instance of Murchie, the sole stockholder of Lark, checks of the latter were issued in payment of those obligations. During the negotiations leading up to and including the execution of the September 1, 1955, Contract of Sale, the Medds were represented by Albert Jenner and Philip Tone of the Chicago law firm of Johnston, Thompson and Mayer. The Medds assigned to Lark certain unrealized receivables which were listed and set forth in the September 1, 1955, Contract of Sale. Tone prepared a memorandum dated October 26, 1955, in which he made a valuation of the fair market value of the specific receivables as follows: MEMORANDUM RE VALUE OF RECEIVABLES LISTED ON PAGES 2 AND 3 OF CONTRACT OF SALE BETWEEN C. R. MEDD & SONS AND LARK SALES COMPANY, EFFECTIVE SEPTEMBER 1, 1955 (a) Rights in funds deposited in the United States District Court in Toledo in Medd v. Boyd Wagner, Inc. Notice of appeal in this case was due on or before October 9, 1955. Thus, when the contract was entered into there was still the possibility that *101 the defendants would appeal. If they had appealed and had been successful, they, rather than the sellers, plaintiffs in that case, would have been entitled to the funds deposited with the Court. In view of these considerations, the Clerk of the United States District Court refused to release the funds to sellers until the appeal time had run. On the other hand, we are now able to determine that the case was not appealed and the clerk paid out the money to plaintiffs, who turned it over to the buyers under the contract. It is the opinion of the trial counsel that, in the light of the possibility of an appeal and the attendant uncertainties, the receivable in the amount $3of,730.64 turned over to the buyer had a fair value at the time of sale of approximately 80% of its face amount. (b) Rights to royalties and license fees and damages for unfair competition receivable in connection with the cases of Medd v. Smith and Medd v. Conoway. The amounts and collectibility of those receivables are uncertain. The Conoway case is an action for unfair competition and for damages for the unauthorized use of the name and phrase against some thirty odd store operators throughout the Southern District *102 of Ohio. The district operators of these store operators have continued to pay sellers royalties and have thus impliedly acknowledged their right, although two of these district operators have not yet signed new contracts with plaintiffs and may in the future dispute plaintiff's right. The issues in this case on the merits are the same as the issues in Medd v. Boyd Wagner, Inc., which was decided in favor of plaintiffs by Judge Kloeb in Toledo. However, defendants in the Conoway case moved to join their district operators as parties defendant, claiming that the district operators were indispensable parties. The effect of this motion, if allowed, would be to bring in parties who would destroy diversity of citizenship, which is the basis for the federal court's jurisdiction. This motion has been argued and briefed and was, at the effective date of the contract, and still is under consideration by Judge Druffel. If Judge Druffel allows the defendant's motion, it will be necessary to proceed against each of the thirty odd defendants in the local state court of his residence. While it may be possible to consolidate some of these suits, the result will be numerous suits, each involving a *103 relatively small amount of money. Turning to the Smith case, this is an action by the plaintiffs against two district operators who are denying sellers' (plaintiffs') right, their store operators and certain other store operators. While the issues between plaintiffs and the various store operators are the same as those in Medd v. Boyd Wagner, Inc., the issues between plaintiffs and the district operators is whether plaintiffs sold the latter all their rights in the name and phrase. If they did, plaintiffs will be unable to recover anything from the district operator. Moreover, the district operator will be entitled to collect all the amounts payable by their store operators. Plaintiffs' claims against the additional 1238 store operators in this case, the operators of two stores, will probably prevail regardless of the outcome of the dispute between the plaintiffs and the two district operators. An additional uncertainty in these cases is raised by the probability that many of the store operator defendants have ceased using the name and phrase during the pendency of these suits. Plaintiffs have conceded in these suits that when the store operator ceases to use the name and phrase *104 he is no longer under any obligation to pay royalties or damages for unfair competition. Most of the store operator defendants will undoubtedly contend, even if and when judgment is entered against them, that they ceased using the name and phrase at some time in the past. Similar claims have already been made by most of the defendants in the Boyd Wagner case. This factor obviously further reduces the amounts of the claims and also affects their collectibility. In view of the foregoing factors, it is the opinion of trial counsel that the fair value of these claims is approximately $2,640. (c) Rights to moneys owed sellers by Boyd Wagner, Inc., in the amount of $1,605. This item is comparable to item (a) above. However, because it is an obligation of a private corporation rather than money resting in the registry of the court, the obvious risks and uncertainties reduce its value by an additional five per cent. Accordingly, it is the opinion of trial counsel that this item has a fair value of 75% of its face value. (d) Rights to moneys owed sellers by Ron Baker, of which $2,460.30 was the property of sellers. This claim represents Baker's royalty obligation for the year 1954. The *105 debtor experienced tax difficulties, was the subject of a deficiency assessment and was unable to pay these royalties. The debtor advised the sellers that he was unable to pay these obligations but that he would pay them as soon as he could. The obligation is over one year old. This claim has a fair value of 50% of its face value. (e) Rights to moneys owed sellers by reason of the operations of Joseph Florentine and Glen Vore and by reason of the operations of certain other store operators in Eastern New York during the winter of 1954-1955. The sellers have received no gallonage reports from Florentine and can only estimate the amount of the claim against him, which is probably about $600. He has refused to pay and is probably in no position to pay. The claim against Vore is also probably about $600, although no mix reports have been received from him. He has also refused to pay. The claim for operations during the winter of 1954-1955 arose because certain store operators continued to sell Dairy Queen during that winter without reporting these sales or paying royalties thereon. The sellers' claim arising from these operations would probably not exceed $100 or $150. All these claims *106 are considered to be substantially worthless. However, since they are listed as receivables transferred in the contract of sale, we have assigned them an aggregate value of $100. P.W.T The following is a statement of the face value and the fair market value on September 1, 1955, of the foregoing unrealized receivables involved in the September 1, 1955, Contract of Sale transferred by Medd Partnership to Lark: Face value
Fair market value
(a) Boyd Wagner law suit
$ 3,730.64
$2,984.51
(b) Smith and Conoway law suits
26,400.00
2,640.00
(c) Boyd Wagner operations
1,605.00
1,293.75
(d) Ron Baker operations
2,460.30
1,230.15
(e) Florentine and Vore operations
1,200.00
100.00
Total
$35,395.94
$8,248.41
The total amounts of the gallonage of Dairy Queen Mix delivered to operators in Ohio and New York under licenses from Medd Partnership were as follows for the indicated years: Year
Ohio
New York
1950
527,956
1951
772,484
1952
910,702
37,752 1/2
1953
1,062,668
72,563
1954
801,530
109,923
The following is a statement of the gross income of Medd Partnership for the indicated years from its Dairy Queen operations in *107 Ohio, income items collected for others, its operating expenses, and its net income: 1239 1952
1953
Gross income
Royalty
$123,733.42
$146,777.63
Franchise
10,722.40
2,622.35
Interest
Other
$134,455.82
238.00
Less: income items collected for
others
McCullough Dairy Queen
Ar-Tik Systems, Inc
36,881.50
43,776.32
Dairy Queen National Trade Association
5,616.62
15,787.07
Ohio Association
3,325.00
45,823.12
2,790.00
Balance
88,632.70
Less: operating expenses
Legal and accounting
1,427.10
1,102.15
Other than legal and ac- counting
5,905.52
7,332.62
13,565.13
Net income
$ 81,300.08
1954
Gross income
Royalty
$99,879.01
Franchise
706.50
Interest
100.00
Other
$149,637.98
269.29
$100,954.80
Less: income items collected for
others
McCullough Dairy Queen
Ar-Tik Systems, Inc
28,440.92
Dairy Queen National Trade Association
15,224.15
Ohio Association
62,353.39
1,600.00
45,265.07
Balance
87,284.59
55,689.73
Less: operating expenses
Legal and accounting
11,046.10
Other than legal and ac- counting
14,667.78
9,901.76
20,947.86
Net income
$ 72,616.81
$ 34,741.87
*108 The following is a statement of the gross income of Medd Partnership for the indicated years from its Dairy Queen operations in Eastern New York, income items collected for others, its operating expenses, and its net income: 1952
1953
Gross income
Royalty
$7,550.50
$14,602.70
Franchise
8,875.25
11,801.35
Interest
Other
$16,425.75
Less: income items collected for
others
McCullough Dairy Queen
7,353.23
11,804.74
Ar-Tik Systems, Inc
1,493.30
2,922.66
Dairy Queen National Trade Association
364.53
Ohio Association
8,846.53
Balance
7,579.22
Less: operating expenses
Legal and accounting
Other than legal and account- ing
660.43
660.43
637.90
Net income
$ 6,918.79
1954
Gross income
Royalty
$21,912.20
Franchise
12,581.30
Interest
Other
$26,404.05
$34,493.50
Less: income items collected for
others
McCullough Dairy Queen
15,049.19
Ar-Tik Systems, Inc
4,380.52
Dairy Queen National Trade Association
547.59
Ohio Association
15,091.93
19,977.30
Balance
11,312.12
14,516.20
Less: operating expenses
Legal and accounting
Other than legal and account- ing
637.90
937.98
937.98
Net income
$10,674.22
$13,578.22
*109 From May 18, 1954, to October 4, 1955, the Medd Partnership withheld payment of moneys collected on the Ar-Tik 4-cents level not only in Ohio but also in New York and Scott County, Iowa, which involved a retention during that period of $48,062.60. Of this sum, $42,813.40 related to Ohio. During the same period, the Medd Partnership withheld payments of the McCullough share of overrides and franchise payments collected in New York in the amount of $10,296.76. The foregoing amounts represented all of the moneys received by the Medd Partnership as to such interests in these areas for the operating periods from May 18, 1954, through September 1, 1955, except that payments to the Ar-Tik and McCullough interests for New York operations were made by the Medds in 1954 through the October 1954 operations' periods. At the time of the execution by the parties on October 4, 1955, of the September 1, 1955, Contract of Sale, the Medd Partnership paid to Lark the sum of $58,359.36, of which $48,062.60 represented 4-cents level delinquencies subsequent to May 18, 1954, and prior to September 1, 1955, in the following areas: in Ohio, $42,813.40; in Scott County, Iowa, $2,055.12; and in New York, *110 $3,194.08. The balance of the $58,359.36, or $10,296.76, represented sums due on the McCullough level overrides and franchise 1240 payments in New York. The funds in the Lark bank account were insufficient to meet the above-mentioned payments by Lark of $150,000 to Medd Partnership and the $39,503.83 paid to the partnership's attorneys without the deposit of the $58,359.36 received by Lark from the partnership. In addition to the sums it received on October 4, 1955, Lark, during the balance of 1955 and in 1956, collected accounts due on the 4-cents and McCullough levels arising from Dairy Queen operations in Ohio and New York prior to October 4, 1955, in the following amounts: 1955
Ohio
New York
4( level
$12,574.26
$ 398.20
McCullough level
1,294.15
1956
4( level
2,270.72
93.70
McCullough level
964.28
Total
$14,844.98
$2,750.33
Exclusive of the Wagner gallonage, during 1955 the Medd Partnership collected gross gallonage payments in Ohio of $81,294.59 on 639,272 1/2 gallons at the following gross rates: Gallons
Rate
Amount
209,040
8(
$16,763.17
430,232 1/2
15(
64,531.42
639,272 1/2
$81,294.59
During the *111 winter of 1955-1956, Lark renegotiated substantially all of the Ohio district operator contracts and approximately 110 of the underlying store contracts. In the new contracts, the royalty requirement of the district operators was pegged at 11 cents. In turn (except in isolated instances where subcontracts were involved), the store operator royalty was reduced to a uniform 29 cents per gallon. In addition, Lark committed itself to 3 cents for advertising out of the 11 cents in connection with these agreements. No 1956 gallonage payments were received or collected in Ohio by Lark in excess of a gross rate of 11 cents per gallon, even though several of the operators refused to sign new contracts. These payments were based on 559,807 gallons in 1956 compared to 1,062,668 in 1953, the last year prior to the Ohio litigation. The total decline of 502,861 gallons includes an amount of 278,632 gallons occasioned by the failure of two major district operators (Pelton and Dickinson) to make any payments in 1956. The gallonages of Dairy Queen mix delivered to operators in the Medd New York area during the years 1952 through 1956 were as follows: 1952
37,752 1/2
1953
73,000
1954
110,000
1955
89,807
1956
20,996
*112 In 1956 the only collections in the New York area were with respect to 7,417 gallons of mix as to which a total of $508.66 was received on the Medd level on account of 1955 operations. Neither the $40,000 franchise payment by the Medd Partnership in Ohio nor the various other sums spent by it in the development, maintenance, and promotion of the Dairy Queen business in that state were capitalized. Respondent determined that during the years 1955 and 1956, Lark received the following amounts, which constituted nontaxable receipts on receivables acquired from the Medd Partnership: 1955
$6,729.91
1956
1,518.50
$8,248.41
From the ownership by Medd Partnership of its businesses and properties which it sold to Lark under the September 1, 1955, Contract of Sale, and from the operation of such businesses and properties during the period September 1, 1955, to October 4, 1955, there accrued to the partnership during the foregoing period, receivables in the amount of $6,472.69, which the partnership by the Contract of Sale transferred to Lark on October 4, 1955. Between October 4, 1955, and the end of 1955, Lark received payment of the receivables. In its partnership *113 return of income for 1955, Medd Partnership reported as ordinary income $8,248.41, representing the fair market value on September 1, 1955, of the unrealized receivables which were involved in the September 1, 1955, Contract of Sale and sold by the partnership to Lark. The partnership's action was taken on the theory that the $8,248.41 was received in exchange for unrealized receivables and that the remainder, $189,503.83, composed of Lark's lump sum payment of $150,000 to the partnership and Lark's payments totaling $39,503.83 of the obligations owing by the partnership to its attorneys for their unpaid legal services and expenses, was received in payment of the partnership's business interests and properties in Ohio and 1241 Eastern New York, including the Dairy Queen trade name and trademark, the trade phrase, franchise agreements, the goodwill established in connection therewith and attributable thereto, and certain shares in National Dairy Queen Development Co. Accordingly, Medd Partnership, in its 1955 partnership return of income, treated the transaction effected under the September 1, 1955, Contract of Sale as a sale or exchange of capital assets held for more than 6 months *114 and reported a long-term capital gain thereon of $180,655.42, computed as follows: Gross
$189,503.83
sales
price
Cost or
8,848.41
other
basis
Long-term
$180,655.42
capital
gain
In determining the deficiencies of petitioners Medd involved herein for 1955, the respondent determined that the gain realized by Medd Partnership on the transaction was ordinary income and not long-term capital gain; that the sale price was $150,000; that the basis of the property rights transferred was $8,848.41, composed of unrealized receivables, $8,248.41, and shares in National Dairy Queen Development Co., $600; that the gain realized was $141,151.59, and that of the latter amount, $140,431.59 constituted ordinary income and was taxable as such. Medd Partnership in its partnership return of income for 1955 took a deduction of $44,033.50 for professional expenses of which $39,503.83 represented the amount of the partnership's unpaid obligations owing by the partnership to its attorneys for legal services and expenses as mentioned above and which were paid by Lark pursuant to the September 1, 1955, Contract of Sale. The respondent determined that the $39,503.83 was not paid by *115 or on behalf of Medd Partnership and accordingly disallowed the deduction of $44,033.50 to the extent of $39,503.83. With respect to the $150,000 paid by it to Medd Partnership pursuant to the September 1, 1955, Contract of Sale, Lark, in accordance with a series of circuitous entries in its books, took in its income tax return for 1955 in reduction of its gross income for that year, the entire amount of the $150,000, comprised of the following: An offset against income for 1955 from 2(
$24,498.53
East derived from Ohio and Eastern New York,
net of dues
An offset against income for 1955 derived
$19,105.19
$ 43,603.72
from Ohio and Eastern New York other than 2(
East
As cost of goods sold
106,396.28
Total
$150,000.00
In determining the deficiency against Lark for 1955, the respondent determined that the above-mentioned payment of $150,000 made by Lark to Medd Partnership constituted a nondeductible capital expenditure. He also determined that the amount of $150,000 was to be reduced by an amount of $6,729.91 paid by Lark for receivables of Medd Partnership which were collected by Lark in 1955 and he accordingly increased Lark's taxable income for *116 1955 by the remainder, $143,270.09. Respecting the unpaid legal fees and expenses of the attorneys for Medd Partnership, totaling $39,503.83, which were paid by Lark pursuant to the September 1, 1955, Contract of Sale, the respondent determined that they constituted a nondeductible capital expenditure to Lark and accordingly increased Lark's taxable income for 1955 for such amount. Ultimate Findings Prior to September 1, 1955, Medd Partnership was the owner of and had the exclusive right to use the trademark and trade name Dairy Queen, the trade phrase "The Cone with the Curl on Top," and the distinctive cone-curl configuration in Ohio and Eastern New York, in connection with the promotion, sale, and merchandising of the frozen ice milk product. Those were property rights of the partnership and had substantial value. The franchise agreements under which Medd Partnership granted to district operators the right to use the trademark and trade name Dairy Queen and trade phrase "The Cone with the Curl on Top" within certain geographical areas in Ohio and Eastern New York, in connection with the merchandising, promotion, and sale of the frozen ice milk product, had substantial value *117 as property rights. The September 1, 1955, Contract of Sale, under which Medd Partnership sold and assigned to Lark all of its right, title, and interest in Ohio and Eastern New York, including the trademark and trade name Dairy Queen, the trade phase "The Cone with the Curl on Top," the distinctive conecurl configuration, and the licenses and franchise agreements with third parties, together with the goodwill attributable thereto, for use in connection with the 1242 merchandising, promotion and sale of ice milk, transferred to Lark a going business in those areas and an established trade phrase which had substantial value as property rights. The amount paid by Lark for those valuable property rights in Ohio and Eastern New York constituted an unamortizable capital expenditure by Lark, except for the amount attributable to the fair market value of the unrealized receivables acquired by Lark from the Medds under the September 1, 1955, Contract of Sale. Opinion Petitioners Medd Issues 1 and 2 With respect to the transaction effected pursuant to the September 1, 1955, Contract of Sale, the respondent has determined (1) that the gain realized therefrom by Medd Partnership *118 in 1955 was ordinary income and not long-term capital gain, that the sale price was $150,000, that the basis of the property rights transferred was $8,848.41, that the gain realized from the sale was $141,151.59, and that of the latter amount, $140,431.59 constituted ordinary income and was taxable as such; and (2) that the $39,503.83 representing the amount of Medd Partnership's unpaid obligations owing by it to its attorneys for legal services and expenses which were paid by Lark were not paid by or on behalf of the partnership and accordingly were not deductible by the partnership. Petitioners Medd take the position (1) that the transaction effected pursuant to the Contract of Sale constituted a sale of long-term capital assets, that such assets were of substantial value, that the consideration paid by Lark for such assets was $189,503.83, representing the $150,000 paid by Lark directly to the Medd Partnership and the $39,503.83 paid by Lark to the partnership's attorneys, and that the value of the accrued receivables involved was fairly estimated; (2) that the obligation for the payment by Medd Partnership to its attorneys for legal services and expenses Partnership to its attorneys *119 for legal services and expenses was solely that of the partnership and was properly deducted as a professional expense; and (3) that we should conclude that the partnership correctly reported in its partnership return of income for 1955 a long-term capital gain of $180,655.42 from its sale to Lark of its long-term capital assets and properly deducted from ordinary income, its attorneys' fees and expenses which were paid by Lark. At this point we observe that respondent states on brief that on the basis of his consideration of the record presented, he now takes the position herein that the transaction effected pursuant to the September 1, 1955, Contract of Sale constituted a sale by Medd Partnership of capital assets for $150,000, that the gain from the sale was $141,151.59, and that such gain was taxable as long-term capital gain. In taking the foregoing position, the respondent recognizes that he here takes a position that is opposite to the position taken by Lark herein with respect to the transaction, which the respondent considers to be contrary to the substantive facts of record. The respondent further recognizes that the position he now takes is diametrically opposite to the *120 statements contained in the separate notices of deficiency issued to petitioners Medd and points out that the prior position was taken for the purpose of protecting the Government revenue. The above-stated present position of respondent respecting the transaction in question constituting a sale of capital assets and the portion, $141,151.59, of the sales price thereof which was taxable as long-term capital gain, removes those questions from controversy between the respondent and the petitioners Medd. However, there remains in controversy the question as to whether the amount of $39,503.83, representing the amount of Medd Partnership's unpaid obligations owing by it to its attorneys for their services and expenses which were paid by Lark pursuant to the September 1, 1955, Contract of Sale, constituted a portion of the sales price as was reported by Medd Partnership in its partnership return of income for 1955. As to this question, the respondent states on brief that he remains neutral as between the Medd Partnership's inclusion of the $39,503.83 as part of the sales price and its deduction of that amount as professional expenses, on the one hand, and the deduction taken by Lark of *121 the $39,503.83 as business expenses on the other hand. The September 1, 1955, Contract of Sale contains the following provisions with respect to Lark's payment of the $39,503.89 here in controversy: That in further consideration of the aforesaid Contract of Sale, Buyer [Lark] 1243 hereby agrees that the aforesaid partnership, Dairy Queen Stores of Ohio [Medd Partnership] is obligated to pay the legal fees, costs and disbursements of the firm of Johnston, Thompson, Raymond and Mayer, of Chicago, Illinois, and the firm of Fuller, Harrington, Seney and Henry, of Toledo, Ohio, for services rendered in connection with the prosecution of certain litigation in the State of Ohio in the Federal District Courts thereof, not to exceed [$]39,503.83, on the effective date of this Contract of Sale, and the Buyer represents that said sum shall be paid from the assets acquired under this Contract, and guarantees that said sum shall be paid. The record discloses that the above-mentioned provision of the Contract of Sale was inserted in the contract at the instance of Murchie, the sole stockholder of Lark, and was acquiesced in by Medd Partnership. From a consideration of the above-quoted *122 provision of the Contract of Sale in connection with the record relating thereto, we think it is apparent that a purpose of the provision, as indicated on its face, was to provide that payment of $39,503.83 was a "further consideration" of the contract and in addition to other considerations mentioned in the contract. Another purpose was to fix the amount of Medd Partnership's indebtedness that was to be paid and to set forth Lark's guarantee that payment of $39,503.83 would be made. As shown by our findings, supra, Lark, on October 4, 1955, issued its checks to the respective firms of Medd Partnership's attorneys in payment of the amounts due and owing each of the firms. The voucher attached to Lark's check issued to Medd Partnership in payment of the $150,000 to the partnership was keyed to the September 1, 1955, Contract of Sale to Lark of the businesses and properties of the partnership in Ohio and Eastern New York. Likewise the vouchers attached to the checks issued by Lark to the respective law firms in payment for their services and expenses rendered to Medd Partnership were keyed to the September 1, 1955, Contract of Sale. Further, the checks issued by Lark to Medd Partnership *123 and to the partnership's attorneys were signed by Murchie in behalf of Lark. Such being the situation and since Murchie was the sole stockholder of Lark, a participant in the formation of the September 1, 1955, Contract of Sale, and was an experienced businessman as well as a certified public accountant, it would appear that Lark, acting through Murchie, at the time of the payments to the law firms, regarded and treated such payments as for a like purpose as the payment of $150,000 to Medd Partnership, namely, in payment for the businesses and for the properties acquired from the partnership under the contract. In view of the manner in which Lark, at the time of payments, regarded and treated its payments to the law firms totaling the $39,503.83 in controversy, and since Medd Partnership has accorded the $39,503.83 a like regard and treatment in its partnership return of income for 1955 by the inclusion of that amount in the sales price of the businesses and properties, and since our consideration of the record relating thereto does not convince us that other and different treatment was the intention of the parties at the time of the payments, we think it fair and reasonable to conclude *124 that the partnership in its return of income correctly included the $39,503.83 as part of the sales price of its properties. Accordingly, we hold for petitioners Medd on this issue. The words "sale" or "exchange" as used in the Internal Revenue Code must be given their ordinary meanings. Helvering v. Flaccus Leather Co, 313 U.S. 247 (1941); Gaius G. Gannon [Dec. 18,304], 16 T.C. 1134 (1935). "A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." Iowa v. McFarland, 110 U.S. 471, 478 (1884); Betty Rogers, 37 B.T.A. 897 (1938), affd. 103 F. 2d 790 (C.A. 9, 1939), certiorari denied 308 U.S. 580 (1939). Here Medd Partnership transferred its businesses and properties involved herein to Lark for a total price of $189,503.83 of which $150,000 was paid directly by Lark to the partnership, and $39,503.83, pursuant to the agreement of the partnership and Lark, was paid by Lark for the benefit of the partnership by payment of the partnership's obligations to its attorneys. Consequently, we conclude that the transaction between the partnership and Lark *125 constituted a sale of the businesses and properties involved. Respecting the respondent's disallowance of the deduction of $39,503.83 for professional expenses taken by Medd Partnership in its partnership return of income for 1955 with respect to the services and expenses of the two law firms rendered in connection with the partnership's suits in the Wagner, Smith, and Conoway litigation, petitioners Medd in their petitions assigned the following error: "The Commissioner erred in determining that certain legal fees were not paid on behalf of the partnership and were, therefore, not deductible on the partnership 1244 return of income for 1955." In their allegations of fact in their petitions, the petitioners Medd alleged that the sales price of the assets of Medd Partnership was $189,503.83, that Lark made payment of that price by paying $150,000 directly to Medd Partnership and by paying the remainder, $39,503.83, to the partnership's attorneys for their services and expenses, and that accordingly the latter amount constituted an allowable deduction to the partnership as a business expense. Both the assignment of error and the allegation of facts were denied by respondent in *126 his answer. As a result of our holdings, supra, as to the sales price of the partnership's businesses and properties and Lark's payments of the sales price, the remaining question for decision is the deductibility as a business expense by the partnership of the $39,503.83 paid to its attorneys. As we understand the position of petitioners Medd on brief, they contend that since the $39,503.83 was part of the sales price of the partnership assets, it therefore follows that such amount was deductible as a business expense from the partnership's ordinary income for 1955. The purpose of the capital gains provisions of the Code is to relieve taxpayers from the excessive tax burdens on gains resulting from a conversion of capital investments and to remove the deterrent effect of those burdens on such conversions. The capital gains provisions, therefore, provide an exception to the normal tax requirements of the Code. Consequently, such provisions are to be narrowly applied and exclusions therefrom broadly interpreted so as to exclude from their operation situations not coming clearly therein in order to protect the revenue from artful devices. Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958); *127 Corn Products Co. v. Commissioner, 350 U.S. 46 (1955). It is now well established that deductions are a matter of legislative grace and that one who seeks a deduction must be able to point to a statute which provides for the allowance of the deduction and show that he comes within the terms of that statute. New Colonial Co. v. Helvering, 292 U.S. 435 (1934), affirming 24 B.T.A. 886 (1931); Deputy v. du Pont, 308 U.S. 488 (1940); Interstate Transit Lines v. Commissioner, 319 U.S. 590 (1943); McDonald v. Commissioner, 323 U.S. 57 (1944), affirming 1 T.C. 738 (1943); Hart v. Commissioner, 338 F. 2d 410 (C.A. 2, 1964), affirming 41 T.C. 131 (1963). Petitioners Medd do not point us to any statute which they contend provides, in the situation presented, for the allowance of the $39,503.83 as a deduction for a business expense by Medd Partnership. In general, the deductibility of legal expense depends upon the purpose for which the expense was incurred. Lykes v. United States, 343 U.S. 118 (1952). The $39,503.83 in issue was a debt incurred by Medd Partnership *128 for legal fees and expenses of two law firms which the partnership employed in its litigation involved in the Wagner, Smith, and Conoway cases. Turning to the purpose of the litigation involved in the foregoing cases, our findings show that in the action instituted by Medd Partnership in the Wagner case, the partnership sought to prevent the use by the defendants, in the absence of consent of the partnership, of the trade name Dairy Queen and the trade phrase "The Cone with the Curl on Top" in the vending of soft frozen ice milk, and from representing to the public that they were part of the Dairy Queen organization in Ohio and elsewhere vending Dairy Queen ice milk. The primary basis of and the theory of the complaint were that the Medds were the owners of the exclusive right of the use in the State of Ohio of the trade name and trade phrase and that the use of this name and phrase by the defendants was common-law unfair competition and that the defendants were using the property of the Medds without permission therefor. The defendants' primary basis of and the theory of defense were that the trade name and trade phrase were so coupled with the freezers manufactured under the Oltz *129 patent that the right to the exclusive use of the trade name and trade phrase expired with the patent. In view of the foregoing stuation, coupled with other of our Findings as to the matter, we think it apparent that the primary purpose of the action brought by Medd Partnership was to obtain a judicial determination as to its ownership of and property rights in the trade name and trade phrase in the State of Ohio, and that such action was basically and primarily an action by the partnership to defend or perfect its title or property rights in the trade name and the trade phrase. 1245 Shortly after Medd Partnership instituted its action in the Wagner case, it instituted actions in the Smith and Conoway cases which also involved defense of or perfection of the partnership's title or property rights in the trade name and the trade phrase. In Food Fair of Virginia, Inc., 14 T.C. 1089 (1950), it was held that a suit instituted by the taxpayer against a competitor for the primary purpose of obtaining a judicial determination as to ownership of and property rights in a trade name which the taxpayer alleged it had established and had the exclusive right to use in the *130 State of Virginia was basically and primarily a suit to defend or perfect the taxpayer's title or property right in the trade name and that in substance a fee paid by the taxpayer to an attorney who represented it in a suit was a cost of defending or perfecting title to property and as such was not allowable as a deduction for a business expense. The Court further held that the fact that the suit was disposed of by agreement of the parties did not alter the Court's holding. In reaching its holding, the Court relied on the following cases: Morgan Jones Estate, 43 B.T.A. 691 (1941), affd., 127 F. 2d 231 (C.A. 5, 1942); Central Material & Supply Co., 44 B.T.A 282 (1941), affd. on this point, 126 F. 2d 542 (C.A. 10, 1942); and Louisiana Land & Exploration Co., 7 T.C. 507 (1946), affd. 161 F. 2d 842 (C.A. 5, 1947). In the cases there relied on by the Court, not only was it held that expenditures incurred in defending or perfecting title to property were not deductible as business expenses, but it also was held that such expenditures were capital in nature. In our opinion the holdings in the Food Fair of Virginia, *131 Inc., case, supra, and the cases there relied on are applicable here. Accordingly, we conclude and hold that the attorneys' fees and expenses of $39,503.83 here in controversy were not deductible by Medd Partnership as a business expense but were capital expenditures and as such were to be applied as an offset against the sales price of the property sold by the partnership to Lark in computing the amount of the partnership's long-term capital gain on the sale. The respondent's disallowance of the deduction of the $39,503.83 as a business expense is sustained. Opinion Lark Sales Company Issues 1 and 2 In pursuance of the September 1, 1955, Contract of Sale, Lark on October 4, 1955, made payment by check of a lump sum amount of $150,000 to Medd Partnership. The check was signed on behalf of Lark by Murchie, Lark's sole stockholder, and the voucher attached to the check contains the following explanation: "9-1-55 Contract of sale of Businesses Ohio & E.N.Y. $150,000.00." Although the contract involved the sale to Lark by Medd Partnership of its businesses and properties stated in the contract and as set out in our findings, Lark, in accordance with a series of roundabout entries *132 made in its books, took in its income tax return for 1955 as a reduction of its gross income for that year, the entire amount of the $150,000 comprised of the following: An offset against income for 1955 from 2(
$24,498.53
East derived from Ohio and Eastern New York,
net of dues
An offset against income for 1955 derived
19,105.19
$ 43,603.72
from Ohio and Eastern New York other than 2(
East
Cost of goods sold
106,396.28
150,000.00
In determining the deficiency against Lark for 1955, the respondent determined that the payment of $150,000 made by Lark to Medd Partnership constituted a nondeductible capital expenditure; that the amount of $150,000 was to be reduced by $6,729.91, representing a receivable acquired by Lark from Medd Partnership which was collected by Lark in 1955; and that accordingly Lark's taxable income for 1955 was to be increased by the remainder, $143,270.09. The September 1, 1955, Contract of Sale is a comprehensive instrument which shows that in making the sale to Lark, Medd Partnership sold its going businesses in Ohio and Eastern New York, including various items of property then employed in the conduct of those businesses. *133 Lark's position, as we understand it, is that by the Contract of Sale the parties thereto were attempting to resolve all of their controversies and differences by an instrument which in its nature was a "sweeping assignment." From our consideration of the contract against the background of the portion of the record relating thereto in connection 1246 with the contentions of the parties herein, we have found as a fact that the formulation and execution of the contract was the culmination of an arm's length transaction which was entered into by the parties thereto following various controversies, conferences, and negotiations between them or their representatives who were conversant with the subject matter and terms of the contract and its objective to place in Lark the ownership of the businesses and properties transferred by Medd Partnership. Lark, having thus acquired ownership of such businesses and properties involved in the Contract of Sale, urges that it is not unusual for a legal draftsman to employ inartful or inappropriate phrases in characterizing a relatively simple transaction, and states as its primary position herein, that its transaction with Medd Partnership did *134 not involve the acquisition by Lark of any capital asset, but if any was acquired, the value thereof was so nominal as to be merely incidental. With respect to the lump-sum amount of $150,000 it paid to Medd Partnership, Lark takes the position that $14,631.10 thereof was allocable to receivables acquired by it from Medd Partnership under the Contract of Sale. As to the $135,368.90, the remainder of the $150,000, Lark contends that the amount constituted a proper deduction from its gross income for 1955 for the reason that payments totaling the latter amount were made in whole or in part for one or all of the following purposes: (1) to obtain the relinquishment of a contractual interest which threatened the existing Dairy Queen interests of those parties for whom Lark acted; (2) to effect the elimination of a burdensome or onerous contract to pay Medd Partnership 34 cents per gallon in the future; and (3) for the collection of several delinquent gallonage accounts as well as to insure collection of such accounts in the future. Lark takes the position on brief that under the September 1, 1955, Contract of Sale it acquired from Medd Partnership two groups of receivables: (1) the *135 five items of receivables listed and set forth in the Contract of Sale discussed in Philip Tone's memorandum dated October 26, 1955, as shown in our Findings, and as to which we have found a fair market value of $8,248.41 on September 1, 1955; and (2) numerous items of receivables, which Lark contends were in the total amount of $6,472.69 and accrued to Medd Partnership between September 1, 1955, the effective date of the Contract of Sale, and October 4, 1955, the date of the execution of the contract, were collected by Lark between October 4, 1955, and the end of 1955, and were income to Medd Partnership for the foregoing period. The above-mentioned receivables in the amounts of $8,248.41 and $6,472.69 are relied on by Lark in support of its position that $14,631.10 of the $150,000 paid by it to Medd Partnership was allocable to receivables and the remainder of $135,368.90 constitutes a proper deduction from its (Lark's) gross income for 1955. Respecting the above-mentioned amount of $8,248.41, we have found that the respondent determined that during 1955 and 1956 Lark received the following amounts which constitute nontaxable receipts from receivables acquired from Medd Partnership: *136 1955
$6,729.91
1956
1,518.50
Total
8,248.41
From the foregoing, it is apparent that Lark here seeks to enlarge by $1,518.50 the amount of its nontaxable receipts of $6,729.91 for 1955, as determined by respondent. Since Lark has not shown error in respondent's determination of the latter amount for 1955, the respondent's action is sustained. With respect to receivables in the amount of $6,472.69, we have found as facts that from the ownership of Medd Partnership of its businesses and properties which it sold to Lark and from the operation of such businesses and properties during the period September 1, 1955, to October 4, 1955, there accrued to the partnership during the foregoing period, receivables in the amount of $6,472.69 which the partnership transferred to Lark on October 4, 1955, and that between October 4, 1955, and the end of 1955, Lark received payment of the receivables. The rule with respect to the accrual of income was stated by the Supreme Court in Spring City Co. v. Commissioner, 292 U.S. 182 (1934), as follows: Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is *137 the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues. * * * In view of the rule as to the accrual of income enunciated above and the 1247 applications made of that rule in Hulburt v. Commissioner, 227 F. 2d 399 (C.A. 7, 1955), affirming a Memorandum Opinion of this Court, filed October 30, 1953, and in 2 Lexington Avenue Corp., 26 T.C. 816 (1956), we are of the opinion that on the record presented our above-stated Findings are correct and proper. Consequently, we hold that since the receivables in question accrued to Medd Partnership in 1955, they were income to it for that year and not to Lark. Further, we hold that upon the transfer of the receivables to Lark and Lark's receipt of payment thereof in 1955, the amount of such payment, $6,472.69, constituted nontaxable receipts in the hands of Lark and is to be treated as such in computing the portion of the lump-sum payment of $150,000 made by Lark to Medd Partnership that was allocable to the receivables. After giving effect herein to the above holdings, the portion of the lump-sum *138 payment of $150,000 that remains is $136,797.40 and not $135,368.90 as contended by Lark. Under the tenor of Lark's position, the question posed is whether such remainder, $136,797.40, constituted a proper deduction from Lark's gross income for 1955 for the reason that payments totaling that amount were made in whole or in part for one or all of the above three stated purposes of Lark. The first of such stated purposes was to obtain the relinquishment of a contractual interest (the interest of Medd Partnership in the Dairy Queen businesses in Ohio and the eastern part of New York State) which threatened the existing Dairy Queen interests of those parties for whom Lark acted (which are stated in Lark's brief as the national interests). [2]
From our consideration of the record bearing on the foregoing *139 stated purpose, we are unable to find that the continued ownership and operation by Medd Partnership of the businesses and properties which it sold to Lark would have been detrimental or injurious to the national interests or otherwise would have constituted a threat to such interests. Nor does the record show that there was any program, practice, or desire on the part of the national interests which contemplated the elimination from the Dairy Queen business of Medd Partnership or any other state operator. The record shows that the sale by Medd Partnership of its businesses and properties to Lark emanated solely from the desire of the partnership to get out of the Dairy Queen business in Ohio and the eastern part of New York State. Being unable to find a factual basis to support Lark's position as to the instant purpose, we hold that no portion of $136,797.40 here involved was attributable to such purpose. The second of the stated purposes was to effect the elimination of a burdensome or onerous contract to pay Medd Partnership 3 cents per gallon in the future. That stated purpose relates to the executory agreement entered into on October 30, 1954, by Medd Partnership with McCulloughs *140 Dairy Queen, Inc., and Lark for the sale by the partnership of its entire Dairy Queen business in the State of Ohio to McCulloughs Dairy Queen, Inc., in consideration for which Lark was to pay the partnership 3 cents per gallon for all mix used in the State of Ohio in the manufacture of the Dairy Queen product from and after the date of transfer by Medd Partnership of its business in the State of Ohio. Because of differences which arose between the Medd Partnership, on the one hand, and Lark on the other, and the fact that the September 1, 1955, Contract of Sale involved not only the business of the partnership in Ohio, but also its business in the eastern part of New York State, the October 30, 1954, agreement was never consummated by the parties. Since the October 30, 1954, agreement was never consummated by the parties, and since the September 1, 1955, Contract of Sale did not contain any provision requiring Lark to make any payment to Meed Partnership of 3 cents per gallon for mix used in the State of Ohio, we are unable to find that there was any contract pursuant to which Lark was required to make payment of the 3 cents per gallon of mix. Such being the situation, we are unable *141 to find that the $136,797.40 here involved, or any part thereof, was to effect the elimination of a burdensome or onerous contract. Consequently, Lark is not sustained as to the above-considered purpose and no portion of the $136,797.40 here involved is attributable thereto. The remaining stated purpose was for the collection of some delinquent gallonage 1248 accounts as well as to insure collection of such accounts in the future. As was pointed out above, Lark, in accordance with entries in its books, took in its income tax return for 1955 in reduction of its gross income for that year, the entire amount of the $150,000 paid to Medd Partnership comprised of the following: (1) $24,498.53, representing an offset against income for 1955 from 2( East derived from Ohio and Eastern New York, net of dues, (2) $19,105.19, representing an offset against income for 1955 derived from Ohio and Eastern New York other than 2( East, and (3) $106,396.28, representing the cost of goods sold. In view of Lark's treatment in its books and in its income tax return for 1955 of the $150,000 it paid to Medd Partnership, it is not apparent how it can be found that the $136,797.40, here involved, or *142 any part thereof was expended for the purpose of collecting some delinquent gallonage accounts and insuring collection of such accounts in the future as Lark here contends. Since Lark does not here attempt to reconcile its treatment of the $150,000 in its books and income tax return for 1955 with its contention here as to the $136,797.40, which comprises by far the greater portion thereof, and since we are unable to make such reconciliation, we conclude that Lark has not sustained its burden as to the instant purpose and that no part of the $136,797.40 is attributable thereto. Lark, in taking the position that its transaction with Medd Partnership did not involve the acquisition by Lark of any capital asset, but if any was acquired, the value thereof was of such a nominal amount as to be merely incidental, obviously ignores the fact that basically the September 1, 1955, Contract of Sale was for the sale to Lark by Medd Partnership of the latter's entire going Dairy Queen business in Ohio and its entire going Dairy Queen business in Eastern New York. Such sale included the trade name Dairy Queen Stores of Ohio and the trade name Dairy Queen Stores of Eastern New York, together with *143 the good will in connection therewith. The sale further included all the partnership's rights under licenses and franchise agreements to and with third parties and with Lark or Lark's assignors, and all of the partnership's right, title, interest, and ownership in and to the trademark and trade name Dairy Queen, and the trade phrase "The Cone with the Curl on Top" and the distinctive cone-curl configuration identified with the Dairy Queen product and store operation in the State of Ohio and in the State of New York as used on and in association with the sale of a frozen dairy product by the partnership and its licensees, together with the goodwill of said businesses in connection with which the trademark and the trade name Dairy Queen, the trade phrase "The Cone with the Curl on Top," and the distinctive cone-curl configuration were used, together with all assets of every kind and nature of the partnership's businesses, exclusive, however, of all automobiles, trucks, equipment, office furniture and fixtures, and cash not required by the September 1, 1955, Contract of Sale to be paid to Lark. Since there is no showing or contention herein that any of the foregoing enumerated properties *144 acquired by Lark had any fixed or determinable life in the hands of either Medd Partnership or Lark, and since Lark continued the use of the properties in its business following their acquisition by it, we are unable to find, as Lark contends, that it did not acquire any capital assets in its transaction with Medd Partnership. See Rose Marie Reid, 26 T.C. 622 (1956) and cases there cited. In taking the position that if it acquired any capital asset in its transaction with Medd Partnership, the value thereof was of such a nominal amount as to be merely incidental, Lark fails to accord recognition to the fact that the September 1, 1955, Contract of Sale was an arm's length transaction entered into between it and Medd Partnership and that they were conversant with the subject matter and terms of the contract and its objective to place in Lark the ownership of the businesses and properties transferred by the partnership to Lark. Since it does not appear that either Lark or Medd Partnership was under compulsion to enter into the contract, it would appear that the consideration paid by Lark thereunder approximated the fair market value of the businesses, properties, and rights *145 acquired by Lark from the partnership. From our consideration of the record as a whole bearing on the question of value, we are unable to find that such fair market value was substantially different from the consideration paid by Lark. Consequently, we are unable to sustain Lark's contention that the value of any capital asset acquired by it in its transaction with the partnership was of such a nominal value as to be merely incidental. In connection with the 1249 foregoing, we observe that in accordance with entries in its books, Lark in its income tax return for 1955 applied $19,105.19 of the $150,000 it paid Medd Partnership as an offset against its income for 1955 derived from Ohio and Eastern New York other than 2( East, thereby showing that its net income for the period October 4, 1955, to the end of 1955, derived from the businesses and properties acquired from the partnership was $19,105.19. Such an amount of income for the approximate 3-months' period would be the equivalent of a rate of approximately 14 percent on the $136,797.40 ($150,000 less receivables of $13,202.60) for an entire year. Such rate of return scarcely would support a conclusion that the businesses and *146 properties here involved had only a nominal value. Lark contends that the amount of $39,503.83 it paid to the attorneys for Medd Partnership for the fees and expenses of the attorneys for services rendered by them to the partnership in the partnership's litigation involved in the Wagner, Smith, and Conoway cases was properly deductible as a business expense from its (Lark's) gross income for 1955. In support of its contention, Lark urges that in September 1954 it entered into a firm commitment for the payment of all of the legal fees and expenses owing or to become owing by Medd Partnership in connection with the litigation involved in the above-mentioned cases, that its liability arising from such commitment was undertaken by it on behalf of the national interests and was in the nature of store services similar to those forms of assistance rendered to other holders of franchises throughout the country. Lark further urges that the September 1, 1955, Contract of Sale establishes that its payment of the legal fees and expenses required of it in that contract effected a reimbursement to Medd Partnership in satisfaction of Lark's commitment made in September 1954 and that such commitment *147 was separate and distinct from and not part of the consideration that Lark may have paid to the partnership for assets. The respondent has taken a neutral position as to this issue. From our consideration of the conflicting record bearing on the point, we are unable to find that at any time prior to the execution on October 4, 1955, of the September 1, 1955, Contract of Sale, Lark made any firm commitment for the payment of all or any portion of Medd Partnership's legal fees and expenses involved in the partnership's litigation in the Wagner, Smith, and Conoway cases. In this connection, we observe that the Contract of Sale did not contain any reference to a prior commitment of Lark for the payment of any of the partnership's legal fees and expenses involved in the litigation. The Contract of Sale merely contains a recital of a stated amount of such legal fees and expenses and a further recital of Lark's guarantee of the payment thereof. Payment was made of the amount by Lark on October 4, 1955, to the parties to whom such amount was owing. As a consequence, we are without a basis for concluding that Lark's payment of fees effected a reimbursement to Medd Partnership in satisfaction *148 of Lark's prior commitment to the partnership or to the national interests, or that such payment was separate and distinct from and not part of any consideration that Lark may have paid to the partnership for assets. In our Opinion in the cases of petitioners Medd, supra, we have held that the $39,503.83 here in issue constitutes part of the sales price of Medd Partnership's businesses and properties which it sold to Lark. For the reasons stated in that Opinion, we think our holding there is applicable here and accordingly hold adversely to Lark here. In our Opinion in the cases of petitioners Medd, supra, we held that since the legal fees and expenses in the amount of $39,503.83, which are also involved here, were for the services of the attorneys in defending or protecting the title of the properties of Medd Partnership, they were capital expenditures and were not deductible by the partnership as a business expense. In our view, our holding there is applicable to Lark's contention here that the $39,503.83 was deductible by it as a business expense. The fact that the $39,503.83 of legal fees and expenses were incurred by Medd Partnership but paid by Lark *149 does not alter the fact that they were incurred for the purpose of defending or perfecting title to property which Lark was purchasing, were a part of the consideration for such property, and as such were capital expenditures and not ordinary and necessary deductible business expenses. In view of the foregoing, we sustain the respondent's determination that the $39,503.83 constituted a nondeductible capital expenditure to Lark. Our Findings of Fact and Opinion as to other issues in the case of Lark Sales Company follow. 1250 Issue 3. Whether during 1956, 1957, and 1958 Lark, the petitioner, was the owner of the property interest of "2( East" and thereby realized taxable income from Dairy Queen royalties in the amounts of $53,795.04, $62,079.19, and $44,938.09 during the respective years Findings of Fact Some of the facts have been stipulated and are found accordingly. In the interest of clarity, we reiterate certain background facts heretofore found. On or about May 18, 1937, Harry M. Oltz became the owner of United States patent No. 2080971, sometimes referred to as the Oltz patent. That patent was on a machine, sometimes hereinafter referred to as a freezer, which *150 was designed to produce a soft frozen product from milk with sweetener, stabilizer, and flavor added. That product has become known as soft ice cream or ice milk. The Oltz patent expired May 18, 1954. On or about July 31, 1939, Oltz entered into an agreement, hereinafter referred to as the Western Agreement, with H. A. McCullough, pursuant to which, among other things, the latter acquired the exclusive license to use, manufacture, and sell the freezers in the following States: Minnesota, Wisconsin, Illinois, Missouri, Iowa, Arkansas, Louisiana, Texas, Oklahoma, Kansas, Nebraska, North Dakota, South Dakota, Montana, Wyoming, Colorado, New Mexico, Arizona, Utah, Idaho, Washington, Oregon, Nevada, and California. The parties to the Western Agreement contemplated that McCullough would initiate a business in which the freezers manufactured by him would be placed into operation either in his ice cream stores or in stores operated by other retailers on a lease basis. The Western Agreement provided, in part material herein, that McCullough was to furnish the mix to make the product and to pay Oltz a certain royalty until the expiration of the Oltz patent. At that time, the manufacturing *151 rights of McCullough were to end but he was to be allowed to retain his freezers and operate them indefinitely within the allotted territory, provided he continued to pay to Oltz the usual royalty. If for any reason the agreement was terminated at any time, it was agreed that McCullough could keep his freezers and operate them any place within his territory provided he continued to pay to Oltz the regular or usual royalty. Moreover, it was agreed that the heirs of McCullough and Oltz were to be bound to all of the conditions of the agreement and to inherit its rewards. On or about June 11, 1940, Oltz assigned, transferred, and set over to Ar-Tik Systems, Inc., an Indiana Corporation, sometimes hereinafter referred to as Ar-Tik, all his right, title, and interest in the Oltz patent together with all his rights under the Western Agreement. At all times here material, a majority of the capital stock of Ar-Tik was owned by Oltz and members of his family. Events thrust themselves upon McCullough and forced a direction to the business so instituted, wholly uncontemplated by him at the outset, yet the original payment plan altered by this force of events, unique as it was, became the *152 pattern for the entire soft ice cream industry and is now commonplace. McCullough conceived the name Dairy Queen in 1939 or 1940 to designate the business he instituted and conducted. He used that trade name in the merchandising and sale of the ice milk product. He designed a new type of retail merchandising outlet consisting of an attractive small store with windows on three sides and with his stainless steel ice cream freezers visible from the street. McCullough, himself, over a period of several years, put some 20 stores in operation. The response of the public was gratifying. As a result thereof, he realized the importance of the trade name Dairy Queen and had it registered in almost every State in the Union. Shortly after McCullough opened his first store, the popular demand to be permitted to conduct this type of business operation under the trade name Dairy Queen was great. In order to fulfill his duty under the Western Agreement, McCullough decided to commence the granting of franchises throughout the territory covered by the Western Agreement. He, of course, in granting any such franchises was confronted with the royalty payments due Ar-Tik under the Western Agreement. *153 McCullough went into the cities, towns, and villages and promoted and developed a program of licensing and franchising third persons. When he entered into a franchise agreement, he went wherever freezers were installed and taught the people to operate this new equipment. He 1251 was well informed about the freezer, having seen it through its early experimental stage, and was instrumental in having it built. The efforts of McCullough in the licensing and franchising of third persons met with success. Indeed, the business "snowballed" under his guidance. By agreement entered into on or about September 7, 1946, between Ar-Tik and McCullough, the Western Agreement was amended to provide for a royalty payment of 4 cents per gallon on all mix used in the freezers operated within the territory covered by the Western Agreement. The royalty payments to Ar-Tik were to survive the patent expiration so long as McCullough operated the freezers within his allotted territory. On September 7, 1946, Ar-Tik entered into another agreement, sometimes hereinafter called Eastern Agreement, with McCullough by which Ar-Tik exclusively licensed McCullough to use, manufacture, and sell and to permit *154 others to use, manufacture, and sell freezers built under the Oltz patent until the expiration of that patent (May 18, 1954), in all of that part of the continental United States lying east of the Mississippi River, except the States of Florida, Illinois, Wisconsin, and Louisiana, and the County of Greenville in the State of South Carolina, the County of Mecklenburg in the State of North Carolina, and the County of Hinds in the State of Mississippi. The agreement also provided that should there be any improvements made on the Oltz patent, the life of the agreement should be extended during the life of the improvement or improvements. In consideration of Ar-Tik granting the rights and licenses to McCullough under the Eastern Agreement, McCullough agreed to pay to Ar-Tik the sum of $10,000 upon execution of the agreement and 60 percent of all sums received by him from his granting of territorial rights to third persons until the sum of $102,000 had been paid to Ar-Tik. It was further agreed under the provisions of the Eastern Agreement that all sublicenses granted by McCullough would contain a provision obligating the sublicensee to pay to Ar-Tik a royalty in the sum of 2 cents per *155 gallon on all mix used in the freezers, such royalty to continue during the life of the freezers regardless of the expiration of the patent. Also under the Eastern Agreement, copies of all sublicenses granted by McCullough were required to be promptly furnished to Ar-Tik. All freezers manufactured were required to bear a serial number and Ar-Tik was to be kept informed at all times of the location of all freezers manufactured by McCullough or his sublicensees. On September 17, 1947, the above-mentioned Eastern Agreement of September 7, 1946, was amended whereby (1) McCullough returned to Ar-Tik all of his exclusive rights and licenses for the use, manufacture, sale, and distribution of freezers built under the Oltz patent in the States of Mississippi, Alabama, Georgia, South Carolina, and North Carolina, (2) Ar-Tik agreed to credit McCullough's territorial account in the East with the amount of $30,000, and (3) McCullough granted to Ar-Tik all the exclusive rights to the use of the registered trade name Dairy Queen in the foregoing five states and the State of Florida. Sometime after September 7, 1946, and prior to February 20, 1953, McCullough assigned the original Eastern Agreement *156 to McCullough's Dairy Queen, a copartnership. On February 20, 1953, the Eastern Agreement was supplemented and amended retroactively to its inception. As so supplemented and amended, it provided as follows: THIS SUPPLEMENTAL AGREEMENT made and executed as of the 7th day of September, A.D. 1946 by and between AR-TIK SYSTEMS, INC. hereinafter referred to as First Party and H. F. McCullough acting for McCULLOUGH'S DAIRY QUEEN, a co-partnership to which said original agreement has been previously assigned by H. A. McCullough, hereinafter referred to as Second Party, WITNESSETH: WHEREAS, by agreement bearing said date First Party granted exclusive rights to Second Party and license for the use, manufacture, sale and distribution of all machines built under Patent No. 2080971 in certain territory lying East of the Mississippi River, and WHEREAS paragraph 4 of said agreement does not express the agreement actually made nor the intention of the parties, and since the date of execution of said agreement the parties have by all their actions and dealings with each other, treated said agreement as if supplemented and amended as hereinafter set forth and now desire to supplement and *157 amend Agreement in writing so that 1252 said Agreement expresses the intention and agreement of the parties, NOW THEREFORE, Parties agree that Paragraph 4 of said Agreement is amended to read as follows: 4. All sub-contracts issued by Second Party shall contain a provision obligating the sub-contractor, successors, and assigns, to pay to AR-TIK, INC., the sum of Four Cents (.04() per gallon on all mix used in machines built under said patent number, said payments to continue during the life of the machines regardless of the expiration of any patents. Where powdered or concentrated mix is used, the payment of Four Cents (.04() per gallon shall be based upon its equivalent in liquid mix. The said payments in amount of Four Cents (.04() per gallon shall be divided equally between the parties hereto and First Party shall remit to Second Party the amount of Two Cents (.20() per gallon each month as collected from the sub-contractor. Executed as [sic] Moline, Illinois, this 20th day of February, A.D. 1953. ATTEST: /s/ Roger D. Oltz AR-TIK SYSTEMS, INC. By /s/ Harry M. Oltz President McCULLOUGH'S DAIRY QUEEN By /s/ H. F. McCullough The H. F. McCullough referred *158 to in this agreement is the son of H. A. McCullough. The 2 cents per gallon referred to in paragraph 4 of the above-quoted agreement and under which Ar-Tik was obligated to remit to McCulloughs Dairy Queen is sometimes hereinafter referred to as 2( East. On or about December 30, 1946, H. A. McCullough, together with J. F. McCullough (sellers) entered into a patent license agreement entitled, "Agreement Relating to Dairy Queen Freezer Franchise," by which they licensed to Cecil R. Medd, Mildred I. Medd, Richard L. Medd, and Robert R. Medd (buyers), the exclusive right to use the Oltz patent in the State of Ohio for the life of the patent. In consideration for these rights and privileges the buyers agreed, inter alia, to pay the sellers a certain sum of money, payable in the manner provided in the contract. In addition, the buyers agreed to pay to Ar-Tik the sum of 4 cents per gallon in the nature of a royalty on all mix thereafter used in the State of Ohio. These payments to Ar-Tik were to continue for the life of the agreement and so long as the buyers had the rights granted to them in such agreement. Upon thus acquiring the exclusive right to use the freezer patent and about the *159 same time having acquired the exclusive right to use the trade name Dairy Queen in Ohio, the Medds entered into franchise agreements with "district franchise operators" under which the latter were granted the right to use freezers built under the patent in certain designated areas, during the life thereof, for a royalty specified in the contract. In turn, each district franchise operator in Ohio was permitted to and did enter into subfranchise agreements with retail store operators. Another contract similar to the abovementioned Medd contract of December 30, 1946, in all material respects, except for the initial amount to be paid to the McCulloughs for the grant of the exclusive license, is the one with Dairy Queen, Inc., a Kansas corporation for the State of Conlicensee This contract also required the licensee to pay to Ar-Tik the sum of 4 cents per gallon in the nature of a royalty on all mix thereafter used in the State of Connecticut. Pursuant to their license agreements with the McCulloughs, the state or district operators in the territory covered by the Eastern Agreement, paid over to Ar-Tik the sum of 4 cents per gallon on mix used in the freezers in their specific areas. *160 Ar-Tik received these royalties together with gallonage reports from these various state or district operators. Of the 4 cents per gallon, Ar-Tik transmitted 2 cents thereof, less a fractional portion withheld for dues to the Dairy Queen Trade Association by checks to either H. A. McCullough or H. F. McCullough to and during 1954, together with gallonage reports representing royalty payments of the 2 cents per gallon. A typical letter forwarded by Ar-Tik to H. A. McCullough regarding the 2 cents per gallon payments for the years 1950 through 1952 is as follows: July 12th, 1950 Mr. H. A. McCullough c/o McCullough's Dairy Queen Geneseo, Illinois
Dear Mr. McCullough: Enclosed, please find our check No. 5586 in the amount of $1,866.80 covering total gallonage of 106,674 (105,634 for May and 1,040 for April) at 1 3/4( as 1253 reported by the eastern states and indicated on attached listing. Very truly yours, AR-TIK SYSTEMS, INC. Harold F. Oltz Secretary and Treasurer Appended to the letter quoted above was a typical listing of states and specific areas within each state, showing the number of gallons of mix sold in each area in each state for the month or months *161 designated therein. A typical letter forwarded by Ar-Tik to H. F. McCullough regarding the 2 cents per gallon payments during the years 1953 and 1954 is as follows: February 20, 1953 Mr. H. F. McCullough
967 - 24th Avenue Rock Island, Illinois
Dear Mr. McCullough: Enclosed, please find our check number 9347, in the amount of $31,814.65, representing payment on gallonage from August through December for the Eastern states as per attached listings. Very truly yours, AR-TIK SYSTEMS INCORPORATED Roger D. Oltz Vice President The attached listings referred to in the preceding letter were of states and specific areas within each state showing the gallonage of mix sold in each area in each state for the month or months designated therein. Prior to February 25, 1955, the date on which the Lark/Ar-Tik Agreement, hereinafter fully set forth, was executed, Ar-Tik had not been informed that anyone other than the McCulloughs owned the property interest of 2( East. Virgil Bozeman, hereinafter sometimes called Bozeman, is an attorney. He has practiced law since 1937 and has offices in Moline, Illinois. Bozeman now represents Ar-Tik in some matters and has represented Ar-Tik *162 since about November 1, 1953, when he was employed by Harold Oltz, who at that time was executive vice president of Ar-Tik, to institute suit against H. A. McCullough and H. F. McCullough. On March 25, 1954, Bozeman, on behalf of Ar-Tik, filed a civil action (No. p. 1541) against H. A. McCullough, H. F. McCullough lough, and H. A. and H. F. McCullough d/b/a McCulloughs Dairy Queen in the United States District Court, Southern District of Illinois, Northern Division, sometimes hereinafter referred to as the Peoria litigation. It was an action for breach of contract under the Western Agreement only. The decision of the Court was rendered in an opinion dated September 8, 1955, and reported at 133 F.Supp. 807. The Court held that the McCulloughs were liable for payments of 4 cents per gallon of mix in all that territory covered by the Western Agreement, regardless of whether they received such payments from their sublicensees or subfranchisees. By agreement dated March 20, 1954, H. A. McCullough, J. F. McCullough, and H. F. McCullough assigned and sold to Lark Sales Company all their right, title, and interest in and to the Western Agreement, and amendment thereto, including *163 certain contracts thereunder. Under this agreement, the McCulloughs appointed H. A. McCullough their true and lawful attorney to perform and complete said agreement. Prior to the commencement of the Peoria litigation, there was a meeting of all the state and district operators connected with the Dairy Queen business sometime during the month of January 1954. The purpose of such meeting was to discuss the McCulloughs' franchise and license agreements, the coming expiration of the patent and "things" relating to the trademark Dairy Queen. The meeting was attended by H. F. McCullough, along with L. S. Murchie and one Wills, a patent and trademark attorney. Wills recommended a change in the form of the contracts that had been previously negotiated and in existence for many years. The old contracts were so-called "freezer" contracts, in that the royalty payments were tied to the use of the patented freezer. Wills also recommended that new agreements be prepared in such a manner as to utilize the trade name and trademark Dairy Queen. Under the advice of his counsel, H. F. McCullough told the meeting that the McCulloughs had inadvertently weakened the trademark Dairy Queen; that it *164 would be necessary for the McCulloughs to revise their mode of operation and maintain an entity solely for the purpose of policing or "holding" the trademark Dairy Queen; that that entity would then license another entity with the use of the trademark Dairy Queen; and that this latter entity would operate and negotiate new territorial contracts with state and district operators and others. The meeting ended in discord. 1254 On or about January 9, 1954, Lark gave an unlimited power of attorney to Murchie to do any and all things in his sole discretion from time to time, for the purpose of effecting his takeover of Dairy Queen operations from McCulloughs Dairy Queen, a copartnership, and any and all other owners thereof, for the purpose of strengthening the position of the industry as to rights to the uninterrupted use of the trade name and trademark Dairy Queen freezers and on the semifrozen dessert product. The power of attorney was never revoked. It was understood and agreed that Lark would be irrevocably bound in any agreements or other matters negotiated or performed by Murchie under the power of attorney. McCulloughs Dairy Queen, Inc., an Illinois corporation, was formed *165 on or about April 1, 1954, and upon its formation, Murchie became its sole stockholder. He acquired 100 shares of common stock of the corporation and paid therefor $1,000. On or about March 31, 1956, the stock certificate issued to Murchie for the 100 shares was canceled and stock certificates for the shares were issued in the names of the following persons for the indicated number of shares: Shares
H. A. McCullough
48
H. F. McCullough
48
M. P. Murchie (wife of L. S. Murchie)
4
100
Lark Sales Company was organized on or about December 28ere were 64 shares of issued and outstanding common stock. The corporate name was changed to Lark Sales Company on or about January 20, 1950. For the taxable years involved herein, Lark used an accrual method of accounting. Murchie acquired all of the issued and outstanding common stock of Lark consisting of 64 shares. These shares were issued to him on January 2, 1952. By agreement dated and executed April 2, 1954, McCulloughs Dairy Queen, Inc., granted to Lark the exclusive right to use, license, and subcontract for the use of the trademark and trade name Dairy Queen under the terms and conditions contained in an exhibit *166 attached; but no title or title of ownership in or to the trademark and trade name was so granted. The area covered by this agreement was the entire continental United States. The exhibit attached was a typical but unsigned territorial agreement, hereinafter sometimes called Lark Sales territorial agreement. A typical Lark Sales territorial agreement provided, in pertinent part, as follows: TERRITORY AGREEMENT This Agreement entered into this day of , A.D. 19, by and between LARK SALES COMPANY, an Illinois Corporation, hereinafter referred to as First Party, and of the City of , County of , and State , hereinafter referred to as Second Party. A. WHEREAS, H. A. McCullough and thereafter H. A. McCullough in conjunction with J. F. McCullough and H. F. McCullough, doing business as McCullough's Dairy Queen (hereinafter in this Contract referred to as "McCulloughs"), instituted and developed a business which comprises the selling of a frozen dairy product in various forms under the trade-mark "Dairy Queen" from retail outlets bearing the trade-name "Dairy Queen" and have made known the trade-mark and trade-name throughout the United States, including the State of and have used the *167 trade-mark "Dairy Queen" on freezers used in the preparation and dispensing of the Dairy Queen product and made known the same throughout the United States, including the State of , and have registered the trade-mark "Dairy Queen" in the State of and B. WHEREAS, for the purpose of providing a permanent organization to control and make uniform the operations under, the quality of products, and the use and protection of the trade-mark and trade-name "Dairy Queen", a corporation known as "McCulloughs Dairy Queen, Inc." has been formed and said corporation has granted to First Party the exclusive right to use, license and permit others to use, sub-license and sub-contract for use of said trade-mark and trade-name "Dairy Queen" under the terms and conditions herein contained; but no title or ownership in or to said trade-mark and trade-name was so granted. C. WHEREAS, by reason of and subject to the foregoing, First Party has: (a) The exclusive right to use, license and permit others to use and sub-license the trade-mark and trade-name, Dairy Queen; (b) The business and operations of Dairy Queen instituted and developed and made known by the McCulloughs; (c) The rights to make, *168 use, sell and permit others to make, use and sell 1255 Approved Freezers for exclusive use in dispensing the dairy product under the trade-mark, "Dairy Queen." (Approved Freezers are determined by McCulloughs Dairy Queen, Inc.); (d) An assignment of the " Agreement" executed under date of by and between the McCulloughs or some one or more of them and Second Party herein. D. WHEREAS, the First and Second parties desire to more clearly and completely set forth the intentions and understanding at the time the aforementioned Agreement was entered into and to re-affirm all rights of the assigns and successors of the original parties. The contract dated April 2, 1954, out of which the 2( East issue involved herein arises is set forth below in full as follows: AGREEMENT This Agreement made this 2nd day of April, 1954, by and between LARK SALES COMPANY, a Corporation, Party of the First Part, hereinafter referred to as Lark; H. A. McCULLOUGH, Party of the Second Part, hereinafter referred to as McCullough; and H. A. McCULLOUGH and HUGH F. McCULLOUGH, individuals and doing business as McCulloughs Dairy Queen, Parties of the Third Part, hereinafter referred to as McCulloughs Dairy *169 Queen, WITNESSETH: WHEREAS, Ar-Tik Systems, Incorporated, and H. A. McCullough entered into a certain written agreement dated September 7, 1946 and thereafter said H. A. McCullough assigned to said McCulloughs Dairy Queen, a co-partnership, all his right, title and interest in and to said Agreement among other things, and thereafter said Ar-Tik Systems, Incorporated, and said McCulloughs Dairy Queen entered into a certain Supplemental Agreement thereto dated February 20, 1953; and WHEREAS, said H. A. McCullough and said McCulloughs Dairy Queen have from time to time sold, assigned and transferred to others interests under said Agreement and Supplement by written contracts, retaining, however, at all times the right in said McCulloughs Dairy Queen to receive the 2( royalty payment under said Agreement and Supplement; and WHEREAS, said parties hereto believe it to be for the best interest of all parties interested in the business conducted under the name of Dairy Queen that the remaining rights and interests of McCulloughs Dairy Queen be transferred and vested in said Lark and its assigns provided said Lark and its assigns shall pay to said McCulloughs Dairy Queen or its assigns *170 or nominee, all sums due under subcontracts, franchises, and licensing agreements made pursuant to said Agreement and Supplement except the sum of 2( per gallon to be paid to Ar-Tik Systems, Incorporated, or its assigns, and the 2( per gallon to be paid to McCulloughs Dairy Queen pursuant to the terms of said Supplement which latter sum of 2( per gallon on all mix processed after December 31, 1954 shall be and become the property of Lark hereunder. NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) in hand paid by each of the parties hereto, to each of the other parties hereto and other good and valuable consideration, the receipt and adequacy whereof are hereby acknowledged by each of the parties hereto to the other parties hereto, the parties do hereby mutually agree as follows: 1. McCullough and said McCulloughs Dairy Queen have this day sold, assigned, transferred and set over and do by these presents sell, assign, transfer and set over to Lark, its successors and assigns, all of their rights, titles and interests in and to said Agreement and Supplement thereto and further do hereby constitute and appoint Lark as their respective lawful agent and/or *171 attorney-in-fact in their respective name, place and stead to the end that Lark, as the contracting party, may negotiate, renegotiate, enforce and fully perform any and all sub-contracts, franchises and licenses heretofore granted under said contract and supplement, subject, however, to the terms, conditions and promises of this agreement. 2. Lark promises and agrees to pay to said McCulloughs Dairy Queen, or its assigns, all cash considerations received on receivables or to be received under contracts heretofore executed by said McCullough, McCulloughs Dairy Queen and/or Lark to others in the nature of subcontracts, franchises or licenses granted pursuant to said Agreement and Supplement other than the 2( per gallon of mix to be paid to Ar-Tik Systems, Incorporated, pursuant to said Supplement dated February 20, 1953 and except the 2( per gallon which was payable to McCulloughs Dairy Queen pursuant to said Supplement which latter 2( on all mix processed from and after December 31, 1954, it is agreed shall be and become the property of Lark hereunder. 3. Lark hereby acknowledges receipt of the assignment of the foregoing contract and supplement and of all subcontracts, franchise *172 and licenses granted others thereunder and agrees with said McCullough and McCulloughs Dairy Queen to assume and undertake the full and complete performance of: 1256 (a) All duties and obligations of McCullough under said Agreement and Supplement; (b) The undertakings, duties and obligations, liability and performance of McCullough and McCulloughs Dairy Queen under the contracts, franchise agreements and licenses granted pursuant to said Agreement and Supplement and will unsole cost, risk and expense of said Lark or its assigns and further agrees to recognize, observe and respect all rights possessed by the respective contracting parties to said sub-contracts, franchises, and licenses granted pursuant to said Agreement and Supplement and will undertake no action which shall infringe, impair or diminish any of the rights of the said contracting parties thereto except that Lark shall not be barred hereby from bringing any action or proceedings to enforce the performance thereof and particularly the right to collect any and all royalty, franchises, considerations and monies which Lark shall be entitled to receive either for the benefit of itself or others. 4. It is further agreed *173 by and between the parties hereto that Lark and its assigns shall have the exclusive right and protection afforded by the trade mark and trade name Dairy Queen and previously owned by McCullough and/or McCulloughs Dairy Queen in the territory described in said contract dated September 7, 1946 and supplement, subject, however, to the prior transfer, assignment, license or permissive use of said trade mark and trade name heretofore granted to others by McCullough or his assigns previous to the making of this Agreement. 5. It is further agreed by and between the parties hereto that said Lark and its assigns, in cooperation with said McCullough and McCulloughs Dairy Queen will make available only to those persons lawfully using the trade mark and trade name Dairy Queen any and all improved and new equipment developed by said Lark or its assigns useful in the processing and sale of the product Dairy Queen and any additional registrations of the trade mark and trade name Dairy Queen in their respective territories to the end that there shall be a strong and forceful national industry for the sale and marketing of the product Dairy Queen. 6. It is further agreed by and between the parties *174 hereto that no concessions, changes or alterations in sub-contracts, franchises and licenses made and entered into pursuant to said contract and supplement aforesaid shall be authorized or negotiated by any of the parties hereto without the written consent of Lark in each instance. 7. This Agreement to be effective as of the 20th day of April, A.D. 1954 except as hereinabove otherwise specifically provided. IN WITNESS WHEREOF, the parties hereto have hereunto caused these presents to be executed under their respective hands and seals, all done at Moline, Illinois, the day and year first above written. (Emphasis added.) LARK SALES COMPANY By /s/ G.E. Stange President ATTEST: /s/ H.N. Pieper Secretary /s/ H. A. McCullough (SEAL) By /s/ L.S. Murchie Atty. In Fact H. A. McCullough, Individually /s/ Leonard O. Hunt /s/ Gladys C. Noah As to H. A. McCullough individually /s/ H. A. McCullough (SEAL) By /s/ L. S. Mrchie Atty. In Fact H. A. McCullough (SEAL) /s/ H. F. McCullough H. F. McCullough Co-partners doing business as McCulloughs Dairy Queen /s/ Leonard O. Hunt /s/ Gladys C. Noah As to H. A. McCullough and H. F. McCullough, co-partners *175 doing business as McCulloughs Dairy Queen. Under the agreement of April 2, 1954, H. A. McCullough and McCullough's Dairy Queen retained the right to receive the 2( East royalty payment until December 31, 1954. During the years here involved, the agreement of April 2, 1954, was not modified, changed, or terminated. H. A. McCullough had earlier, by written instrument, appointed Murchie as his attorney to act for him and in his name. That instrument was entitled "POWER OF ATTORNEY" and dated September 28, 1951. It recited, in pertinent part, as follows: IN CONSIDERATION of One Dollar ($1.00) and other good and valuable consideration paid by L. S. Murchie to the undersigned, H. A. McCullough, I hereby agree that this Power of Attorney shall continue in full force and effect until such time as I shall deliver to Sollo, Graham and Califf, Attorneys at Law, of Moline, Illinois, written revocation of this Power of Attorney. 1257 No such revocation has been made by H. A. McCullough. Murchie outlined the Lark Sales territorial agreement to Oltz in 1954 and the latter looked with favor upon this contract. Lark Sales territorial agreements negotiated in early 1954, pursuant *176 to the Eastern Agreement as amended and supplemented, required that all subfranchises and sublicensees pay directly to Ar-Tik the 4 cents per gallon as provided in the September 7, 1946, agreement between Ar-Tik and McCullough. Murchie caused Lark to commence business operations regarding the negotiations of the new Lark Sales territorial agreements as early as April 1954. H. F. McCullough's part in the operation was to circulate among the state and district operators on behalf of Lark and enter into Lark Sales territorial agreements. Murchie also did some of this work. Murchie and H. F. McCullough met with some success in getting operators to sign Lark Sales territorial agreements in 1954. In fact, some of these operators who entered into such agreements began making royalty payments as early as April, which preceded the expiration date of the Oltz patent on May 18, 1954. However, in the main, the state and district operators were dissatisfied and voiced objections to signing the new Lark Sales territorial agreements. In the first place, various operators were reluctant to give rights which they felt they presently owned under existing contracts in exchange for rights merely *177 to use. Secondly, these operators did not wish to confirm any tie-in of the trade name Dairy Queen with the freezer. Thirdly, these same operators had no wish to sign a new contract while litigation (Peoria) and differences continued to exist between the Oltzes and the McCulloughs. There were discussions of mutual concern in the latter part of 1954 between the McCullough and Ar-Tik interests. The whole problem, as Bozeman saw it, between the two interests was that in order to arrive at any kind of settlement (Peoria litigation), it seemed to him that they (the McCullough and Ar-Tik interests) should be "put" together and caused to operate in a businesslike arrangement. The McCullougs and Ar-Tik had a common goal. Both of them were trying to collect royalties from state and district operators. After considerable discussions and negotiations as to the matters involved therein, the parties entered into a detailed agreement dated December 31, 1954, sometimes hereinafter referred to as the Lark/Ar-Tik Agreement, as follows: THIS AGREEMENT entered into this 31st day of December, 1954, by and between LARK SALES COMPANY, an Illinois corporation, hereinafter referred to as Lark: AR-TIK *178 SYSTEMS, INCORPORATED, an Indiana corporation, hereinafter referred to as Ar-Tik; H. A. McCULLOUGH, co-partners doing business as McCULLOUGHS' DAIRY QUEEN, hereinafter referred to as Dairy Queen; H. A. McCULLOUGH, individually, hereinafter referred to as McCullough; McCULLOUGHS' DAIRY QUEEN, INC., an Illinois corporation; WITNESSETH: WHEREAS, Harry M. Oltz developed, used and obtained Patent No. 2080971 upon a mechanical device for the manufacture of a frozen dessert, and thereafter, on July 31, 1939, entered into an agreement with McCullough (hereinafter referred to as the Western Agreement), a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "A"; and WHEREAS, on June 11, 1940, Harry M. Oltz assigned, transferred and set over to Ar-Tik the aforesaid patent, together with all his rights under the Western Agreement; and WHEREAS, the Western Agreement was thereafter supplemented by an agreement between Ar-Tik and McCullough dated September 7, 1946, a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "B"; and WHEREAS, on September 7, 1946, Ar-Tik and McCullough entered into an agreement (hereinafter *179 referred to as the Eastern Agreement), a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "C"; and WHEREAS, by agreement between Ar-Tik and McCullough dated September 17, 1947, in the nature of a license, a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "D", Ar-Tik became the sole owner of the right to use the said patented mechanical device and the trade name "Dairy Queen" in the States of North Carolina, South Carolina, Georgia, Florida, Alabama and Mississippi, together with the right to receive and collect all of the royalty for its sole account and without division thereof with McCullough under the terms of the Eastern Agreement; and 1258 WHEREAS, the Eastern Agreement was further supplemented by agreement between Ar-Tik and McCullough dated February 20, 1953, a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "E"; and WHEREAS, from time to time certain interests in the said agreement hereinbefore mentioned have been held by Dairy Queen; and WHEREAS, it was the intent of all of the parties to said agreements that McCullough would institute and develop *180 a business for the sale of a frozen dessert through the use and sale or license of the said patented mechanical device and that in the institution and development of such business a trade mark and trade name would be used and publicized; and WHEREAS, McCullough, and subsequently Dairy Queen, in compliance with the agreements and the intent thereof, did institute and develop a business which comprises the selling of a frozen dessert product in various forms under the trade name or trade mark "Dairy Queen" from retail outlets bearing the trade name or trade mark "Dairy Queen", and also by advertising, and otherwise established the trade name or trade mark "Dairy Queen" throughout the United States, and used the trade name or trade mark on mechanical devices manufactured under the aforesaid patent in the preparation and dispensing of products known as "Dairy Queen"; and WHEREAS, McCullough and/or Dairy Queen have obtained registrations of the trade mark or trade name "Dairy Queen" in all States of the United States except California and Wisconsin; and WHEREAS, it was the further intent of the aforesaid Eastern and Western Agreements, as amended, that the trade name or trade mark *181 and the patented mechanical equipment would be used together in the same business to the end that Ar-Tik would at all times receive a royalty or license fee for the use thereof in the Western Territory of 4( per gallon on each gallon of mix processed through said patented mechanical device or sold under the trade mark or trade name "Dairy Queen", and a royalty or license fee for the use thereof in the Eastern Territory of 2( per gallon on each gallon of mix processed through said patented mechanical device or sold under the trade mark or trade name "Dairy Queen", but with the distinct understanding, in so far as the Western Agreement is concerned, that McCullough would pay said royalty or license fee on all of said mechanical equipment owned or operated by him, and that the said royalty or license fee would be paid over to Ar-Tik as funds therefor were received by McCullough for the account of Ar-Tik from the operators (hereinafter referred to as licensees) of said mechanical equipment and/or the said trade mark or trade name, which were not owned or operated by McCullough or Dairy Queen; and WHEREAS, under the Eastern Agreement Ar-Tik collected and received from licensees a royalty *182 of 4( per gallon on each gallon of mix processed through said patented mechanical device or sold under the trade name "Dairy Queen", of which one-half was remitted to McCullough pursuant to the terms of the Eastern Agreement, as supplemented, until December 31, 1954; and WHEREAS, by agreement dated March 20, 1954, McCullough and Dairy Queen assigned and transferred to Lark all their interests under the Western Agreement, except certain territory payments specifically set forth in Exhibit "C" attached to said agreement, a true and correct copy of which assignment agreement is attached hereto, made a part hereof and marked Exhibit "F"; and WHEREAS, by assignments dated April 2, 1954, McCullough and Dairy Queen assigned and transferred to Lark interests under the Eastern Agreement, a true and correct copy of which assignments is attached hereto, made a part hereof and marked Exhibit "G-1"; and WHEREAS, by assignment dated December 31, 1954, Ar-Tik assigned and transferred to Lark the right to collect in its behalf, a true and correct copy of which assignment is attached hereto, made a part hereof and marked Exhibit "G-2"; and WHEREAS, McCulloughs' Dairy Queen, Inc., an Illinois *183 corporation, has been formed as a permanent organization to hold title to the trade mark and trade name "Dairy Queen", and McCullough, Dairy Queen and Ar-Tik have assigned and transferred to the said corporation all of their right, title and interest in and to the said trade mark and trade name, and by Territory Agreement dated April 2, 1954, McCulloughs' Dairy Queen, Inc., an Illinois corporation, granted to Lark the exclusive right to use, license and to permit others to use, sub-license and subcontract the trade mark or trade name "Dairy Queen" throughout the continental United States, subject to prior rights, a true and correct copy of which Territory Agreement is hereto attached, made a part hereof and marked Exhibit "H"; and WHEREAS, Lark is willing to collect and receive all sums of money which may become due and payable to Ar-Tik, for 1259 the purpose of remitting the same to Ar-Tik and for the purpose of carrying out all of the provisions of this Agreement; and WHEREAS, pursuant to the terms of the aforementioned agreements, Lark has entered into certain revised territory agreements as provided under the terms of the Territory Agreement (Exhibit "H" hereto attached), *184 and has made provision for the continuation without any interruption of all agreements relating to the said patented mechanical device and the trade name and trade mark "Dairy Queen", and it is the intent of all parties to this agreement that Lark shall be the instrumentality for the further development of the interests of the respective parties, to the end that the said parties may cooperate together for their mutual benefit, that said development shall continue through one instrumentality, to more clearly and completely construe and define the undertaking of each of the aforementioned agreements, and to effect the intent of this agreement; NOW, THEREFORE, In consideration of the mutual covenants and agreements herein contained and the sum of One Dollar ($1.00) in hand paid each to the other, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the parties hereby promise and agree as follows: 1. Ar-Tik consents to, approves and accepts the transfer, sale, assignment and delivery to Lark of all rights of McCullough and Dairy Queen in and to the said agreements made by and between Harry M. Oltz and *185 H. A. McCullough under date of July 31, 1939, as supplemented by agreement dated September 7, 1946, between Ar-Tik and McCullough (except certain cash payments as shown by Schedule "C" of Exhibit "F" due to others), and agreement between Ar-Tik and McCullough dated September 7, 1946, as supplemented by agreement dated February 20, 1953, between Ar-Tik and McCullough, and the agreement dated September 17, 1947, by and between Ar-Tik and McCullough relative to the operation of the businesi in sex southeastern States in the United States, and said Ar-Tik does further acknowledge that Dairy Queen and McCullough have fully performed each and every of said agreements in this paragraph described to the date of this agreement, and does further release and discharge McCullough and Dairy Queen of and from all past and future liability in connection with or arising under said agreements. No assignment of this agreement shall be made by Lark without the written consent of Ar-Tik. 2. Lark shall endeavor to re-negotiate Territory Agreements to the end that the standards of operation of said Dairy Queen business shall be uniform and in accordance with the rules, standards and regulations required *186 by McCulloughs' Dairy Queen, Inc. in connection with the operation under and use of said trade mark and trade name, as set forth in the Territory Agreement Exhibit "H" attached hereto. Each and every such contract negotiated by it shall contain a provision requiring that the licensee shall pay a royalty or license fee of not less than 4( per gallon of liquid mix used in the preparation of the frozen dairy product sold under the trade mark and trade name "Dairy Queen" within such territory for the period of time that such rights shall be granted, which Lark shall collect and remit as set forth in Paragraph 5 of this agreement. Such Territory Agreements shall further provide that such payments shall be made regardless of the existence or non-existence of patents or after the expiration thereof or otherwise, and where either powdered or concentrated mixes are used, the payment shall be based on the equivalent in liquid mix and shall further require that such amount as shall be due and owing shall be computed at the end of each month's operation, and remittance of the same shall be forwarded, together with proper reports, within such time as Lark shall require. Dairy Queen and Ar-Tik agree *187 to assist Lark in negotiating such new Territory Agreements. No change shall be made in the Territory Agreements which shall diminish the rights of Ar-Tik hereunder except upon written approval of Ar-Tik. 3. Lark shall hold all reports as required under said Territory Agreements and make available to Ar-Tik all information contained therein in such manner and form as may be determined by the parties from time to time. Lark further agrees to give notice to Ar-Tik of any default of licensees in payments or failure to report, not later than 30 days after such default or failure to report. 4. Lark shall further, in cooperation with Ar-Tik, take such measures to cure and eliminate any such defaults and failures to report, provided, however, Lark shall not be required to expend funds in excess of such as may be provided by Ar-Tik or Lark for such purposes. 5. Lark hereby undertakes the continued performance of said agreements described in Paragraph 1 hereof pursuant to the terms of this agreement and the terms of all sub-contracts, licenses or franchise agreements assigned to Lark and others, and shall collect all monies due Ar-Tik as hereinafter set forth. Lark shall use its best *188 efforts to collect and 1260 receive for the account of Ar-Tik and Lark and others respectively, from the licensees (whether under licenses presently in existence or under re-negotiated Territory Agreements), on all mix used in the frozen dairy product sold under the trade mark or trade name "Dairy Queen" or processed through said freezers as shown in Exhibit "I" attached. To enable Lark to collect from Licensees under the Eastern Agreement, Ar-Tik shall notify each of said licensees to make payment to Lark of all sums due Ar-Tik under their respective territory agreements "until further notice", and Ar-Tik will not countermand such notice so long as Lark is not in default under this agreement. Upon receipt of said monies, Lark shall pay over to Ar-Tik, or its assigns, only the amounts received for the account of Ar-Tik, as hereinabove set forth, on or before the 10th day of the month following actual receipt of such monies by Lark. Notwithstanding the foregoing, from such amounts per gallon so received by Lark, Lark shall retain such sum computed at such rates per gallon as shall be agreed upon from time to time by Lark and Ar-Tik and said sum shall be expended for the purpose *189 of developing the Dairy Queen business as Lark and Ar-Tik may from time to time determine. 6. Lark shall render to Ar-Tik a report of its costs of operations from time to time, which report shall show the areas occasioning such expenses and the amounts thereof, and Ar-Tik, within ten (10) days of receipt of such report, shall make payment to Lark of Ar-Tik's share of such expenses in the proportions to which Ar-Tik and Lark are sharing revenue from such area as set forth in Paragraph 5 above. 7. Dairy Queen, Ar-Tik and Lark agree that should any one of them receive or have received any funds to which any one of the others is entitled, they will pay any and all such funds to Lark for distribution in accordance with the terms of this agreement. 8. Lark agrees to furnish to Ar-Tik such copies and information as Ar-Tik may request concerning all Territory Agreements hereafter granting rights to the use of the trade mark and trade name "Dairy Queen", and will make available to Ar-Tik such copies and information concerning present Territory Agreements as it now has in its possession. 9. Lark agrees to make available to Ar-Tik at all reasonable times such records, contracts, reports *190 for the determination and verification of any and all payments due to Ar-Tik. 10. Lark and Ar-Tik shall jointly undertake to improve and further the Dairy Queen business, including the development of new products, the improvement and invention of equipment for use in processing and selling Dairy Queen products, the obtaining of patent protection for said new products and equipment, the possible selection of secondary trade marks and the registration thereof, the originating of advertising matter and the like which may be copyrightable and the obtaining of copyright registrations therefor; and all property rights developed hereunder shall be for the use and benefit of Lark and Ar-Tik and the Dairy Queen business. It is understood and agreed that the ownership of all trade mark registrations, copyright registrations, and the like shall be vested in McCulloughs' Dairy Queen, Inc. which shall license the use of the same through Lark to the owners and operators of Dairy Queen businesses, and the ownership of all patent rights shall be vested in Ar-Tik, and Lark shall have the sole and exclusive right to make, use, and sell, and to license others to make, use, and sell said products and *191 equipment in the Dairy Queen business. None of the parties hereto shall be obligated to defend any of said patents and all offensive litigation relating to said patents shall be controlled by the owner thereof who shall pay all expenses and retain all income resulting therefrom. 11. That all freezers used in the processing of the frozen dairy product sold under the trade mark or trade name "Dairy Queen" shall be manufactured and/or sold under the supervision and control of Lark. 12. Contemporaneously with the execution of this agreement and for the purpose of providing a permanent organization to control and make uniform the operations under, the quality of products and the use and protection of the trade mark and trade name "Dairy Queen", Ar-Tik has sold, assigned, transferred and set over to MCulloughs' Dairy Queen, Inc., an Illinois corporation, all its right, title, interest in and to the trade mark and trade name "Dairy Queen" as used on and in association with the sale of the frozen dairy product, together with the good will of the business in connection with which said trade mark and trade name is used, in exchange for and upon Lark executing the Territory Agreement with *192 Ar-Tik for the teritory comprising the States of Alabama, Georgia, Florida, Mississippi, North Carolina and South Carolina, (Exhibit "H" attached hereto). 1261 Nothing herein contained or to be contained in the Territory Agreement with Lark, as hereinabove provided, shall be construed to require the payment of any sum of money to Lark for its own account on mix sold in the States of North Carolina, South Carolina, Georgia, Florida, Alabama and Mississippi. 13. Ar-Tik appoints Lark its attorney in fact with full power and authority in its or their joint names to sue for and collect all monies due from licensees under said Western Agreement and said Eastern Agreement, and upon receipt of such funds, to account for and pay over the same in accordance with the terms of this agreement. 14. In the event Lark shall have failed to take action to enforce the liability of licensees under said Western Agreement or said Eastern Agreement or this Agreement, and Ar-Tik shall notify Lark in writing setting forth the nature of such claimed failure to act, and in the event Lark shall fail to diligently take steps to correct such condition within sixty (60) days thereafter, then Ar-Tik shall *193 thereupon have a right in its own name or in the name of Lark and/or McCulloughs' Dairy Queen, Inc. but at its sole cost and expense, to take such action as it may deem necessary or proper in the premises, and in th& event recovery is made in any such action Ar-Tik shall account for any proceeds collected in accordance with the terms of this Agreement. 15. The provisions of this agreement relating to the collection and receipt of monies by Lark for the account of Ar-Tik shall continue for a period of five (5) years commencing January 1, 1955, and ending on December 31, 1959, and shall continue thereafter for successive five (5) year periods unless sixty (60) days prior to the end of any such period either Lark or Ar-Tik shall notify the other of the termination of such agreement in so far as Lark is acting for Ar-Tik in the collections and receipt of monies due Ar-Tik under the terms of this agreement. Lark does by these presents irrevocably name Ar-Tik as its nominee to receive payment of the said sums due Ar-Tik as set forth in Paragraph 5 hereof from all licensees under the Territorial Agreements effective upon termination hereof as provided herein. 16. Nothing contained in *194 this agreement shall be construed as an assignment by Ar-Tik of any right, title or interest which it holds under the terms and provisions of the Eastern Agreement and the Western Agreement, as such Agreements are respectively supplemented, except to the extent hereinabove set forth. 17. If any one or more of the following events (hereinafter sometimes called "events of default") shall occur: (a) If Lark shall at any time fail or refuse to pay over to Ar-Tik any sum of money received by Lark for the account of Ar-Tik under the terms and provisions hereof; or (b) If Lark shall not continue to be qualified at all times as a corporation duly organized and existing under the laws of the State of Illinois, or shall make any assignment of any right under the Eastern Agreement and Western Agreement or Territory Agreement Exhibit "H" attached hereto except as herein provided; or (c) If Lark shall otherwise fail or refuse to keep and perform any of the terms, covenants and agreements herein contained on its part to be kept and performed; provided, however, action by Ar-Tik under Paragraph 14 shall not be a default hereunder, unless Lark shall habitually or completely fail to endeavor *195 to enforce the liability of Licensees under said Western, Eastern and this Agreement; and (d) If Lark shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute of law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Lark or of all or any substantial part of its properties or assets; or shall suffer a judgment or other lien upon any of its property or assets to remain unsatisfied; provided that at all times Lark shall not be in default in this respect if it is in the process of litigation in the matters mentioned in this Paragraph 17; and such event of default shall continue for a period of fifteen (15) days after notice in writing by Ar-Tik to Lark, then and in either of such events of default, Ar-Tik may, at its option, terminate all rights of Lark to receive and collect any sum of money which may be due or become due *196 to Ar-Tik. 18. If any portion of this agreement shall be held invalid, such portion shall be inoperative, but the remainder shall continue in full force and effect. 19. Any notice or notices which may be required to be given by the terms of this agreement shall be in writing and shall be considered to have been properly given if sent by United States mail, postage prepaid. (a) If to Lark, addressed to Lark at P.O. Box 335, Moline, Illinois, or at such 1262 other address as Lark from time to time may have designated by written notice; (b) If to Ar-Tik, addressed to Ar-Tik at 3280 SW 22nd Street, Miami, Florida, or at such other address as Ar-Tik from time to time may have designated by written notice; (c) If to Dairy Queen, addressed to Dairy Queen at P.O. Box 335, Moline, Illinois, or at such other address as Dairy Queen from time to time may have designated by written notice; (d) If to McCullough, addressed to McCullough at P.O. Box 335, Moline, Illinois, or at such other address as McCullough from time to time may have designated by written notice; (e) If to McCulloughs' Dairy Queen, Inc., addressed to McCulloughs' Dairy Queen, Inc. at P.O. Box 335, Moline, Illinois, *197 or at such other address as McCulloughs' Dairy Queen, Inc. from time to time may have designated by written notice. 20. This agreement shall be binding upon and inure to the benefit of the respective parties, their respective heirs, executors, administrators, successors and assigns. IN WITNESS WHEREOF Lark, Ar-Tik and McCulloughs' Dairy Queen, Inc. have caused these presents to be signed in their respective corporate names and their respective corporate seals to be affixed, by their thereunto duly authorized officers, and H.A. McCullough and H.F. McCullough, co-partners doing business as McCulloughs' Dairy Queen, and H.A. McCullough individually, have hereunto set their hands and affixed their seals as of December 31, 1954 on this the 25th day of February, 1955. LARK SALES COMPANY By /s/ G.E. Stange President ATTEST: /s/ H.N. Pieper Secretary AR-TIK SYSTEMS, INCORPORATED By /s/ Harry M. Oltz ATTEST: /s/ Roger D. Oltz Secretary Signed, Sealed and Delivered in the presence of: /s/ Leonard O. Hunt /s/ Gladys C. Noah As to H.A. McCullough and H.F. McCullough, co-partners doing business as McCulloughs' Dairy Queen /s/ Leonard O. Hunt /s/Gladys C. Noah As to *198 H.A. McCullough individually /s/ H.A. McCullough (SEAL) By /s/ L.S. Murchie Atty in Fact H.A. McCullough (SEAL) /s/ H.F. McCullough H.F. McCullough Co-partners doing business as McCULLOUGHS' DAIRY QUEEN /s/ H.A. McCullough (SEAL) By /s/ L.S. Murchie Atty in Fact H.A. McCullough individually McCULLOUGHS' DAIRY QUEEN, INC. By /s/ Charles J. Hott President ATTEST: /s/ P.D. Robinson, Jr. Secretary There were appended to and incorporated by reference as exhibits in the Lark/Ar-Tik Agreement the following documents: Date
Description of agreement
Exhibit
Jt. Ex. Per
letter
Stip. of
Facts
7/31/39
Western Agreement
A
1-A
9/ 7/46
Western Agreement Supplemented
B
2-B
9/ 7/46
Eastern Agreement
C
3-C
9/17/47
Eastern Agreement Amended
D
4-D
2/20/53
Eastern Agreement Supplemented
E
45-AS
3/20/54
Western Agreement and Supplement
F
46-AT
Assigned to Lark
4/ 2/54
Eastern Agreement, Amendment and
G-1
47-AU
Supplement (including 2( East) Assigned
to Lark
12/21/54
Collection Agreement Lark and Ar-Tik
G-2
48-AV
Lark Sales Territorial Agreement
H
49-AW
Schedules:
I
43-AQ
Eastern and Western Agreement Income
Western Agreement-Sub-Contracts
*199 Exhibit I which was appended to and incorporated by reference in the Lark/Ar-Tik Agreement provided, in pertinent part, as follows: LARK SALES Co. EASTERN AGREEMENT INCOME (Except income from franchise ba6ances receivable Amount
per
gallon
of mix
Ar-Tik
Lark
Lark for
others
Connecticut
- State
$.02
$.02
0
Delaware
- State
.02
.02
0
District of Columbia
- District
.02
.02
0
Indiana
- State
.02
.02
0
Additional:
Miami County
(1)
0
0
$.15
Howard County
0
0
0
Lake County
0
0
0
Porter County
0
0
0
LaPorte County
0
0
0
Marion County
0
0
0
St. Joseph County
0
0
0
City of Bedford in Lawrence
(2)
0
0
.10
County
Balance of State
(3)
0
0
*03.10
(1) Amounts for Miami County
being negotiated for reduction to
10(.
(2) Amounts for City of Bedford being
negotiated for 10( base royalty in lieu of
present treatment as franchise collections.
(3) Amount is reduced by certain expenses
shared with State operator.
Kentucky
- State
.02
.02
0
Additional
*10- State
(4)
0
0
.75
(4) Amount is reduced by certain
expenses shared by State
operator.
Maine
- State
.02
.02
0
Massachusetts
- State
.02
.02
0
Maryland
- State
.02
.02
0
Michigan
- State
.02
.02
0
Additional
Wayne County less Detroit and
0
0
0
Belle Isle
Certain locations in Detroit area
0
0
0
Balance of State except
(5)
0
0
.075
subcontracts by:
Bess, Higgins, Murphy, Wingard,
*10
(5)
0
0
.05
and Pure Seal Dairy
(5) Amounts are reduced by
certain expenses shared with
State operator; estimated at 2(
per gallon.
New Hampshire
- State
.02
.02
0
Additional
- State
(6)
0
0
*02.10
(6) Tentative agreement with
State operator - tar- get amount.
New Jersey
- State
.02
.02
0
Additional
- State
0
0
.10
New York
- State
.02
.02
0
Additional
-
Districts:
Western Counties and Suffolk
(7)
0
0
.10
County (H.H. Hartman)
Westchester and Nassau Counties
(8)
0
0
.10
(R.L. Jester)
Eastern Counties - balance of
0
0
*02.08 1/3
State (C.R. Medd and Sons)
(7) Amount is reduced by certain
expenses shared with District
operator.
(8) No amounts received from this district
to date
Ohio
- State
(9)
.02
.02
0
Additional
- State
(9)
0
0
*020
(9) Pending entry of final decree
in suit in Fed- eral District
Court at Toledo, amounts are not
fully established.
Pennsylvania
- State
$.02
$.02
0
Additional
- District
County of Allegheney
(10)
0
0
*02$.08
1/3
(10) Amount is reduced by certain
expenses shared with District
operator.
Rhode Island
- State
.02
.02
0
Tennessee
- State
.02
.02
0
Vermont
- State
.02
.02
0
Virginia
- State
.02
.02
0
West Virginia
- State
.02
.02
0
Additional
- State
(11)
0
0
*02.10
(11) Amount is reduced by certain
expenses shared with District
operator. In addition, amount is
increased for Charleston as reim-
bursement of capital outlay until
paid in full.
Alabama
- State
(12)
(12)
0
0
Florida
- State
(12)
(12)
0
0
Georgia
- State
(12)
(12)
0
0
Mississippi
- State
(12)
(12)
0
0
North Carolina
- State
(12)
(12)
0
0
South Carolina
- State
(12)
(12)
0
*020
(12) The amount per gallon of mix
is to be sup- plied by Ar-Tik as
these States are under license to
Ar-Tik.
*200 Murchie actively participated in the negotiations leading to the execution of the Lark/Ar-Tik Agreement. At no time, either prior to or after the signing of the Lark/Ar-Tik Agreement, did Bozeman or Oltz know that anyone other than the McCulloughs owned 2( East. In fact, it was always represented to Bozeman that the McCulloughs owned 2( East. The agreement of April 2, 1954, which assigned 2( East to Lark and which was incorporated by reference in the Lark/Ar-Tik Agreement as Exhibit G-1, provided the financial substance which assured Ar-Tik of Lark's performance under the Lark/ Ar-Tik Agreement. It was vital to Ar-Tik that the property interest of 2( East vest in Lark. During the year 1955, Lark was the recipient of cash receipts of 4 cents per gallon from state or district operators in the East and the West and recorded such amounts in its cash receipts journal. Column 1 of the journal shows the month and date on which the check or cash was received. Column 2 shows the name of the state or district operator who forwarded money. Column 3 shows the check number, if any, of the payor. Column 4 shows the date of the check itself. Column 5 shows the bank number of the payor. Column *201 6 shows the total gallons. Column 7 shows the amount of either the cash or check received. Column 8, which is headed "W," stands for the total payments received from the western part of the United States. Column 9 is headed "E" and shows the total cash receipts from the eastern part of the United States. The last two columns, 10 and 11, are general columns to record items other than those elsewhere specifically provided for. At different times during the year 1955, the total amount shown in Column 8, headed "W," of the cash receipts journal was posted on the books of petitioner as a credit to an account entitled "AR-TIK ACCOMMODATION CREDITS." Also at different times during the same year, the total amount shown in Column 9, headed "E," of the journal was posted on the books of Lark as a credit of onehalf, or 2 cents, to an account entitled "AR-TIK ACCOMMODATION CREDITS" and one-half (or 2( East) to an account entitled "LARK-ACCOMMODATION CREDITS." During the year 1955, the total accruals and receipts from 2( East recorded on the books of Lark as a credit to LARK-ACCOMMODATION CREDITS was in the amount of $150,735.62, computed as follows: 1265 1955
Gal. East
Gal. East
Cr. total
Ar-Tik
reports
4/30
CR-2
Rpt #3
100,275
$ 2,005.50
5/25
CR-6
Rpt #4
184,167
3,683.34
6/29
CR-10
Rpt #5
628,336 1/2
12,566.73
6/23
CR-10
Ar-Tik
(1) 4,915
(2) 15,081
(3) 42,370
1,247.32
Ar-Tik
6/23
J-7
1954
3,843,773
[1] 62,461.32 3/4
7/27
CR-16
Rpt #6
339,832
6,796.64
8/31
CR-22
Rpt #7
506,286
(4) 51,233
9/30
CR-27
Rpt #8
417,738
(5) 77,295
(6) 64,912
[2] 13,994.52 8,354.76
Ar-Tik
9/30
CR-27
July
(7) 31,400
628.00
10/31
CR-33
Rpt #9
1,351,986
27,039.73
1/2
10/31
CR-33
(8) 128,184
2,563.68
11/30
CR-40
Rpt #10
78,717
Rpt #10A
285,063 1/2
7,275.61
12/30CR-43
Rpt #11
45,168-7/10
Rpt #11A
14,715
Rpt #11B
46,040
2,118.47
8,257,488.95
415,390
$150,735.62
*202 At December 31, 1955, the balance in the account "LARK-ACCOMMODATION CREDITS" was $110,163.70. A summary of the account for the year 1955 is as follows: Cr. Gross royalty income from 2( East on 4,413,715 gallons
$ 88,274.30
Dr. Dues on above
(16,073,39)
Dr. Ohio and Eastern New York receipts included in the
(24,498.53)
above, transferred to the "Cost of Collection Opera- tion"
account
Cr. Payment by Ar-Tik in 1955 (retention by Lark of re-
62,461.32
ceipts on behalf of Ar-Tik) of r&ceipts from 2( East col-
lected by Ar-Tik in 1954 and withheld
Total (net balance)
$110,163.70
The petitioner closed out the $110,163.70 to profit and loss and reported, inter alia, the amount in sales, in its Federal income tax return for the year 1955. Sales in the total amount of $308,421.09, as shown on line 1 of page 2 of Lark's 1955 income tax return was comprised of the following: Jt. Exh. No
Account name
Amount
141-EK
Lark-Accommodation credits
$110,163.70
150-ET
McCullough reserve
105,204.05
151-EU
Sales - expense allocation
93,053.34
$308,421.09
*203 Micro Manufacturing Company, a partnership comprised of the wife and two daughters of Murchie, and Micro, Inc., the stock of which was held by Murchie or his wife and one Till, reported no royalty income from 2( East on the return of income filed by it for the year 1955. For the period January 1, 1956, through April 13, 1956, there was no change in the petitioner's method of recording cash receipts from 2( East from the method it employed in recording similar receipts during the year 1955. From and after April 13, 1956, the only entries in the LARK ACCOMMODATION CREDITS account were journal entries, adjusting receipts recorded for the period from January 1, 1956, through April 13, 1956, to reflect the elimination from this account of all receipts from 2( East (less dues applicable thereto) for the period from April 10, 1956, to April 13, 1956, so that the account would only reflect the net receipts from 2( East for the period from January 1, 1956, to April 9, 1956, inclusive. The balance in the LARK ACCOMMODATION CREDITS account in the amount of $1,126.44 was closed out to United Dairy Queen, a partnership, by a journal entry as of December 31, 1956. Henry Pieper, sometimes *204 hereinafter called Pieper, is the secretary and treasurer of 1266 Lark. He was in charge of the books and records of Lark and they were kept under his general supervision and control. He received no remuneration from Lark for such services. Pieper has been associated with L.S. Murchie & Company since 1944 under a "fee" arrangement. No taxes were withheld therefrom. He has no share or interest in the profits of L.S. Murchie & Company and he has never owned stock in Lark. Pieper had "business dealings" with L.S. Murchie. In and prior to 1958, Pieper acquired from Murchie shares of common stock in several companies but paid nothing for the shares at the times of their issuance to him. Murchie also held stock in these companies. In or about 1960, Pieper executed a note or notes with respect to the shares he had acquired. In 1963, Pieper received $171,450.81 from a liquidation of the companies and in 1964, at the request of Murchie, issued to the latter a check or checks in the amount of $66,578.90 in full payment of the note or notes. In a statement of the net income (or loss) of Micro from 2( East for the years 1959 12-31 J-13 Close for Period… Dr… $23,305.13 Cr… (12,305.13) *205 The amount of $23,305.13 represented onehalf of the net income of 2( East as computed by Pieper on a cumulative basis for the years 1956, 1957, 1958, and 1959. United Dairy Queen filed its 1959 return of income with the district director of internal revenue at Chicago, Illinois, and included therein gross receipts in the amount of $57,413.67, comprised as follows: Exh. No.
Account name
Amount
647
Delaware
$ 1,517.91
648
Wisconsin income
1,672.86
649
Michigan
26,216.03
650
Net East 2( income to United
23,305.13
651
Pennsylvania (Jester)
4,699.14
652
Misc. income
2.60
The amount of $23,305.13 shown in the preceding paragraph was included in gross receipts on the United Dairy Queen partnership return of income for the year 1959. The members of the United Dairy Queen partnership, as shown on its partnership return of income for 1959, were H.F. McCullough, Ilco Corporation, and Dairy Queen Venture. 1956, 1957, and 1958 which was prepared by Pieper, the net income is shown as $11,056.37 and $20,450.59 for 1956 and 1957, respectively, and a loss of $619.24 for 1958. No part of such net income of $11,056.37 for 1956 was paid over to Micro during *206 the years 1956, 1957, 1958, and 1959. Nor was any part of such net income of $20,450.59 for 1957 paid over to Micro during the years 1957, 1958, and 1959. The general journal of United Dairy Queen, a partnership, for the year 1959 provided, in pertinent part, as follows: East 2(
$140,969.57
Ar-Tik 2( net
59,448.45
East 2( charge for store service
$41,421.99
Charge for Lark expense
63,732.04
Charge for United ex- pense
48,653.74
Income - East 2(
23,305.13
Micro Mfg - East 2( (sun- dry payables)
23,305.12
(To release net 2( from reserve - collection
per LSM consistent with pre-1954 contract
years + RAR)
On the books and records of United Dairy Queen for the year 1959, the account entitled "Net East 2( Income to United" provided as follows: During 1955, a dispute arose between Ar-Tik and Lark. Ar-Tik contended that Lark, among other things, had breached the Lark/Ar-Tik agreement in that Lark failed to remit to Ar-Tik the royalty payments collected by Lark on behalf of Ar-Tik. In a letter dated February 8, 1956, Ar-Tik informed Lark that it had given notice to Lark in writing of certain defaults in the performance of the agreement dated *207 December 31, 1954, and that since such defaults had continued for more than 15 days after the giving of such notice in writing, it exercised its option contained in the agreement and terminated all of Lark's rights to receive and collect any sum of money which was due or might become due to Ar-Tik. On March 15, 1956, Ar-Tik filed a complaint for accounting and injunction against Lark Sales Company and L.S. Murchie in Chancery in the Circuit Court, Rock Island County, Illinois. The action thereby instituted is sometimes hereinafter referred to as the Rock Island litigation. The 1267 complaint was in three counts. The first count consisted of a demand by Ar-Tik for an accounting from Lark, alleged to be acting in a fiduciary capacity in its duty to collect for and remit moneys to Ar-Tik. The second count was a prayer for damages for breach of the contract. The third count was a prayer for a permanent injunction. In the Rock Island litigation, Ar-Tik was represented by Bozeman. Lark and Murchie were represented by counsel. Count I of Ar-Tik's complaint stated, in pertinent part, as follows: 12. That upon an accounting by the defendant, Lark Sales Company, there will be found *208 due to the plaintiff from the defendant, Lark Sales Company, or L.S. Murchie, a large sum of money, the amount of which is not known to the plaintiff and which can only be ascertained by requiring the defendant, Lark Sales Company, to account in every respect as to the performance of its trust required by it to be performed on plaintiff's behalf. A hearing was had on March 19, and 20, 1956, at which Murchie gave testimony under oath. Attached to Ar-Tik's complaint was the Lark/Ar-Tik Agreement, including exhibits A through I appended thereto. This agreement was designated by Ar-Tik in its complaint as Exhibit A. One of the specific agreements appended to the Lark/Ar-Tik Agreement is Exhibit I, marked in pertinent part, "Eastern Agreement Income." The contents of that agreement have been set out in full, supra. During the course of the hearing on March 19, and 20, 1956, in the Circuit Court, the following questions were asked Murchie by the court and Bozeman regarding the Lark/Ar-Tik Agreement, and in particular, the exhibit appended marked "Eastern Agreement Income (Exhibit I)," and the following answers were given: By the Court: * * * Q. Now, with reference to these divisions *209 that are shown here on Exhibit "A" as to the various states, I notice a number of states in the west are marked Ar-Tik 4 cents, then it will say Lark 10 cents for certain counties in Illinois, and so forth, in this exhibit that's attached to the complaint marked Western Agreement Income, and another one Eastern Agreement Income? A. Yes, sir. Q. There's a third column which indicates Lark for others, who were others? A. McCulloughs, McCulloughs' Dairy Queen, that's a co-partnership, and it's largely our funds that Lark uses in its operation. * * * BY MR. BOZEMAN: Well, I would like to ask just one question in that connection. There are these columns. I didn't quite understand this. One is collecting for Ar-Tik Systems, as set forth, and the second one is collecting for Lark, is it? BY THE COURT: Right, Lark. BY MR. BOZEMAN: What is the second one, the second column is for Lark - well, who receives that, Mr. Murchie? BY THE WITNESS: Lark receives it. BY MR. BOZEMAN: And for whom? BY THE WITNESS: For itself. At page 351 of that same transcript of record, Murchie said: Q. (BY MR. SHAW) You may answer. A. Well, the first page of Exhibit "3" is a summary of report *210 of the gallonage included in other reports received by Lark Sales Company during the period from January 1 to December 13, 1954, and in that is shown the distribution of the amount of funds received by Lark during that period and included therein is $12,317.58 allocated as payable by Lark to Ar-Tik, and I assume the rest of this is the continuity of reports submitted to Ar-Tik throughout the year '55, also receipts of funds by Lark in which they have some beneficial interest. Murchie also had this to say at pages 421 and 422 of that transcript as follows: BY MR. GRAHAM: Go ahead with any other facts that come to your attention upon which your opinion is based? BY THE WITNESS: Our experience in endeavoring to collect from delinquents for the benefit of Lark Sales Company and Ar-Tik Systems has been that we have no right to collect any sums of money from them; therefore, an injunction that denies us the right to make such pleading would jeopardize the interests of Ar-Tik Systems, Inc. Our files are replete with that experience, and that is not an opinion. That is stated as a fact. BY MR. BOZEMAN: I didn't get that ending. WHEREUPON THE last portion of the preceding answer was read *211 by the Reporter. BY MR. BOZEMAN: Is he reading that correctly, Mr. Murchie? BY THE WITNESS: It sounds familiar, yes, sir. 1268 BY MR. BOZEMAN: Okay. BY MR. GRAHAM: Or to jeopardize any other interest other than the interest of Ar-Tik, Inc.? BY THE WITNESS: Definitely it would jeopardize the interests of Lark Sales Company, McCulloughs, and every operator under the royalty system in Dairy Queen in the continental United States. At pages 430 and 431 of the transcript in that hearing, Murchie testified on his direct examination as follows: A. * * * We collect our funds in Lark Sales Company in and for ourselves and recognize the beneficial interests of Ar-Tik Systems. Q. According to the Lark Sales Company, are there any other beneficial interests other than - who are these beneficial interests? A. McCulloughs' Dairy Queen. Q. And also Ar-Tik? A. Ar-Tik Systems and Lark Sales Company. Q. And Lark Sales Company? Now, let me ask you this - oh, by the way, are you through with that reference there to the complaint in a brief sort of a way, or the motion? A. Well, in the interest of brevity, I think so. I can probably think of a lot of beautiful thoughts later *212 on. Murchie also told the court at that hearing as follows: Q. Have you read paragraph 24 of Count II? A. 24? Yes, I have read it. Q. Do you admit or deny it? A. Deny it. Q. In what respect? A. Deny the valid determination of the contract. I don't understand what it means. Deny that there is any just cause. Deny there's any failure to remit to Ar-Tik. Deny that there is any failure to comply with the terms of the contract between the parties. Deny that L.S. Murchie used terminology to the effect that "we have them on the hook." Q. Do you admit or deny that? A. There was one other thing to deny. Deny that we insist upon rights to negotiate on behalf of and do bind Ar-Tik Systems in the creation of commitments. Q. For what reason? A. Our commitments in Lark Sales Company are commitments of Lark Sales Company. The beneficial interests, if any, of Ar-Tik Systems to a net amount from the Lark Sales Company is an accounting following that. But we contract in and for ourselves, Lark Sales Company. After the hearing on March 19, and 20, 1956, the defendants Lark and Murchie on April 5, 1956, filed a verified pleading with the Circuit Court in the Rock Island litigation. *213 The verified pleading containing the joint and several answer of the defendants Lark and Murchie stated, in pertinent part, as follows: 8. * * * * * * As to paragraph 8 of Count II defendants further allege that Lark Sales Company acquired under the contract attached to plaintiff's complaint the right to negotiate and otherwise proceed as in its sole discretion it deemed advisable in attempting to effect collection due to plaintiff and/or funds due to defendant, Lark Sales Company; * * * * * * 10. * * * As to paragraph 10 of Counts I and III, defendants allege that Lark Sales Company has complied with all of the terms of the contract marked Exhibit "A" and attached to the Complaint * * * * * * 18. * * * Defendants further allege that no funds of plaintiff have been diverted to the use of either L.S. Murchie or Lark Sales Company and that in fact, plaintiff has diverted large sums of money belonging to defendant, Lark Sales Company, * * * and that plaintiff has failed to report such funds received to defendant, Lark Sales Company. On April 9, 1956, the Circuit Court in the Rock Island litigation granted a temporary injunction restraining Lark Sales Company and Murchie *214 from collecting any moneys from any person for and on behalf of Ar-Tik and from using, withdrawing or otherwise disposing of any funds which Lark Sales Company and Murchie had which belonged to Ar-Tik. Thereafter, on June 29, 1956, the Circuit Court in the Rock Island litigation modified its order for temporary injunction, entered on April 9, 1956, to permit Lark to collect all moneys which may have been owing by the various franchise holders under what is known as the Lark Sales territory agreement entered into between Lark and certain state and district operators. As to other royalty payments of 4 cents which may have been due from the various state and district operators which had not, up 1269 until April 9, 1956, entered into a Lark Sales territory agreement, Ar-Tik was permitted to collect the entire 4 cents royalty payment. The order modifying the temporary injunction also provided that any payments made by state or district operators under the court's order as modified, constituted a discharge of their liability with respect to both Ar-Tik and Lark; and that Lark forward to Ar-Tik on or before July 10, 1956, any and all moneys which it had collected between April 9, 1956, and *215 June 30, 1956, to which Ar-Tik was entitled, but after deducting therefrom, authorized commitments for advertising and store services. The injunction as modified was to remain in full force and effect until further order of the court but it was also subject to and conditioned upon the performance of the following terms as they applied to Ar-Tik: 1. Ar-Tik, upon receipt of any moneys to which Lark was entitled, was to make a report thereof and remit the same to Lark not later than the fifth day of the month following the month in which they were collected. 2. Lark, upon receipt of any moneys to which Ar-Tik was entitled, was to make a report thereof and remit the same to Ar-Tik not later than the fifth day of the month following the month in which they were collected, after deduction of authorized commitments for advertising and store services, provided, however, that Lark furnish Ar-Tik with a list showing the exact commitments. 3. Ar-Tik was to forward to Lark for the purposes of advertising and store deficiencies from the amounts collected in its own behalf, such amounts per gallon as had been previously committed, by the fifth day of the month following the month of collection, *216 provided, however, that Lark provide Ar-Tik with a list showing the exact commitments made. 4. Ar-Tik was to forward to Lark on or before July 10, 1956, any and all moneys which it had collected between the dates of April 9, 1956, and June 30, 1956, to which Lark was entitled but after deducting therefrom, authorized commitments of the parties for advertising and store services already paid out by Ar-Tik. Ar-Tik was to furnish Lark with a list showing payments of such commitments and to whom made. By agreement dated October 14, 1959, Lark, Ar-Tik, H.A. McCullough, individually, H.A. McCullough and H.F. McCullough, copartners doing business as McCulloughs Dairy Queen and McCulloughs Dairy Queen, Inc., terminated the Lark/Ar-Tik Agreement and in so doing provided as follows: WHEREAS, the parties hereto are all of the parties to a certain Agreement dated December 31, 1954, which Agreement was executed on February 25, 1955 (hereinafter sometimes referred to as Lark-Ar-Tik Agreement), and WHEREAS, the said parties do hereby desire to terminate said Agreement; NOW, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable considerations, the parties do hereby *217 agree as follows: 1. That the Lark-Ar-Tik Agreement is hereby terminated in all respects. 2. It is further agreed and understood that the ownership, right and title of the trade-mark and trade-name "Dairy Queen" still remains with Dairy Queen. 3. It is further agreed and understood that Dairy Queen, McCullough, Ar-Tik, Lark and McCulloughs' Dairy Queen, Inc. have fully performed each and every Agreement made with each other or their predecessors in interest and each of them does further release and discharge each other of and from all liabilities in connection with or arising under said Agreements. It is expressly understood by all of the parties that this release, as well as any prior releases of a similar nature and content, then, and do not now in any way affect the rights and obligations of the parties hereto with respect to any other parties not signatories thereto. [4] It is further agreed and understood that each of the parties hereto shall have the right, in its own name or in the name of any of the other signatories hereto, but at its sole cost and expense, to take such action as it may deem necessary or proper to enforce the liability of any "Dairy Queen" licensee *218 and each of the parties agree to cooperate in the enforcement of said liabilities. 5. It is further agreed and understood that all freezers used in the processing of the frozen dairy products sold under the trade-mark or trade-name "Dairy Queen" shall be manufactured and/or sold under the supervision and control of Lark. IN WITNESS WHEREOF Lark, Ar-Tik and McCulloughs' Dairy Queen, Inc. have caused these presents to be signed in their respective corporate names and their respective corporate seals to be affixed, by their thereunto duly authorized officers, and H.A. McCullough and 1270 H.F. McCullough, copartners doing business as McCulloughs' Dairy Queen, and H.A. McCullough, individually, have hereunto set their hands and affixed their seals, upon this, the day and year first above written, at Moline, Illinois. Signed, Sealed and Delivered in the presence of: /s/ Duane P. Benson LARK SALES COMPANY By /s/ G.E. Stange President ATTEST: /s/ H.N. Pieper Secretary AR-TIK SYSTEMS, INC. By /s/ Harold F. Oltz President ATTEST: /s/ Roger D. Oltz Secretary /s/ L.S. Murchie, Attorney-in-Fact (SEAL) H.A. McCullough /s/ H.F. McCullough (SEAL) *219 H.F. McCullough Co-partners doing business as McCULLOUGHS' DAIRY
QUEEN
As to H.A. McCullough and H.F. McCullough, co-partners doing business as McCulloughs' Dairy Queen /s/ Duane P. Benson As to H.A. McCullough Individually /s/ L.S. Murchie Attorney-in-Fact (SEAL) H.A. McCullough, Individually McCULLOUGHS' DAIRY
QUEEN, INC. By /s/ Charles J. Hott President ATTEST: /s/ P.D. Robinson, Jr. Secretary By petitioner's journal entry No. 7, dated June 30, 1955, the amount of $62,461.32 was recorded as follows: Debits Ar-Tik 62,461.32
Credits Lark 62,461.32 Explanation 3,843,773-3/4 at 1-5/8 - 1954 Per Ar-Tik The amount of $62,461.32 was posted on the books and records of petitioner to an account entitled "LARK ACCOMMODATION CREDITS" by entry dated June 23, 1955. After the Peoria litigation was commenced on March 25, 1954, Ar-Tik withheld payments from 2( East from the McCulloughs during the rest of the year 1954 in the aforementioned amount of $62,461.32. The amount of $62,461.32 represented a total gallonage from 2( East of 3,843,773-3/4 at 1-5/8 cents per gallon, that is to say, 2 cents per gallon, less three-eights of a cent for agreed *220 upon dues. By an agreement dated December 31, 1954 (Lark/Ar-Tik Agreement), Lark entered upon its duties as collection agent for Ar-Tik on or about February 23, 1955. In general, from January 1955 through September 1955, Lark did not remit any moneys to Ar-Tik. There was a meeting or telephone conversation between Murchie and Oltz in June 1955 regarding the $62,461.32. Ar-Tik and Lark reached an agreement and it was settled in September 1955. The amount of $62,461.32, which Ar-Tik had been withholding for the year 1954 and a similar amount which Lark had been withholding through August of 1955, were set off against each other in an exchange of funds. Lark paid no cash or property of any kind to either the McCulloughs or Micro for the $62,461.32 which was reported by Lark in sales in the corporate income tax return for the year 1955. The joint and several answer filed by the defendants Lark and Murchie on April 5, 1956, in the Rock Island litigation, in pertinent part, stated as follows: Defendants further alleged that by oral agreement of the parties during March of 1955 and subsequent to the execution of the said contract, a pattern of offset was established which relieved *221 defendant, Lark Sales Company, of any duty to remit to plaintiff, that at said time and solely at the request of plaintiff, defendant Lark Company permitted plaintiff the right to retain in excess of $62,000 owing to defendant Lark Sales Company, for the year 1954, solely at the request of plaintiff, as an aid to its financing of operations by it * * * On October 4, 1955, and to be effective from and after September 1, 1955, the Medds, individually and as copartners doing business as Dairy Queen Stores of Ohio and doing business as Dairy Queen Stores of Eastern New York (as sellers) and Lark Sales Company (as buyer) entered into an agreement entitled "Contract of Sale," which is and has been herein sometimes referred to as the September 1, 1955, Contract of 1271 Sale. Pursuant to the foregoing contract, Medd Partnership sold its business es and properties in Ohio and in Eastern New York to Lark. As part payment for its purchase of the businesses and properties, Lark, on October 4, 1955, paid Medd Partnership $150,000. In its income tax return for 1955, Lark took in reduction of its gross income for that year the entire amount of the $150,000 composed of the following: An offset against income for 1955 from 2(
$24,498.53
East derived from Ohio and Eastern New
York, net of dues
An offset against income for 1955 derived
from Ohio and Eastern New
York other than 2( East
19,105.19
$ 43,603.72
As cost of goods sold
106,396.28
Total
$150,000.00
*222 The joint and several answer filed by defendants Lark and Murchie on April 5, 1956, in the Circuit Court in the Rock Island litigation stated, in pertinent part, as follows: 19. * * * Defendants further allege that all amounts received by defendant, Lark Sales Company, from franchise holders in the State of Ohio, have been fully accounted for to plaintiff in reports referred to and summarized in plaintiff's Exhibit "C" attached to the Complaint; that defendant, L.S. Murchie has received no sums of money from franchise holders in the State of Ohio; that the sums of money received by defendant, Lark Sales Company, were included in part in the assets acquired in the purchase of the Dairy Queen business * * * Murchie is a certified public accountant. He has been a certified public accountant since 1934. He is certified to practice in Illinois. Prior to 1947, Murchie worked for himself. He also worked for a nationally known firm of certified public accountants for 16 years. Murchie is not an attorney. However, he is authorized to practice before the Tax Court of the United States. He was admitted to such practice in 1938. At all times here material, Murchie conducted his accounting *223 business from the Moline National Bank Building, Moline, Illinois, under the name L. S. Murchie & Company. The office of L. S. Murchie & Company is located on the fifth floor. Post Office Box 335 is the post office box maintained by L. S. Murchie & Company. Lark had maintained an office on the fourth floor (Room 401) of the Moline National Bank Building. However, such office may have been moved to Murchie's office on the fifth floor some time during the period herein involved. Lark's office was occupied by G. L. Ball and H. F. McCullough when the latter was in town. Ball was employed by Lark as an independent contractor and began work for Lark on March 9, 1955. No taxes were withheld by Lark from his compensation. G. E. Stange held the office of president of Lark. He worked for Murchie, personally, and his time and charges went through the books of Murchie. Stange had a separate office which was adjacent to Lark. Sometimes Murchie paid the rent for that office. Stange worked under the direction of Murchie. Charles J. Hott worked for Murchie during the years 1945 through 1958. P. D. Robinson also worked for Murchie during the years herein involved on a salary basis and taxes *224 were withheld. L. O. Hunt also was employed by Murchie. Gladys C. Noach also was employed by Murchie as office secretary. Ultimate Findings of Fact During 1954 and prior to December 31 thereof, H. A. McCullough and his successor in interest, McCulloughs Dairy Queen, a partnership, transferred to Lark all of their rights in and to the 2( East royalty payable under the Eastern Agreement and thereafter throughout the taxable years here involved Lark continued to be the owner of such royalty. Opinion The respondent now has modified the amounts determined originally as to the unreported and additional taxable income from 2( East royalties paid to petitioner as set out below: 1956
1957
1958
Determined
$61,279.20
$69,753.35
$51,756.90
Modifications
7,484.16
7,674.16
6,818.81
Remainder
$53,795.04
$62,079.19
$44,938.09
Implicit in the respondent's determinations as so modified is the determination that petitioner was the owner of the 2( East royalties and derived income therefrom during the respective indicated years. The respondent takes a like position herein. A brief review of the source of the 2( East royalties follows: By an agreement *225 entered into on September 7, 1946, between Ar-Tik and H. A. 1272 McCullough and herein referred to as the Eastern Agreement, Ar-Tik exclusively licensed McCullough to use, manufacture, and sell, and to permit others to use, manufacture, and sell, freezers built under the Oltz patent until the expiration of that patent, May 18, 1954, in all that part of the continental United States lying east of the Mississippi River, except the States of Florida, Illinois, Wisconsin, and Louisiana, and the following counties: Greenville County, South Carolina, Mecklenburg County, North Carolina, and Hinds County, Mississippi. In consideration of Ar-Tik granting to him the rights and licenses under the Eastern Agreement, McCullough agreed to pay to Ar-Tik the sum of $10,000 upon execution of the agreement and 60 percent of all sums received by him from his granting of territorial rights to third persons until the sum of $102,000 had been paid to Ar-Tik. The Eastern Agreement required that copies of all sublicenses granted by MeCullough be promptly furnished to ArTik, that all freezers manufactured bear a serial number, and that Ar-Tik be informed at all times of the location of freezers manufactured *226 by McCullough or his sublicensees. The Eastern Agreement further required that all sublicenses granted by McCullough would contain a provision obligating the sublicensee to pay to Ar-Tik a royalty of 2 cents per gallon on a mix used in the freezers, such royalty to continue during the life of the freezers regardless of the expiration of the patent. On September 17, 1947, the Eastern Agreement was amended. H. A. McCullough returned to Ar-Tik the exclusive rights to use, manufacture, and sell the freezers in certain specified States. Sometime after September 7, 1946, and prior to February 20, 1953, H. A. McCullough assigned the original Eastern Agreement, as amended by the foregoing agreement of September 7, 1947, to McCulloughs Dairy Queen, a copartnership. From and after the execution of the Eastern Agreement on September 7, 1946, the parties thereto treated it as containing a provision that all subcontracts issued by McCullough obligate the subcontractor, successors, and assigns to pay Ar-Tik 4 cents per gallon on all mix used in the machines built under the Oltz patent, such payments to continue during the life of the machines regardless of the expiration of any patents, that *227 such 4 cents per gallon be divided equally between Ar-Tik and McCullough, and that Ar-Tik remit to McCullough 2 cents per gallon each month as collected from the subcontractor. On February 20, 1953, Ar-Tik and McCulloughs Dairy Queen executed a supplement and amendment to the Eastern Agreement wherein was incorporated the manner of treatment theretofore made with respect to the 4 cents per gallon of mix to be paid to Ar-Tik and the 2 cents thereof to be remitted by Ar-Tik to McCullough. The Eastern Agreement as thus supplemented and amended is the source of the 2( East royalty payments involved herein. After a careful overall consideration of the oral and documentary evidence of record bearing on the question and the contentions and arguments of the parties on brief with respect thereto, we have concluded and found as an ultimate finding of fact that during 1954 and prior to December 31, thereof, H. A. McCullough and his successor in interest, McCulloughs Dairy Queen, a partnership, transferred to Lark all of their rights in and to the 2( East royalty payable under the Eastern Agreement and thereafter throughout the taxable years here involved, Lark continued to be the owner of *228 such royalty. See Ar-Tik Systems v. Lark Sales Company, 12 Ill. App. 2d 304, 139 N.E. 308, 321 (1957), involving appeals by Lark and Murchie in the Rock Island litigation, which in turn involved royalties under both the Western Agreement and the Eastern Agreement, and wherein the Illinois Court of Appeals held that "Prior to December 31, 1954, [H. A.] McCullough and his successors in interest transferred all of their rights to defendant, Lark Sales Company." The agreement of April 2, 1954, between Lark, H. A. McCullough, and H. A. McCullough, individually and doing business as McCulloughs Dairy Queen, shows that it was made on April 2, 1954, and executed by the parties thereto on the same date. The agreement further shows the assignment to Lark by H. A. McCullough and his successor in interest, McCulloughs Dairy Queen of 2( East royalty payable under the Eastern Agreement. The agreement of April 2, 1954, is specifically referred to as such in the Lark/Ar-Tik Agreement of December 31, 1954, and was expressly made a part thereof as Exhibit G-1. In its opinion in Ar-Tik Systems v. Lark Sales Company, supra, the Illinois Court of Appeals quoted the Lark/Ar-Tik *229 Agreement in full. As a consequence that Court had before it all 1273 the provisions of the agreement of April 2, 1954, and made no modification of any of them. Implicit in the holding of the Illinois Court of Appeals is recognition of the agreement of April 2, 1954, and the transfer thereby of the 2( East by H. A. McCullough and his successor in interest, McCulloughs Dairy Queen, to Lark prior to December 31, 1954. The petitioner, relying on various exhibits of record herein, particularly one entitled "Bill of Sale and Agreement." dated December 30, 1950, contends that Micro Manufacturing Company, a partnership, acquired on the foregoing date from Ilco-Mac Venture, ownership of the 2( East royalty interest under the Eastern Agreement; that during the taxable years 1956, 1957, and 1958, Micro Manufacturing Company was the actual owner of the 2( East royalty interest; that the provisions of the agreement of April 2, 1954, relating to the assignment by H. A. McCullough and McCulloughs Dairy Queen of the 2( East royalty interest to petitioner were for security purposes only and were not intended to and did not vest in petitioner actual ownership of the 2( East royalty interest; *230 and that accordingly the income derived from the 2( East royalties during the years 1956, 1957, and 1958 was not taxable to petitioner for the respective years. The Bill of Sale and Agreement relied on by petitioner provided as follows: BILL OF SALE AND AGREEMENT DATE - December 30, 1950 PARTIES - Ilco-Mac Venture and L. S. Murchie, Agent, Micro Manufacturing Co.
SUBJECT - Bill of sale and agreement for interests in and to contract with Ar-Tik Systems Inc. referred to as Eastern WHEREAS, Ilco-Mac Venture is the owner of contract with Ar-Tik Systems Inc. regarding amounts received on account of 2( per gallon on mix used and sold in Eastern territory by Ar-Tik Systems Inc. and WHEREAS, Ilco-Mac Venture is obligated to Ar-Tik Systems Inc. on account of purchase of Eastern territory from Ar-Tik Systems Inc., and WHEREAS, Ilco-Mac Venture for the best interests of the coadventurers in said venture wish to dispose of rights receivable from Ar-Tik and wishes to liquidate amount due to Ar-Tik for acquisition of Eastern territory for sole account of Ilco-Mac Venture, and WHEREAS, L. S. Murchie as Agent, has found Micro Manufacturing Co. willing to acquire said interests from *231 and assume said indebtedness of Ilco-Mac Venture to Ar-Tik Systems Inc. NOW, THEREFORE, Ilco-Mac Venture hereby sells, assigns, sets-over, and delivers unto L. S. Murchie, Agent, in consideration of $1.00 and other good and valuable considerations the receipt and adequacy wherof is hereby acknowledged, all rights titles and interests in and to a certain agreement with Ar-Tik Systems Inc. under which 2( per gallon is payable by Ar-Tik Systems Inc. in liquidation of the interests in Eastern territory. Ilco-Mac Venture hereby warrants title to said interests and guarantees to L. S. Murchie, Agent, without any reservation whatsoever, the collection thereof for account of L. S. Murchie, Agent, and such guaranty shall be binding upon the said Ilco-Mac Venture and/or the coadventurers therein, their successors, executors, and assigns. The parties hereto recognize and hereby agree that L. S. Murchie, Agent, shall assume and agree to pay the indebtedness of Ilco-Mac Venture to Ar-Tik Systems, Inc., in the amount of $15,368.88 as of this date, out of the proceeds of amounts collected from Ar-Tik Systems Inc., after this date. Ilco-Mac Venture hereby pays over as of this date, the sum *232 of $13,455.13 out of collections made from Ar-Tik Systems Inc. on account of the 2( per gallon hereunder as described hereinabove, since May 1,1950 to date. As part consideration for this payment and the foregoing, L. S. Murchie, Agent, shall be obligated to pay out of future collections on the foregoing, various amounts from time to time as agreed between the parties hereto, on account of dues of the Dairy Queen National Trade Association for the year 1951 and future years. L. S. Murchie, Agent, by execution of this agreement hereby assumes and agrees to pay the obligations stated hereunder. Executed at Moline, Illinois, this 30th day of December A.D. 1950. ILCO-MAC VENTURE
By /s/ H. F. McCullough ACCEPTED: /s/ L. S. Murchie, Agent L. S. MURCHIE, AGENT. From our consideration of the foregoing instrument in connection with the record relating thereto, we are unable to find that any one of the three "2( per gallon" referred to therein is properly identifiable with the 2( East assigned to petitioner by H. A. McCullough by McCulloughs Dairy Queen by the agreement of April 2, 1954. Of the 4 cents per gallon of mix collected by Ar-Tik under the Eastern Agreement, 2 cents *233 thereof belonged to Ar-Tik and the other 2 cents was 1274 payable to H. A. McCullough and/or McCulloughs Dairy Queen. Murchie testified that he did not pay any cash and did not transfer any property to Ilco-Mac Venture in connection with the transaction involved in the above-mentioned instruments. Murchie further testified that with the exception of the indebtedness of Ilco-Mac Venture to Ar-Tik Systems, Inc., in the amount of $15,368.88 stated in the above-mentioned instrument which was payable "out of the proceeds of amounts collected from Ar-Tik Systems, Inc., after this date [December 30, 1950]," Micro Manufacturing Company paid nothing. Since there is no showing that on December 30, 1950, the $15,368.88 or a larger amount was not currently payable by Ar-Tik, we can only conclude that by the provisions of the Bill of Sale and Agreement, Ilco-Mac Venture, in effect, reserved from the assets transferred by it to Micro, an amount equal to $15,368.88 to be applied in payment of the latter amount when collected. In such a situation, Micro, in effect, paid nothing for any property it may have acquired from Ilco-Mac Venture. Consequently, we are unable to find that either Murchie *234 or Micro paid any consideration to Ilco-Mac Venture for any property or properties involved in the above-mentioned Bill of Sale and Agreement. There is no showing that Micro at any time executed any instrument showing or purporting to show an assignment of the 2( East royalty interest here involved to petitioner (Lark), or to any other corporation, or to any individual either as security for performance of the Lark/Ar-Tik Agreement of December 31, 1954, or for any other agreement, or for transfer of ownership of such interest. In view of the record presented as to the contentions of the petitioner, we are unable to find that Micro Manufacturing Company on December 30, 1950, or any other date thereafter, acquired the ownership of the 2( East royalty interest involved herein. Accordingly the contentions of the petitioner are not sustained. The parties have stipulated that in the event it is finally determined that during 1956, 1957, and 1958 petitioner realized income from 2( East, the sales reported by petitioner in its income tax returns for such years shall be reduced by the amounts of $11,366.43, $8,300.91, and $7,367.69, respectively, computed as follows:
1956
1957
1958
(a) Expenses determined by
$18,451.80
$13,022.70
$10,022.08
petitioner to be allocable to
2( East, the "reimbursement"
of which was included in
sales
(b) Less: L. S. Murchie & Co.
7,085.37
4,721.79
2,654.39
accounting fees included in
(a) above
Total
$11,366.43
$ 8,300.91
$ 7,367.69
*235 Since we have held above that petitioner derived taxable income from 2( East royalty for the years 1956, 1957, and 1958, effect will be given herein to the above-mentioned stipulation. Respecting his determination of petitioner's income for 1956, 1957, and 1958, the respondent in his reply brief concedes the following: 1. That Dairy Queen gallonage from the Maryland area for 1957 was duplicated for 1958. 2. That petitioner's income derived from 2( East in 1956 and 1957 should be reduced by the amounts of $2,057.77 and $4,781.73, respectively, which were reflected in reports of August 1956, July 1957, and November 1957 to Ar-Tik. 3. That petitioner's income derived from 2( East for 1956, 1957, and 1958 should be reduced by the expenses paid by United Dairy Queen and allocated to 2( East on the books of United Dairy Queen but not on the books of petitioner as follows: 1956
$ 4,821.00
1957
4,876.16
1958
19,900.97
The foregoing concessions of respondent will be given effect in recomputations of petitioner's income for the respective years under Rule 50. Other or larger amounts sought by petitioner are not sustained on the basis of the record. Issue 4. *236 Whether Lark, the petitioner, purchased the property interest of the Medd Partnership in 1955 in Ohio and Eastern New York and thereby realized income from Dairy Queen royalties and other receipts from those areas, sometimes referred to as Ohio-Eastern New York or Medd Level, in the amounts of $56,597.69, $45,787.99, and $46,342.76 during 1956, 1957, and 1958, respectively 1275 Findings of Fact By the September 1, 1955, Contract of Sale, the Medd Partnership sold, assigned, and transferred to Lark the partnership Dairy Queen businesses and properties in Ohio and Eastern New York as set forth in the foregoing contract and as heretofore set forth in our Findings in the cases of Medd and Lark. In the case of Lark, we have held that Lark's payment for the businesses and properties was $176,301.23, which was composed of $136,797.40, representing a portion of the lump sum cash payment of $150,000 made by Lark in October 1955 to Medd Partnership, and $39,503.83, representing Lark's payment also made in October 1955 of unpaid legal fees and expenses owing by Medd Partnership to its attorneys. After the Medd acquisition, H. F. McCullough went to Ohio in November 1955 to attempt *237 to get district operators to enter into Lark Sales Company contracts. He spent most of the time between November 1955 and March 1956 in Ohio negotiating the Lark agreements with district and store operators. During this period, he was rendering services for and was paid by Lark; therefore, no taxes were withheld therefrom by lark. At the time he was negotiating these contracts, he advised the district and store operators that he was acting on behalf of Lark. McCullough further advised the district and store operators that Lark had acquired the Medds' business interest in Ohio. All of the contracts negotiated by McCullough in Ohio on the district operators' level were uniformly negotiated in the name of Lark Sales Company as party of the first part. Under the Lark Sales Company contract, each district operator was obligated to pay royalties to Lark in the amount stated in the contract. As has been set forth in our findings on issue 3, after October 4, 1955, receipts of royalty income from the State of Ohio and the eastern part of New York were recorded in the cash receipts journal of Lark. Column 1 shows the month and date on which the check or cash was received. Column 2 *238 shows the name of the state or district operator who forwarded money. Column 3 shows the check number, if any, of the payor. Column 4 shows the date of the check itself. Column 5 shows the bank number of the payor. Column 6 shows the total gallons. Column 7 shows the amount of either the cash or check received. Column 8, which is headed "W," stands for the total payments received from the western part of the United States. Column 9 is headed "E" and shows the total cash receipts from the eastern part of the United States. The last two columns, 10 and 11, are general columns to record items other than those elsewhere specifically provided for. Exclusive of receipts from 4( East, the petitioner received royalty income from Ohio and Eastern New York in the amounts of $1,265.96 and $650.50, respectively, after October 4, 1955, covering the period of Dairy Queen business operations from September 1955 through December 1955. After October 4, 1955, receipts of Dairy Queen royalty income from Ohio and Eastern New York (exclusive of 4( East income) for 1955 were credited by Lark to the account "Suspense Acct-Medd." Included therein were the amounts of $1,265.96 and $650.50 referred to in *239 the preceding paragraph. As of December 31, 1955, the total amount in the account Suspense Acct-Medd was $31,126.17, and after deductions of dues charged to the account, the net amount thereof was $19,105.19. The entire amount of $150,000 paid by Lark to the Medd Partnership was claimed by the petitioner in reduction of gross income for the year 1955 as follows: An offset against income for 1955 from 2( East derived from
$ 24,498.53
Ohio and Eastern New York
An offset against income for 1955 de- rived from Ohio and
19,105.19
Eastern New York, other than 2( East
%cost of goods sold
106,396.28
$150,000.00
During the months of January and February 1956, receipts from Ohio and Eastern New York were recorded in Lark's cash receipts journal in the same manner as they had been in 1955. In its cash receipts journal for the months of January and February 1956, the petitioner recorded receipts from Ohio and Eastern New York (exclusive of income derived from 4( East) in the total amounts of $210.60 and $964.27, respectively, covering the period of Dairy Queen business operations in those areas from September 1955 though December 1955, as follows: 1276 Month of operation
Ohio
Eastern
New York
Sept.-Oct. 1955
$ 55.55
Oct. 1955
29.26
Nov.-Dec. 1955
125.79
$210.60
Oct. 1955
$304.52
Oct. 1955
564.33
Nov. 1955
83.20
Dec. 1955
12.22
*240 Each item referred to in the immediately preceding paragraph and the second paragraph preceding that was shown in the General column as a credit to Medd Suspense Acct. During the months of March and April 1956, the petitioner received and recorded in its cash receipts journal, royalty collections from Ohio (exclusive of collections derived from 4( East) in the total amount of $194.04 and $934.50, respectively, covering the period of Dairy Queen business operations for the months of February and March 1956, as follows: Month of operation
Amount
Feb. 1956
$ 56.70
Feb. 1956
29.4o
Feb. 1956
107.94
$194.04
Mar. 1956
$66.50
Mar. 1956
28.00
Mar. 1956
24.50
Mar. 1956
26.60
Mar. 1956
89.60
Mar. 1956
32.20
Mar. 1956
66.50
Mar. 1956
67.20
Mar. 1956
255.50
Feb.-Mar. 1956
168.70
Mar. 1956
49.70
Mar. 1956
59.50
$934.50
Each item referred to in the above paragraphs was recorded in the books and records of Lark as a credit to the account "RESERVE McCULLOUGHS DAIRY QUEEN, INC." The total amount of $5,291.93, which appears in the account RESERVE McCULLOUGHS DAIRY QUEEN, INC., represented collections from Ohio and Eastern New York (exclusive *241 of 4( East and also in the case of Eastern New York, exclusive of overrides and franchise balances) during the period January 1, 1956, through April 10, 1956. Included in the amount of $5,291.93 is a check from A. W. Martin in the amount of $59.50. It is the last item in this account. The date of Martin's check is April 10, 1956. This item was recorded in Lark's cash receipts journal by entry dated April 12, 1956. After April 10, 1956, no other receipts (except one item in the amount of $59.50) of royalty income from Ohio and Eastern New York was credited to the account RESERVE McCULLOUGHS DAIRY QUEEN, INC. The account was closed out by an adjusting journal entry as of December 31, 1956. During the year 1955 and through April 9, 1956, the petitioner maintained a bank account at the Moline National Bank of Moline, Illinois, and receipts from Dairy Queen operations were deposited therein. A few days after the Circuit Court entered its temporary injunction on April 9, 1956, in the Rock Island litigation, the petitioner ceased making deposits in its account at the Moline National Bank. The checks which were received were retained in Lark's office until May 23, 1956, when Lark opened *242 a new account at the First National Bank of Moline. Thereafter, the receipt of royalty funds were deposited in this account. Receipts from Ohio only (exclusive of income derived from 4( East) from and after April 10, 1956, were recorded as a credit to a new account called "RESERVE - McCULLOUGHS DAIRY QUEEN, INC. SPECIAL." McCulloughs Dairy Queen, Inc., filed corporate returns with the district director of internal revenue at Chicago, Illinois, for the fiscal years ended March 31, 1956, March 31, 1957, March 31, 1958, and March 31, 1959. These returns were prepared by an employee of Murchie. The McCulloughs Dairy Queen, Inc., return for the year ended March 31, 1956, showed no income and no deductions. The only asset reflected in the return was an account receivable in the amount of $1,000. There were no liabilities. Capital stock was shown in the amount of $1,000. The address shown on the return was P.O.Box 335, Moline, Illinois, which is the post office box number of L. S. Murchie & Company. The return was filed with the district director on June 5, 1956. The McCulloughs Dairy Queen, Inc., returns for the years ended March 31, 1957, March 31, 1958, and March 31, 1959, show *243 income and deductions as follows: 1277 1957
March 31 1958
1959
Gross sales
$5,216.93
$16,630.35
$1,227.56
Deductions
$ 46.35
$ 60.19
$ 62.63
6,000.00
15,000.00
$6,046.35
$15,060.19
$ 62.63
Net income or (loss)
(829.42)
1,570.16
1,164.93
Less NOLD
829.42
$ (829.42)
$ 740.74
$1,164.93
The address shown on the return of McCulloughs Dairy Queen, Inc., for the years ended March 31, 1957, March 31, 1958, and March 31, 1959, was also that of L. S. Murchie & Company. During the period April 2, 1954, until March 31, 1957, no bookkeeping entry was made on the books and records maintained with respect to McCulloughs Dairy Queen, Inc. The only entry during that period was an entry made on April 2, 1954, which reflected the issuance of 100 shares of stock for $1,000. H. A. McCullough did not know what assets were owned by McCulloughs Dairy Queen, Inc. According to him, the corporation, McCulloughs Dairy Queen, Inc., was "nothing but a holding company." Its sole purpose was to "hold" the trade name Dairy Queen and it was not intended to be an operating company. McCullough did not keep or maintain any books and records. Murchie kept *244 the books in Moline, Illinois. McCullough was not aware that McCulloughs Dairy Queen, Inc., filed income tax returns for the years herein involved or that it had reported income on its returns. Philip D. Robinson, hereinafter sometimes called Robinson, has been an accountant since 1951. He began working for Murchie during 1951 and at all times here material was his employee. When Robinson began working for Murchie, he was paid a salary of $250 a month. By 1958 he was paid about $600 or $700 a month. He had no share or interest in L. S. Murchie & Company. He never owned stock in Lark. Robinson was an officer in McCulloughs Dairy Queen, Inc., holding the office of secretary-treasurer. In or about 1958 and apparently after the death of M. P. Murchie, the wife of L. S. Murchie, Robinson acquired from Murchie 4 shares of stock in McCulloughs Dairy Queen, Inc. He paid nothing to Murchie for the shares. Robinson acquired certain shares of stock in Bettendorf Steel Castings Company and Ilco Corporation from Murchie in 1958. These companies purportedly had some association with the Dairy Queen business. Murchie also purportedly had shares in those companies. Robinson paid nothing *245 to Murchie for the shares of stock in the two companies which he acquired from Murchie and considered that such shares were gifts. In 1963, Robinson received about $190,000 in connection with the purported liquidation of the two companies. With respect to the amount so received, Murchie in 1964 demanded that Robinson pay him approximately $90,000. Robinson did not pay him anything and left the employment of Murchie on May 4, 1964. Ultimate Finding During 1955 through 1958, the petitioner was the owner of property interests under which it was entitled to receive royalties and other sums payable by all holders of Dairy Queen territorial franchises in Ohio and the eastern part of New York, and during 1956, 1957, and 1958 received and realized taxable income by reason of its ownership of such interests in the amounts of $56,597.69, $45,787.99, and $46,342.76, respectively, which it failed to report on its income tax returns for the respective years. Opinion Under the September 1, 1955, Contract of Sale, the Medd rights in Ohio and Eastern New York were transferred to petitioner. The amounts of royalties and other sums received by petitioner by reason of those rights are sometimes *246 herein referred to as Ohio-Eastern New York or Medd Level. The petitioner takes the position that by reason of an assignment excuted by it and dated November 1, 1955, the Medd rights in Ohio and Eastern New York were transferred by petitioner to McCulloughs Dairy Queen, Inc., and that therefore, the petitioner was not taxable on the income resulting therefrom during the years 1956, 1957, and 1958. As support for its position, the petitioner relies on an undated instrument entitled "Assignment of Trade-Mark and Trade Name" whereby Cecil R. Medd and Richard L. Medd, on behalf of all members of the Medd Partnership, purportedly sold and assigned to McCulloughs Dairy Queen, Inc., all their right, title, and interest in and to the trademark and trade name Dairy Queen, together with the goodwill of the business in connection with 1278 which the trademark and trade name were used. While Cecil and Richard Medd signed the foregoing instrument, they did not appear before a notary public and they did not acknowledge their signatures on September 20, 1954, as later was entered on such instrument. Neither McCulloughs Dairy Queen, Inc., nor Lark or Murchie paid any cash or property to the *247 Medds in connection with the foregoing purported "assignment." Contemporaneously with the execution of the above-mentioned assignment, Cecil and Richard Medd, on behalf of all members of the Medd Partnership, signed an undated second instrument entitled "Territory Agreement" under the terms of which Lark, as an alleged licensee of McCulloughs Dairy Queen, Inc., purported to assign and transfer to the Medds the exclusive right to use the trademark and trade name Dairy Queen in the State of Ohio and the Medds agreed to pay to Lark the sum of 4 cents per gallon of mix used in the preparation of soft frozen ice milk sold under that name. This undated instrument was signed for Lark by H.A. McCullough, Agent, and contained his acknowledgment dated September 20, 1954. There was no acknowledgment by either Cecil or Richard Medd contained in this instrument. Neither Lark nor Murchie received any money or other property from the Medds in connection with this therewith. Nothing of value changed hands between the parties. The Medds made no payments to Lark pursuant to the terms thereof. The two undated instruments referred to above were prepared by Murchie. They were not intended to have any *248 force or effect but were intended to be held in "escrow" by Murchie and used by him solely in an effort to effect settlement of the Ohio litigation, which he failed to effect. Another instrument relied on by petitioner in support of its position here is that of October 30, 1954, by which Medd Partnership entered into an executory agreement with McCulloughs Dairy Queen, Inc., and Lark. This agreement was signed by Cecil Medd on behalf of the Medd Partnership and by Murchie, attorney in fact for McCulloughs Dairy Queen, Inc., and for Lark. This executory agreement was never consummated and there is no showing that any money or property passed to or between any of the parties to the agreement. In view of what has been said above, we are unable to find that either the abovementioned two undated agreements or the above-mentioned unconsummated executory agreement of October 30, 1954, in anywise effected the transfer of any property or interest therein to anyone, or in anywise support the petitioner's contention herein. Respecting its assignment dated November 1, 1955, under which petitioner contends that it transferred its Medd rights in Ohio and Eastern New York to McCulloughs Dairy *249 Queen, Inc., there is no showing of any payment of consideration therefor by United Dairy Queen, Inc., to Lark. In our view this is significant since only a few weeks earlier petitioner had disbursed more than $176,000 to and in behalf of Medd Partnership in order to acquire the property rights in issue. Royalty receipts from Ohio licenses during the period from November 1, 1955, to the end of 1955, were received by petitioner, were recorded in petitioner's books of account as petitioner's income, and were included in the gross income reported by petitioner in its income tax return for 1955. The receipts were retained by petitioner thereafter. A corporation income tax return was filed by McCulloughs Dairy Queen, Inc., for the year ended March 31, 1956. However, the receipts during the period November 1, 1955, to March 31, 1956, in respect of Dairy Queen operations in Ohio and Eastern New York were not reported thereon. In fact, the return showed no receipts and no deductions. Nor did it show any assets or any liabilities. The books and records of the corporation disclose that for the entire period from April 2, 1954 (the corporation was organized on April 1, 1954), until March 31, 1957, the *250 only business transaction in which the corporation engaged was one in which it received $1,000 for the issuance of 100 shares of its capital stock to Murchie. Nowhere on the books of petitioner does there appear an entry to record the alleged transfer of the property rights in Ohio and Eastern New York in issue to McCulloughs Dairy Queen, Inc. Nowhere on the books of the latter does there appear an entry to record its alleged acquisition of the property rights in Ohio and Eastern New York in issue. In view of the foregoing and from a consideration of the remainder of the record bearing on the instant issue, we are of the 1279 opinion and so hold that petitioner has failed to show that it was not the owner during the years 1956, 1957, and 1958 of the property rights in Ohio and Eastern New York here in issue and did not receive and realize taxable income by reason of its ownership of the property rights in issue. Respecting his determination of petitioner's income derived from the Medd Level for 1956, 1957, and 1958, the respondent in his reply brief concedes the following: (1) That petitioner's income should be reduced by $17,062.07, $19,471.56, and $19,463.79, respectively, *251 representing amounts received or treated as having been received by petitioner from Ohio operators as dues and so applied by petitioner. (2) That petitioner's income should be reduced by $17,205.01, $9,017.59, and $9,161.29, respectively, representing expenses allocations to the Medd Level which were included in sales on petitioner's income tax returns, less the amount of Murchie's fees allocable thereto, if any. (3) That petitioner's income should be reduced by the expenses paid by United Dairy Queen and allocated to Medd Level on the books of United Dairy Queen but not on the books of petitioner, as follows: 1956
$ 4,233.97
1957
3,376.51
1958
18,191.68
(4) That petitioner's income for 1956 should be reduced by $12,654.93 representing the amounts received by petitioner from the United States District Court in Ohio on behalf of certain operators and distributed to or on behalf of them. The foregoing concessions of respondent will be given effect in recomputations of petitioner's income for the respective years under Rule 50. Other or larger amounts sought by petitioner are not sustained on the basis of the record. Issue 5. Whether income accruals by Lark, *252 the petitioner, for expense charges to Ar-Tik Systems, Incorporated, during 1955, 1956, 1957, and 1958 in the amounts of $93,053.35, $53,568.20, $27,140.73, and $12,279.19, respectively, and reported by petitioner as sales in its income tax returns for the respective years should be eliminated from the income reported by the petitioner in its income tax returns for such years Findings of Fact In the interest of clarity, we again reiterate, to some extent, facts heretofore found. Harry M. Oltz, the predecessor in interest of Ar-Tik, patented a freezer machine in 1937. Thereafter he (and later Ar-Tik) entered into various agreements hereinbefore referred to as the Western and Eastern Agreements with H. A. McCullough under which he and his successors in interest, McCulloughs Dairy Queen, a partnership, developed a business of selling a frozen ice milk product known as Dairy Queen throughout the United States by virtue of which Oltz (and later Ar-Tik) received certain royalty payments per gallon of mix sold, as did H. A. McCullough. Prior to December 31, 1954, Ar-Tik was entitled to keep the entire amount of all royalty payments of 4 cents per gallon collected in the territory *253 covered by the Western Agreement. However, in the area under the Eastern Agreement, Ar-Tik was entitled to keep only 2 cents per gallon. The other 2 cents belonged to the McCulloughs and Ar-Tik remitted such funds to them. In March and April of 1954, H. A. McCullough and his successor in interest, McCulloughs Dairy Queen, a partnership, transferred all of their rights under the Western and Eastern Agreements to Lark. On or about February 23, 1955, Lark and Ar-Tik entered into a contract wherein Ar-Tik appointed Lark its agent to collect in Ar-Tik's behalf and to remit to Ar-Tik the 4 cents per gallon royalty under the Western Agreement and the 2 cents per gallon royalty covered by the Eastern Agreement as supplemented. Paragraph 4 of that contract provided as follows: 4. Lark hereby undertakes to collect for Ar-Tik the sums due or to become due to Ar-Tik under the terms of the aforesaid Western and Eastern Agreements and Supplements, all in accordance with the main agreement of even date, to which this agreement is to be attached, and promises and agrees to pay to Ar-Tik or its assigns all cash considerations received arising from receivables by H. A. McCullough, McCulloughs' *254 Dairy Queen and/or Lark to others in the nature of subcontracts, franchises or licenses granted pursuant to said Western Agreement and Supplement (4( per gallon) and Eastern Agreement and Supplement (2( per gallon), except such portion thereof as Ar-Tik may, in writing, direct Lark to retain as its property. The main agreement referred to in the preceding paragraph 4 of the above-mentioned contract, is the Lark/Ar-Tik Agreement dated December 31, 1954. 1280 For the years 1955 through 1958, Lark kept its books of account and filed its income tax returns on the accrual basis. On or about February 23, 1955, Lark entered upon its duties as agent and attorney in fact for Ar-Tik. From September 1, 1955, to December 31, 1955, Lark collected sums of money belonging to Ar-Tik in the amount of $77,644.97 and it deducted therefrom the gallonage deductions authorized by paragraph 5 of the Lark/Ar-Tik Agreement in the amount of $15,558.43, but it had not remitted to Ar-Tik any of the balance of $62,086.54. Under date of February 8, 1956, Ar-Tik sent a letter to Lark stating that it had previously given Lark notice in writing (a letter dated December 29, 1955) of certain defaults *255 by Lark in the performance of the Lark/Ar-Tik Agreement of December 31, 1954, and that since such defaults had notice, Ar-Tik now exercised its option contained in the agreement and terminated all of Lark's rights to receive and collect any sums of money which might be due or become due to Ar-Tik. On March 15, 1956, Ar-Tik filed a suit against Lark and Murchie in the Circuit Court of Rock Island County, Illinois, in Chancery, sometimes hereinafter and hereinbefore referred to as the Rock Island litigation. Ar-Tik's complaint was in three counts. Count 1 asked for an accounting from Lark alleged to be acting in a fiduciary capacity in its duty to collect and remit moneys for Ar-Tik. Count 2 was a prayer for damages for breach of the contract. Count 3 was a prayer for a permanent injunction. On April 9, 1956, after notice, appearance, and a full hearing consuming several days, the Court, on Ar-Tik's motion, granted a temporary injunction restraining Lark and Murchie from collecting any moneys from any person for and on behalf of Ar-Tik and from using, withdrawing, or otherwise disposing of any funds which Lark then had which belonged to Ar-Tik. Lark then filed a counterclaim and *256 made an application for temporary injunction which was presented to the Court and after a full hearing was had, an order was entered denying the injunction requested by Lark. On June 29, 1956, on Ar-Tik's motion, the Court modified the temporary injunction granted on April 9, 1956, in pertinent part, as follows: 1. That the injunction restraining defendants Lark and Murchie from collecting any moneys from any persons for or on behalf of the plaintiff Ar-Tik was modified to permit Lark to collect any moneys which were owing by the various franchise holders under what is known as the Lark Sales Territory Agreement entered into between Lark and certain state and district operators. 2. As to other royalty payments of 4 cents which were due from the various state and district operators which had not, up until April 9, 1956, entered into the Lark Sales Territory Agreement, Ar-Tik was permitted to collect the entire 4 cents royalty payments. 3. That Ar-Tik, upon receipt of any moneys to which Lark was entitled, make a report thereon and remit the same to Lark not later than the fifth day of the month following the month in which they were collected. 4. That Lark, upon receipt of *257 any moneys to which Ar-Tik was entitled, make a report thereof and remit the same to Ar-Tik not later than the fifth day of the month following the month in which they were collected, after deduction of commitments for advertising and store services, provided, however, that Lark furnish Ar-Tik with a list showing the exact commitments. 5. That Ar-Tik forward to Lark for the purpose of advertising and store services from the amounts collected in its behalf, such amounts per gallon as had been previously committed, by the fifth day of the month following the month of collection, provided, however, that Lark provide Ar-Tik with a list showing the exact commitments made. Lark filed an appeal from the orders of the trial court granting Ar-Tik a temporary injunction nenying Lark's request for a temporary injunction, and modifying the original order granting a temporary injunction. On January 9, 1957, the Appellate Court of Illinois, Second District, filed its opinion affirming the orders in question issued by the trial court, which opinion is reported at 139 N.E. 2d 308. During the taxable years 1955 through 1958, Lark included in the sales reported in its returns for *258 those years the following amounts representing charges to Ar- Tik in the respective years for its share of the expenses incurred by Lark in behalf of Ar-Tik for such years: time there was an expectation that the community 1281 1955
$ 93,053.34
1956
53,568.20
1957
27,140.73
1958
12,279.19
Total
$186,041.46
As of December 31, 1958, none of the amounts referred to in the preceding paragraph charged by Lark to Ar-Tik had been paid by Ar-Tik. That portion of the amount of $186,041.46 which related to the period from February 1955 through April 9, 1956, was involved in the litigation pending in the Circuit Court in the Rock Island litigation as to which the master in chancery had ordered an accounting covering the period through April 9, 1956. Prior to completion of the hearing on the accounting, and on or about October 14, 1959, the Rock Island litigation was settled. As a consequence, no accounting for a period subsequent to April 9, 1956, was ever filed. Ar-Tik addressed a letter to Lark dated October 10, 1956, which stated as follows: In re: Your letter of July 31, 1956 and the Disbursements Account rendered at that time. Gentlemen: We have your *259 letter of July 31, 1956, together with the attached "Disbursements made for account of Lark Sales Company and Ar-Tik Systems, Incorporated, January 1 to June 30, 1956" which did not arrive at this office until August 23, 1956. We have delayed answering the letter until we could obtain the advice of our counsel who have been unavailable during a portion of this period because of the vacation season. You are now advised that we have not made payment to you of any percentage portion of the "Disbursements" for the following reasons: 1. That for the period from 12-31 to April 9th, it is believed that this entire question is now in the hands of the Circuit Court of Rock Island County, Illinois and that the Master has in fact presently ordered an accounting covering the period to April 9, 1956 which will, of course, involve the figures which you have submitted. 2. That your "Disbursements" submitted for the period subsequent to April 9, 1956 involves the period wherein Ar-Tik is making its own collections and it is believed that it is, therefore, no longer responsible to Lark Sales Company for any costs of collection. 3. The statements which refer to "McCullough's Dairy Queen" are *260 confusing and unintelligible in that it cannot be determined from them whether the disbursements are claimed to have been made by McCullough's Dairy Queen, a partnership or by McCullough's Dairy Queen, Inc., a corporation. 4. The statements purport to show disbursements made by "McCullough's Dairy Queen" and, therefore an implied obligation to make reimbursement to it under the provisions of the agreement entered into December 31, 1954 and there is no provision in that agreement for disbursements to be made by "McCullough's Dairy Queen," nor for any reimbursement to be made to it for any disbursements which it might make. 5. The above reasons are, we believe, sufficient at this time and do not require us to state other objections which we would have were we not involved in the present litigation. We, of course, reserve the right to question each specific item should it be subsequently determined by the Court that we are under any legal obligation to pay any part of these disbursements. At no time during the year 1955 did Lark submit a statement or bill to Ar-Tik showing the expenses purportedly incurred by Lark which were to be shared by Ar-Tik. No statement or bill of costs *261 and expenses was submitted to Ar-Tik by petitioner after July 31, 1956. Under date of December 15, 1958, Lark's attorney addressed a letter to it which stated that it was in response to Lark's request for an opinion regarding the collectibility of the amounts charged to Ar-Tik under paragraphs 5 and 6 of the Lark/ Ar-Tik Agreement of December 31, 1954. The letter went on to state that the cost of collection by suit would be prohibitive and also that Ar-Tik was apparently not in a position to make any settlement that would require a substantial cash outlay, and thereupon concluded that the amounts indicated as a receivable from Ar-Tik (entire amount of $186,041.46) must be considered to have become uncollectible during that past year. In its income tax return for 1958, the petitioner reported gross sales of $48,586.70, less a sales adjustment of $186,041.46, or net sales of ($137.454.76). The adjustment reducing sales by the amount of $186,041.46 represented the amount purportedly due from Ar-Tik as its share of the expenses incurred by petitioner during the years 1955 through 1958, which petitioner considered to have become worthless during 1958. 1282 In determining the *262 deficiency for 1958, the respondent determined that the sales adjustment in the amount of $186,041.46 was not allowable since petitioner had not established that it was entitled to such reduction in the amount of its sales or in the amount of its taxable income for 1958. An alternative issue raised herein by petitioner to the foregoing determination as to $186,041.46 was withdrawn by petitioner on brief. Under date of October 14, 1959, Lark, Ar-Tik, and H. A. McCullough and H. F. McCulloughs Dairy Queen executed a document entitled "Settlement Agreement" which provided, in pertinent part, as follows: IT IS, THEREFORE, MUTUALLY AGREED that the parties hereto have settled all of their past obligations, including the law suit entitled, "Ar-Tik Systems, Inc., an Indiana Corporation, plaintiff, v. Lark Sales Company, an Illinois Corporation, and L. S. Murchie, defendants, Cause No. 56 E 97" now pending in the Circuit Court of Rock Island County, Illinois, and the Indiana law suit entitled "H. A. McCullough and H. F. McCullough v. Ar-Tik Systems, Incorporated, Civil Action No. 2392" filed in the United States District Court for the Northern Division of Indiana, which obligations shall *263 be resolved in the following manner, to wit: 1. The parties to each of said law suits shall, through their attorneys, on or before the 1st day of December, 1959, enter into a Stipulation of Dismissal with prejudice of said suits to all parties, including prejudice to any rights of any parties of any action arising out of the institution of said suits, which dismissals shall include the dissolution of the injunction in the Rock Island litigation. 2. Lark and Ar-Tik agree to pay the respective costs of the Master, Court Reporter and unpaid Court costs on a fifty-fifty basis. All other costs incurred by each of the respective parties shall be paid by the party incurring them. 3. Ar-Tik shall pay to Lark on or before December 1, 1959, the following sums, ((a) through (d)), by separate checks: (a) Ar-Tik's share of expenses for the year 1955
$92,478.34
(b) Ar-Tik's share of expenses for the year 1956
2,175.46
Total Expenses
$94,653.80
(c) Ar-Tik's receipts for the account of Lark
$4,316.02
through April 9, 1956 (reported)
(c) Additional Ar-Tik receipts for the account of
7,093.21
Lark through April 9, 1956
Total Receipts
$11,409.23
Lark shall *264 pay to Ar-Tik on or before December 1, 1959, the following sum: Lark's receipts for the amount [sic] of Ar-Tik through April 9, 1956 in the amount of $67,422.54. 4. Ar-Tik agrees to pay to Dairy Queen, the following sums on or before the dates indicated opposite such sums: (a) Settlement of Canadian litigation
$2,500.00
Dec. 1, 1960
(b) Michigan proceeds (1956 & 1957)
$10,930.00
Dec. 1, 1960
(c) Foreign freezers contract
$6,550.00
Dec. 1, 1961
(d) Share of Michigan legal expenses (1958)
$6,000.00
Dec. 1, 1961
Dairy Queen agrees to pay to Ar-Tik on or before December 31, 1959 the sum of $2500.00 for the domestic trade mark registration of Dairy Queen obtained by Ar-Tik from the Universal Milk Company. 5. Ar-Tik and Dairy Queen agree that as to all foreign "Dairy Queen" business, that they will set up said future business on a fifty-fifty per centum of gross proceeds basis provided related costs and expenses are agreed upon. IT IS FURTHER AGREED AND UNDERSTOOD with respect to the deferred payments of Ar-Tik to Dairy Queen that should Ar-Tik sell to any third party its Dairy-Queen interest, that all of such deferred payments shall become immediately *265 due and payable to Dairy Queen. LARK SALES COMPANY BY /s/G. E. Stange President ATTEST: /s/ H. N. Pieper Secretary AR-TIK SYSTEMS, INCORPORATED BY /s/ Harold F. Oltz President ATTEST: Secretary /s/ L. S. Murchie Attorney-In-Fact (Seal) H. A. McCullough /s/ H. F. McCullough (Seal) H. F. McCullough Co-partners doing business as McCulloughs' Dairy Queen /s/ L. S. Murchie (Seal) Attorney-In-Fact H. A. McCullough Individually 1283 Contemporaneously with the execution of the agreement referred to in the preceding paragraph, Lark, Ar-Tik, H. A. McCullough, McCulloughs Dairy Queen, a copartnership, and McCulloughs Dairy Queen, Inc., executed a second agreement which provided, in pertinent part, that the Lark/Ar-Tik Agreement was terminated in all respects; that all of the above parties had fully performed each and every agreement made with each other or their predecessors in interest; and that each of them was released and discharged from all liabilities in connection with or arising under said agreements. Opinion Here the petitioner, which kept its accounts and filed its income tax returns on an accrual basis for the years 1955, 1956, 1957, *266 and 1958, included in the sales reported in its returns for those years the amounts of $93,053.35, $53,568.20, $27,140.73, and $12,279.19, respectively, representing charges made to Ar-Tik for its (Ar-Tik's) share of the expenses incurred by petitioner in behalf of Ar-Tik during such years. The petitioner contends that its right to receive the foregoing amounts was in dispute between it and Ar-Tik, during the respective years in which they were incurred by it in behalf of Ar-Tik, and therefore was of such a nature as to be too contingent and too uncertain to constitute income to the petitioner for the respective years and accordingly those amounts should be eliminated from the income reported by petitioner in its income tax returns for such respective years. In support of its position, the petitioner urges that under the provisions of paragraph 6 of the Lark/Ar-Tik Agreement, the petitioner was required to render to Ar-Tik a report of petitioner's costs of operations in behalf of Ar-Tik and that until Ar-Tik approved such costs reported, the petitioner did not have the right to receive payment from Ar-Tik of the amounts of such costs; and that since in none of the years involved *267 did Ar-Tik give its approval to any report of petitioner, the latter was not required to report in its income tax returns for any of the years in issue any of the amounts here in controversy. Paragraph 6 of the Lark/Ar-Tik Agreement provides as follows: 6. Lark shall render to Ar-Tik a report of its costs of operations from time to time, which report shall show the areas occasioning such expenses and the amounts thereof, and Ar-Tik, within ten (10) days of receipt of such report, shall make payment to Lark of Ar-Tik's share of such expenses in the proportions to which Ar-Tik and Lark are sharing revenue from such area as set forth in Paragraph 5 above. At no time during 1955 did petitioner submit a statement, bill, or report to Ar-Tik showing the expenses incurred by it which were to be shared by Ar-Tik. However, during the first half of January 1956, the petitioner made a preliminary report as to 1955. Ar-Tik disregarded that report. No statement, bill, or report of petitioner's costs or expenses was submitted by petitioner to Ar-Tik after July 31, 1956. However, in the foregoing situation, the petitioner included in the sales reported in its income tax returns for the years *268 1955 through 1958, the amounts here in issue representing charges to Ar-Tik in the respective years, for Ar-Tik's share of the expenses incurred by petitioner in behalf of Ar-Tik for such years. To a taxpayer keeping its accounts and filing its income tax returns on an accrual basis, an item of income accrues when the taxpayer has a fixed or unconditional right to receive it. It is the right to receive and not the actual receipt of it which determines its accruability. Spring City Co. v. Commissioner, 292 U.S. 182 (1934); Estate of Putnam v. Commissioner, 324 U.S. 393 (1945). The exact amount need not be determined. It is sufficient that all the facts upon which the Lucas v. American Code Co., calculation depends have become fixed. 280 U.S. 445 (1930). Then the amount of the computation may be unknown, but it is not unknowable. Frost Lumber Industries v. Commissioner, 128 F. 2d 693 (C.A. 5, 1942). At the end of each of the years in issue, the petitioner had made expenditures in behalf of Ar-Tik for which it was entitled to be reimbursed and had accrued on its books as charges to Lark, the amounts in issue herein. Whether the *269 amounts of the charges to Ar-Tik were the exact amounts properly chargeable to it may have been unknown at the time the accruals of the charges were made, but such exact amounts were not unknowable. As we view the provisions of paragraph 6 of the Lark/Ar-Tik Agreement, they were primarily for the convenience of Ar-Tik in checking the accuracy of the amounts of the accruals and the areas to which they related and were not a condition precedent to Lark's rights to accrue such amounts. 1284 However, from a consideration of the record herein, including the overall settlement agreement by which the Rock Island litigation was terminated and the contemporaneous overall agreement by which the Lark/Ar-Tik Agreement also was terminated, we are unable to find that petitioner was entitled to reduce its income for the years in issue by the respective amounts involved herein. Respecting the $93,053.35 accrued by petitioner for 1955, the petitioner concedes on brief that in 1956 it reduced its claim by $575.01, which left a remaining amount of $92,478.31, or substantially the identical amount accrued by petitioner. The amount of $92,478.31 was paid by Ar-Tik to petitioner in the settlement *270 made pursuant to the settlement agreement. Such payment established the substantially complete accuracy of petitioner's accrual for 1955. Respecting the $53,568.20 accrued by petitioner for 1956, $2,175.46 was paid by Ar-Tik in the settlement made pursuant to the settlement agreement. That payment left a remaining amount of $51,392.74 of the amount that had been accrued for the year. The only accounting shown by the record to have been involved between Ar-Tik and petitioner was for the period ended April 9, 1956. Such being the situation and being unable to find otherwise, we assume that the above-mentioned payment of $2,175.46 related to expenditures made by petitioner in behalf of Ar-Tik during the portion of 1956 ending on April 9 of that year, and the remainder, $51,392.74, related to the remainder of 1956. Since we are not shown any action taken by either petitioner or Ar-Tik with respect to such remainder and petitioner's accruals to Ar-Tik in the amounts of $27,140.73 and $12,279.19 for 1957 and 1958, respectively, we can only conclude that they were paid by Ar-Tik in view of the recital contained in the agreement executed by the parties contemporaneously with the agreement *271 of October 14, 1959, which recited, "that all of the above parties had fully performed each and every agreement made with each other or their predecessors in interest and that each of them was released and discharged from all liabilities in connection with or arising under said agreements. We hold for the respondent on this issue. Issue 6. Whether Lark, the Petitioner, Was Entitled to Deduct as Ordinary and Necessary Business Expenses for 1956, 1957, and 1958 the Amounts of $59,913.50, $29,408.25, and $13,570.50, Respectively, Which Were Accrued by Petitioner as Payable to L.S. Murchie & Company as Accounting Fees Findings of Fact All of petitioner's accounting matters were handled by L. S. Murchie & Co. In addition to keeping the original books of account, ledger, and detailed operator records of petitioner, L. S. Murchie & Co. performed other matters of a routine nature for petitioner such as checking gallonage reports received by petitioner from operators, corresponding with various operators concerning the reports, preparing disbursement checks, and preparing dues reports to the Trade Association and Development Company. It also performed services for petitioner at meetings *272 and during negotiations with various state and district operators and with officers of Ar-Tik. Further services were performed by it for petitioner in the Rock Island litigation. The accounting filed in that litigation in 1956 was prepared by L. S. Murchie & Co. A substantial amount of time was devoted in 1957 and 1958 by it in preparation of accounting testimony taken during those years in that litigation. During the calendar years 1956, 1957, and 1958, the petitioner accrued in its books of account, as accounting fees payable to petitioner to L. S. Murchie & Co., the amounts of $59,913.50, $29,408.25, and $13,570.50, respectively. In its income tax returns for the years 1956, 1957, and 1958, the petitioner reported the foregoing amounts as having been incurred for "Professional Services" which comprised part of its costs of operations for such years. Having thus reported the foregoing respective amounts, the petitioner took them as deductions in computing its cost of goods sold in the respective years. The foregoing accounting fees accrued by the petitioner for the years 1956, 1957, and 1958, totaling $102,892.25, remained unpaid during the years of accrual, were reflected *273 on petitioner's books of account as a liability to L. S. Murchie & Co. as of December 31, 1958, and still were unpaid at the end of March 15, 1959. Murchie and his wife filed their joint income tax returns for the years 1955, 1956, and 1957 with the district director of internal revenue at Chicago, Illinois. During the years 1955, 1956, and 1957, they used a cash basis, calendar year method of reporting income. The returns did not 1285 include any income attributable to the above accounting fees charged to the petitioner for 1955, 1956, and 1957. Murchie filed his individual income tax return for the year 1958 with the district director of internal revenue at Chicago, Illinois. He used a cash basis, calendar year method of reporting income. The return did not include any income attributable to the above accounting fees charged to the petitioner for 1958. The fees in question purportedly were computed by L. S. Murchie & Co. on an hourly basis. The amount of $59,913.50 accrued by petitioner as an accounting fee expense incurred during 1956 was predicated on the basis of 9,245 1/2 hours of service having been rendered to the petitioner during the years 1955 and 1956; on the *274 basis that of the 9,245 1/2 hours, 3,079 hours related to services rendered during 1955 and that of the amount of $59,913.50, $18,749.25 related to the 3,079 hours and the year 1955, and that an amount of $692.25 constituted a carryforward from 1954, thus resulting in a total accrual for 1955 of $19,441.50. The latter amount was not deducted by petitioner in its income tax return for 1955. The petitioner's income tax returns for the years 1955, 1956, and 1957 were all prepared and signed by Murchie. Each of those returns bears the statement that it was prepared by Murchie from data and information obtained from the taxpayer without verification thereof. In the case of Ar-Tik Systems, Incorporated v. Lark Sales Company, et al. (Rock Island litigation), the master in chancery ordered an accounting for the period April 9, 1956. In the accounting then submitted by Lark it attempted to charge a portion of the L. S. Muchie & Co. accounting fees to Ar-Tik as Ar-Tik's share of the expense purportedly incurred by Lark during that period. Ar-Tik filed with the master in chancery its objections to Lark's accounting and in paragraph 51 thereof, stated as follows: 51. Plaintiff * * * specifically *275 objects to the service charges of L. S. Murchie & Company as being exorbitant and not in accordance with the fair and reasonable charges for like services rendered in this community; for the additional reason that said charges by the said L. S. Murchie & Company are charges which are not in any wise allocable to this plaintiff; that the charge is obviously an attempt to assess part of the charges, which the said L. S. Murchie & Company is making to the McCulloughs for handling their personal affairs, to this plaintiff; that the entire accounting shows that the firm of L. S. Murchie & Company is paying the individual expenses of, and running the affairs of, the McCulloughs out of the Lark Sales Company account and any attempt to charge Ar-Tik Systems, Incorporated with 40% of the share thereof is clearly a violation of the trustee's obligation to be fair to the plaintiff, Ar-Tik Systems, Incorporated, as a beneficiary under the contract between the parties; that the said accounting service charges are so exorbitant and out of proportion to the amount of money involved in this case as to indicate the services are for something other than that involved in this case; that the said figure *276 is further objected to for the reason that L. S. Murchie & Company and Lark Sales Company are one and the same person or have had its affairs so commingled as to make them indistinguishable and, therefore, any charges by the said L. S. Murchie & Company are in violation of the contractual provision that no moneys may be retained by the said Lark Sales Company unless authorized in writing by the plaintiff, Ar-Tik Systems, Incorporated. Murchie owned all of the issued and outstanding common stock of Lark which consisted of 64 shares. Murchie's stock ownership of Lark remained unchanged until January 1, 1956, when he purportedly sold all of the 64 shares of stock of Lark to McCulloughs Dairy Queen, Inc., for the sum of $14,428.93. Across the face of Murchie's stock certificate was printed in hand "CANCELLED." The back of the stock certificate stated as follows: For Value Received, I hereby sell, assign and transfer unto McCulloughs Dairy Queen, Inc. - 64 - Shares represented by the within Certificate, and do hereby irrevocably constitute and appoint the Secretary of the Company Attorney to transfer the said Shares on the books of the within named Corporation with full power of *277 substitution in the premises. Dated January 1, 1956 In presence of /s/ P. D. Robinson, Jr. /s/ Leland S. Murchie The sale of the stock in Lark was not evidenced by any written instrument other than the stock certificate itself. No part of the above-mentioned $14,428.93 was paid to Murchie in cash or property during the years here involved. No promissory note of any kind was received by him as 1286 evidence of the purported indebtedness nor was any property of any kind transferred to him to secure payment thereof. No provision was ever made for the payment of interest on the purported indebtedness and none was paid. No fixed or determinable future dates were set for the payment of the purported indebtedness. On a sheet entitled "GENERAL JOURNAL" of the books and records of McCulloughs Dairy Queen, Inc., there was entered the following: DR
CR
4-1-56
Investments
$14,428.93
Accounts payable
$14,428.93
(To record purchase of 64 shares
of Lark Sales Company)
The foregoing entry is sandwiched between two other entries each of which is dated "3-31-57." The alleged sale by Murchie of his Lark stock was not reported by him in his income *278 tax return for 1956 or for any of the other years here involved. The income tax return of McCulloughs Dairy Queen, Inc., for the fiscal year ended March 31, 1956, showed no gross income or deductions and the balance sheet showed that the assets and liabilities both at the beginning and end of the year consisted solely of an account receivable in the amount of $1,000 and capital stock of a similar amount. The balance sheets in the returns of McCulloughs Dairy Queen, Inc., for the fiscal years ended March 31, 1957, through March 31, 1959, reflect a stock investment in the amount of $14,428.93 with an offsetting account payable of a similar amount. McCulloughs Dairy Queen, Inc., was incorporated under the laws of the State of Illinois on or about April 1, 1954. Murchie contributed the entire capital of $1,000 and caused to be issued to himself 100 shares of common stock, the entire issued and outstanding capital stock of the corporation. McCulloughs Dairy Queen, Inc., stock certificate number 1 for 100 shares was issued to Murchie on April 2, 1954, and his stock ownership of McCulloughs Dairy Queen, Inc., remained unchanged until "March 31, 1956," when he purportedly sold all of *279 his shares to H. A. McCullough, H. F. McCullough, and M. P. Murchie, wife of L. S. Murchie, for the total sum of $1,000. Across the face of L. S. Murchie's stock certificate number 1 was written in hand: "Cancelled 3/31/56 PDR." The back of the certificate stated: For Value Received, I hereby sell, assign and transfer unto H. A. McCullough - 48 shares; H. F. McCullough - 48 Shares; M. P. Murchie - 4 Shares of the Capital Stock represented by the within Certificate, and do hereby irrevocably constitute and appoint the Secretary of the Company to transfer the said Stock on the books of the within named Corporation with full power of substitution in the premises. Dated 3-31 1956 In the presence of /s/ P. D. Robinson, Jr. /s/ L. S. Murchie The figure "6" appearing in the date "3-31-1956" was superimposed on the figure "7" after the latter had been partially erased so that instead of "3-31-1957" it now reads "3-31-1956." The purported purchase price for H. A. McCullough's 48 shares of stock of McCulloughs Dairy Queen, Inc., was $480, of H. F. McCullough's 48 shares of the stock was $480, and of M. P. Murchie's 4 shares was $40. At the time of the purported transaction, L. *280 S. Murchie did not receive any cash or property from H. A. McCullough, H. F. McCullough, or M. P. Murchie in connection therewith. Murchie did not receive a promissory note from either H. A. McCullough or H. F. McCullough in connection with the aforementioned transaction. Neither did Murchie receive any payments of interest from the McCulloughs. There was no fixed time for them to pay to Murchie the purported purchase prices. To the time of the hearing herein, the McCulloughs had not paid to Murchie the purported purchase price, or any portion thereof, of the shares of stock purportedly sold to them. Murchie filed no gift tax returns in connection with the aforementioned transaction. McCulloughs Dairy Queen, Inc., stock certificate number 3 for 48 shares was issued in the name of H. F. McCullough on March 31, 1956, and was signed by Charles J. Hott and P. D. Robinson, Jr., as president and secretary, respectively. H. F. McCullough was not present in person when stock certificate number 3 was issued and he never received it. The first he learned of the existence of the certificate was in October 1958 during the taking of 1287 his deposition in connection with a lawsuit in *281 Michigan. In or about 1958 and apparently after the death of M. P. Murchie, wife of L. S. Murchie, P. D. Robinson acquired from L. S. Murchie 4 shares of stock in McCulloughs Dairy Queen, Inc. Robinson paid Murchie nothing for the stock. The income tax returns of McCulloughs Dairy Queen, Inc., for the years ended March 31, 1957, through March 31, 1959, purported that no individual or corporation owned 50 percent or more of its voting stock. The income tax return of Lark for 1955 purported that at no time during the taxable year did any corporation or individual own 50 percent or more of its voting stock. Lark's income tax returns for the years 1956, 1957, and 1958 purported that 100 percent of its stock was owned by McCulloughs Dairy Queen, Inc., by whom the stock was purportedly acquired on January 1, 1956. The income tax return of McCulloughs Dairy Queen, Inc., for the year ended March 31, 1956, showed Murchie as owning 100 percent of its stock during that year. The income tax returns of McCulloughs Dairy Queen, Inc., for the years ended March 31, 1957, through March 31, 1959, purported that it was the owner of 100 percent of the stock of Lark, which interest it purportedly *282 acquired in "1956." During the years 1956 through 1958, the directors and officers of McCulloughs Dairy Queen, Inc., consisted of the following persons: Board of Directors
1956
Board of Directors
Officers
C. J. Hott
C. J. Hott - President
P. D. Robinson
P. D. Robinson - Secy.-
Treas.
1957
C. J. Hott
C. J. Hott - President
P. D. Robinson
P. D. Robinson - Secy.-
H. A. McCullough
Treas.
1958
C. J. Hott
C. J. Hott - President
P. D. Robinson
P. D. Robinson - Secy.-
H. A. McCullough
Treas. With the exception of H. A. McCullough, all of the foregoing persons were accountants by profession and were employed by Murchie. Murchie had a power of attorney to act in his sole discretion from time to time for and in behalf of Lark. In the suit filed by Ar-Tik against Lark, et al., in the Circuit Court, in Chancery (Rock Island litigation), Ar-Tik had also joined Murchie as a party defendant. Lark and Murchie moved to dismiss the action against Murchie on the ground that he was not a proper party to the proceedings, but the motion for dismissal was denied. In Lark's subsequent appeal of the various injunction orders issued by the trial court, *283 the Appellate Court of Illinois affirmed all of the orders appealed. With respect to the status of Murchie and his relationship to Lark, the Appellate Court stated at 139 N.E. 2d 308, 323, as follows: Defendants contend that Murchie was not a proper party to these proceedings, for the reason that he testified he was not a stockholder, director, officer or employee or managing agent of Lark. The record, however, shows that Murchie owned all the stock of McCulloughs' Dairy Queen, Inc., which in turn owned all the stock in Lark; that Murchie was the person dealt with by anyone dealing with Lark; that Murchie was the only person who was thoroughly familiar with Lark's affairs and that his duties for Lark encompassed everything that any managing agent would perform. His name appeared on the contract of December 31, 1954 as attorney in fact for H. A. McCullough. [Emphasis added.] Murchie's knowledge of the affairs of Lark and his relationship to such affairs as expressed above by the Appellate Court continued throughout the years 1956 through 1958 substantially the same as there stated. Not only did Murchie's name appear on the contract of December 31, 1954, the Lark/Ar-Tik *284 Agreement, as attorney in fact for H. A. McCullough, but it also appeared on the Rock Island litigation settlement agreement of October 14, 1959, as attorney in fact for H. A. McCullough, individually, and for H. A. McCullough and H. F. McCullough, copartners doing business as McCulloughs Dairy Queen. Ultimate Findings From the time of the formation of McCulloughs Dairy Queen, Inc., on or about April 1, 1954, Murchie as its sole stockholder held and exercised the sole domination over and control of that corporation and its affairs. Following the purported transfer on March 31, 1956, by Murchie of his stock in McCulloughs Dairy Queen, Inc., Murchie continued to exercise domination and control of that corporation and its affairs. 1288 The transactions by which Murchie purported to transfer his ownership of the stock in Lark to McCulloughs Dairy Queen, Inc., and his ownership of 96 shares of the stock in McCulloughs Dairy Queen, Inc., to H. A. McCullough and H. F. McCullough, in equal portions, did not constitute arm's length, or the equivalent of arm's length, and bona fide sales. Opinion The petitioner contends that the accounting fees of Murchie in the amounts of $59,913.50, *285 $29,408.25, and $13,570.50 for 1956, 1957, and 1958, respectively, accrued by petitioner on its books as expenses for the respective years and deducted as such in its income tax returns for such years constituted deductible ordinary and necessary business expense to it for the years in issue. The petitioner further contends that Murchie, the sole proprietor of L. S. Murchie & Co., did not own, directly or indirectly, more than 50 percent in value of the outstanding stock of petitioner during the periods December 31, 1956, to March 15, 1957; December 31, 1957, to March 15, 1958; and December 31, 1958, to March 15, 1959, or during any of the foregoing periods, and that accordingly the provisions of section 267 of the Internal Revenue Code of 1954 are inapplicable here and consequently do not prevent the allowance as deductions of the amounts in question. The respondent contends that more than 50 percent of the petitioner's outstanding stock was owned, directly or indirectly, by or for Murchie during the taxable years involved herein, within the meaning of section 267 and that therefore the deductions taken by petitioner for the accrued but unpaid accounting fees *286 of Murchie for the years in question were not allowable. In the alternative, the respondent contends that petitioner has not shown that the deductions in issue constituted ordinary and necessary business expenses or that they were incurred for the purposes claimed and that accordingly the petitioner was not entitled to deduct them. As hereinabove pointed out, deductions are a matter of legislative grace and it is incumbent on one who seeks a deduction to point to a statute which provides for the allowance of the deduction and to establish that he comes within the terms of that statute. Except for petitioner's reference above to section 267 of the Code of 1954, the provisions of which it contends are inapplicable here, the petitioner has not pointed us to a statute which provides for the allowance of the deductions here involved. In such situation, we assume the petitioner relies on the following provisions: SEC. 161. ALLOWANCE OF DEDUCTIONS. In computing taxable income under section 63(a), there shall be allowed as deductions the items specified in this part, subject to the exceptions provided in part IX (sec. 261 and following, relating to items not deductible). SEC. 162. *287 TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; Part IX of the Code provides, in pertinent part, as follows: SEC. 261. GENERAL RULE FOR DISALLOWANCE OF DEDUCTIONS. In computing taxable income no deduction shall in any case be allowed in respect of the items specified in this part. SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. (a) Deductions Disallowed. - No deduction shall be allowed - * * * (2) Unpaid Expenses and Interest. - In respect of expenses, otherwise deductible under section 162 or 212, or of interest, otherwise deductible under section 163, - (A) If within the period consisting of the taxable year of the taxpayer and 2 1/2 months after the close thereof (i) such expenses of interest are not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and (B) If, by reason of the *288 method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and 1289 (C) If, at the close of the taxable year of the taxpayer or at any time within 2 1/2 months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b). (b) Relationships. - The persons referred to in subsection (a) are: * * * (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; * * * (c) Constructive Ownership of Stock. - For purposes of determining, in applying subsection (b) (1), the ownership of stock - (1)Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries; Section 267(a) (2) of the Code provides that no deduction shall be allowed for an expense incurred by an accrual basis taxpayer, *289 as was the case of Lark, if the person to whom payment is due is a "related person" who reports his income on the cash basis, as did Murchie, and if payment of the expense is not made during the taxable year of the taxpayer and within 2 1/2 months after the close of the taxable year in which the expense accrued. From our consideration of the record presented in connection with the contentions and arguments of the parties, the primary question for determination is whether Murchie's transactions by which he caused the stock he owned in Lark to be transferred out of his name and into the name of McCulloughs Dairy Queen, Inc., and caused the stock he owned in McCulloughs Dairy Queen, Inc., to be transferred out of his name and into the names of H. A. McCullough, H. F. McCullough, and M. P. Murchie, were of such arm's length and bona fide nature and character as to constitute bona fide sales. At the outset we observe that Murchie was a businessman of extensive experience. In addition, he had been a certified public accountant since 1934 and had actively engaged in that business, including the preparation of income tax returns for clients. Further, in 1938 he was admitted to practice *290 before the Tax Court of the United States. All of the accounting matters of petitioner Lark, including the preparation of its income tax returns, were handled by Murchie and L. S. Murchie & Co., which was Murchie's sole proprietorship. Throughout the years in issue, Murchie held and exercised control of Lark and McCulloughs Dairy Queen, Inc., and their affairs. On January 1, 1956, Murchie was the sole owner of all the outstanding stock in Lark and on the same date he also was the sole owner of all of the outstanding stock in McCulloughs Dairy Queen, Inc. As a result, he alone had the full and complete power to fix and determine the terms and conditions on which he would transfer his stock in Lark to McCulloughs Dairy Queen, Inc. As an experienced businessman and as an experienced certified public accountant, we think it is fair and reasonable to expect that he would have caused to be prepared some instrument clearly setting forth at least the principal terms and conditions of the sale of the stock, including when ownership of the stock should pass and the sale was to be complete. For reasons not disclosed to us, Murchie elected not to cause the preparation of such a writing or instrument. *291 Such being the situation and finding nothing in the record which we think warrants the contrary, we are of the opinion that payment for the stock fairly and reasonably may be regarded as completion of the sale transaction and the passing of the ownership of the Lark stock from Murchie to McCulloughs Dairy Queen, Inc. The petitioner does not point us to any testimony in the record, nor have we found any, from which we can determine the date of the payment to Murchie for the stock. In its reply brief, the petitioner, referring to an exhibit in the record, takes the position that the date of payment was March 26, 1962. However, in the succeeding paragraph of its reply brief, the petitioner takes the position that 1961 was the year "when he [Murchie] received the consideration in cash" and "It is clear that under the evidence presented in this case, 1961 was the proper year for the reporting of the transaction by Murchie." For the years in issue herein, Murchie reported his income on the calendar year basis and the record does not show that for the years 1961 or 1962 he reported income on any other basis. In view of what has been said above and granting, but not deciding, that Murchie *292 received payment for his Lark stock on March 26, 1962, it follows that on that date he became divested of his ownership of the Lark stock. Since ownership of the Lark stock remained in Murchie until March 26, 1962, McCulloughs Dairy Queen, 1290 Inc., did not acquire ownership thereof prior to that date. In view of the foregoing, we conclude that the factual situation presented here as to the Lark stock comes within the above-quoted provisions of section 267(a) (2) and (b) (2) and accordingly prevents the allowance of the deductions taken by Lark for the years in issue for the unpaid acounting fees accrued by Lark for such years. We are of the opinion that payment for the stock fairly and reasonably may be regarded as completion of the sale transaction and the passing of the ownership of the McCulloughs Dairy Queen, Inc., stock from Murchie to H. A. McCullough and H. F. McCullough. Since the record shows and we have found as a fact that to the time of the hearing herein the McCulloughs had not paid to Murchie the purported purchase price, or any portion thereof, of the shares purportedly sold to them, we are unable to find that the sales transactions respecting such shares have *293 been completed. Consequently, we conclude that at the end of the respective years in issue, Murchie not only had not divested himself of the ownership of such shares, but had retained his ownership of them. Accordingly, we conclude that H. A. McCullough and H. F. McCullough during the years in issue did not have the ownership of such shares. Since we have concluded that McCulloughs Dairy Queen, Inc., did not acquire ownership of the stock in Lark prior to March 26, 1962, and since the deductions here involved were those of Lark for the years 1956 through 1958, the provisions of section 267 (a) (2), (b) (2), (c) (1) are without application here where only the purported sales by Murchie to H. A. McCullough and H. F. McCullough of shares of stock in McCulloughs Dairy Queen, Inc., are involved. Having reached the foregoing conclusions, it becomes unnecessary to consider the respondent's alternative contention. We hold for the respondent on this issue. Issue 7. Whether Lark, the petitioner is entitled to a reduction of its income for 1955 of $8,538.95, representing a portion of an amount of $17,077.91 (so-called Grafton expenditure) deducted by petitioner as part of its cost of *294 goods sold and which was disallowed by respondent Opinion Respecting the respondent's disallowance of the deduction of the $17,077.91, the notice of deficiency here involved contained the following: (c) On or about September 17, 1955, you issued your check #180 in the amount of $17,077.91 to the Moline National Bank in payment of a note. In your income tax return for 1955 you included that amount as a part of the total amounts claimed for "Merchandise bought for manufacture or sale" and "Cost of goods sold" and reduced your taxable income accordingly. It is determined that said expenditure of $17,077.91 is not allowable either in reduction of the amount of gross income reportable for 1955, or as a deduction therefrom in computing the amount of your taxable income for 1955. Accordingly, your taxable income for 1955 is increased in the amount of $17,077.91. The note referred to in the notice of deficiency was that of James Grafton. In its petition, the petitioner conceded that the foregoing determination of the respondent was proper. However, in its petition, the petitioner assigned the following error: (i) The respondent erred in failing to reduce the taxable income of the *295 petitioner for the calendar year 1955 by $8,538.95 as a result of his disallowance of the so-called Grafton expenditure of $17,077.91. (Item (c), Page 4, 90-day letter). With respect to the foregoing assignment of error, the petitioner in its petition made the following allegations of fact: (hh) On or about September 17, 1955, petitioner made a disbursement of $17,077.91 to the Moline National Bank in payment of a note which it deducted on its 1955 tax return. In his 90-day letter (c), Page 4, respondent has disallowed this deduction for the calendar year 1955. (ii) The purpose of the disbursement referred to in the preceding sub-paragraph was in the nature of store assistance to a "Dairy Queen" operator in New York State. Of this $17,077.91, petitioner credited to sales and reported as income $8,538.95 for the taxable year 1955, for which the respondent has made no adjustment in his determination. In his answer the respondent denied the above-mentioned assignment of error and denied the above-mentioned allegations of fact except that he admitted that on or about September 17, 1955, petitioner issued its check in the amount of $17,077.91 to the Moline National Bank; that petitioner *296 deducted such amount on its 1955 tax return and that in the 90-day letter he (respondent) denied the deduction for the calendar year 1955. 1291 From a consideration of the petitioner's assignment of error and petitioner's allegation of facts, it appears that what the petitioner seeks is a reduction of its income for 1955 by $8,538.95 of the so-called Grafton expenditure of $17,077.91, and further seeks a finding that the purpose of the disbursement of the $17,077.91 was in the nature of store assistance to a Dairy Queen operator in New York State and that of the disbursement of the $17,077.91, the petitioner credited to its sales and reported as income, $8,538.95 for its taxable year 1955, and that for which the respondent in his determination has made no adjustment. From the foregoing it is apparent that petitioner has shifted its position as to the purpose of the payment made by the check from that taken in its 1955 return, namely, that the check was issued in payment of cost of goods sold by petitioner, to the position that the check was for store assistance to an operator in New York State and that of the amount of the check, the petitioner credited $8,538.95 to its sales *297 for 1955 and reported the latter amount as income for that year. No explanation is offered as to why, if the check was for store assistance to a Dairy Queen operator in New York State, any portion of it was credited to the sales of petitioner for 1955. As a further indication of the petitioner's difficulty in identifying the purpose of the check, the petitioner at the hearing and on brief, in effect, took the position that the amount of the check, $17,077.91, was included in the petitioner's accounting to Ar-Tik in the Rock Island litigation and that the portion thereof here in issue, $8,538.95, comprised part of the $93,568.20 of income accruals made by the petitioner for expense charges to Ar-Tik during 1955 and reported by petitioner as sales in its income tax return for 1955. In determining the deficiency involved herein for 1955, the respondent has determined that the expenditure of $17,077.91 made on or about September 17, 1955, by petitioner in payment of the note is not allowable either in reduction of the amount of gross income reportable by the petitioner for 1955, or as a deduction therefrom in computing the amount of the petitioner's taxable income for 1955. That determination *298 is presumed to be correct until shown to be otherwise. From a consideration of the evidence relied on by petitioner and its arguments with respect thereto, we are unable to identify the $8,538.95 here in issue as constituting part of the above-mentioned $93,568.20. Accordingly, we hold that petitioner is not entitled to reduce its taxable income for 1955 by the $8,538.95 in issue. Issue 8. Whether Lark, the petitioner, is entitled to a deduction from its income for 1955 of $4,155.35 representing expenditures, hereinafter referred to as the Rockford expenditures, which the petitioner in its income tax return deducted as costs of goods sold and which the respondent disallowed. Findings of Fact Some time prior to March 1, 1955, the petitioner acquired the DairyQueen franchise for the Rockford and Rochelle areas in the State of Illinois. Thereafter petitioner made payments directly to the equipment owners of the following expenditures in connection with the opening of a new Dairy Queen store in the Rochelle area which was covered by petitioner's newly acquired franchise: Jt. Ex. No.
Date
Check No.
Payee and explanation
Amount
500-SF
3/ 1/55
22
LeRoy Signs, Inc. - 2
$ 45.00
highway signs
501-SG
3/ 5/55
26
LeRoy Signs, Inc. -
750.00
approved DQ. roof sign
502-SH
3/24/55
32
Stoelting Bros. - 3/4
3,054.15
Model S freezer
503-SI
6/ 1/55
70
Brown-Brockmeyer -
122.20
motor for freezer
504-SJ
6/ 1/55
72
Lite-Brite-fluorescent
184.00
strips
Total
$4,155.35
*299 In its income tax return for 1955, the petitioner included the entire amount of the above disbursements in the item "Merchandise bought for manufacture or sale" which was in turn included in the amount deducted in the return for cost of goods sold and which deduction was disallowed by respondent who determined that such disbursements constituted capital expenditures. No income was reported by the petitioner for the years 1955 through 1958 with respect to its above-mentioned franchise in the Rockford or Rochelle areas. Opinion The petitioner contends that during 1955 it disbursed the total sum of $4,155.35 for Henry Charnock, a Dairy Queen operator 1292 in Rochelle, Illinois. The disbursements purportedly represented "financial assistance" to Charnock by Lark. The disbursements were made in connection with the opening of the new "Dairy Queen" store in the Rochelle area which was covered by the petitioner's newly-acquired franchise. The record is silent as to the terms and conditions under which Charnock used the items in issue in the business conducted by him in the newly-opened store, whether as owner, lessee, or otherwise. The record shows that Charnock continued operations *300 in the newly-opened store during 1955 through 1958 and continued to sell Dairy Queen gallonage. There is no showing that the items in issue were not continued in use by him in his operations during 1955 through 1958. In its income tax return for 1955, the petitioner deducted the disbursements in issue as part of the cost of goods sold by it during that year. In determining the deficiency, the respondent determined that the disbursements constituted capital expenditures and accordingly disallowed the deduction. The respondent's determination is presumed to be correct until shown to be otherwise. Apparently being unable to show that the disbursements in issue constituted part of the cost of goods sold by it during 1955, the petitioner, as we understand its position, now contends that the disbursements constituted ordinary and necessary business expenses to it in that they were for the promotion and protection of its business. From a consideration of the record presented in connection with the arguments of petitioner and the cases cited by it, we are unable to find that the disbursements in issue, which were made by petitioner in payment for items of physical property, employed in *301 opening and operating the new store which continued in operation at least during 1955 through 1958, were other than capital expenditures. The respondent is sustained on this issue. Issue 9. Whether Lark, the petitioner, sustained a net operating loss in 1958 of $186,906.43 which was available for being carried back and allowed as a net operating loss deduction in 1955, 1956, and 1957 Findings of Fact The income tax returns filed by the petitioner for the taxable years 1955, 1956, and 1957 reported taxable income (or loss) for each of those years in the respective amounts of $5,039.10, ($279.51), and $3.69, and an income tax liability for those years in the respective amounts of $1,511.73, none, and $1.11. On January 5, 1960, the petitioner filed an application for tentative carryback adjustment in which it stated that it had sustained a net operating loss of $186,906.43 in 1958 and requested that such loss be carried back and allowed as a net operating loss deduction in 1955, 1956, and 1957 in the respective amounts of $118,111.77, $12,854.64, and $3.69. On February 10, 1960, these tentative carryback adjustments were allowed and refund made to the taxpayer of overpayments *302 of tax in 1955, 1956, and 1957 in the respective amounts of $55,918.12, $3,856.39, and $1.11, together with interest thereon. In his statutory notice, the respondent determined that the petitioner did not sustain a net operating loss in 1958 and consequently that it had no net operating loss carryback from 1958 to the taxable years 1955, 1956, and 1957. Opinion The respondent takes the position on brief that his determination that petitioner did not sustain a net operating loss in 1958 and consequently had no net operating loss carryback from 1958 to the years 1955, 1956, and 1957 was correct and should be sustained. In its petition, the petitioner, in the alternative, assigned as error the respondent's action in increasing petitioner's net sales for 1958 by the amount of $186,041.46 in determining that petitioner improperly adjusted its sales for that year. The foregoing assignment of error was denied by respondent in his answer. In its original brief, the petitioner stated that such alternative issue "is withdrawn." Thereby the petitioner removed such issue from our consideration and determination here. Since the foregoing amount of $186,041.46 closely approximates the amount *303 of $186,906.43 stated in petitioner's application for tentative carryback adjustment, the petitioner suggests in its reply brief that the instant issue be resolved in a Rule 50 recomputation of its tax liability. Accordingly the issue will be considered and disposed of as suggested by petitioner. The petitioner's petition in the instant proceeding did not contain an assignment of 1293 error or an allegation of fact to the effect that it sustained a net operating loss of $101,919.54 for 1959 which is deductible for the years 1956, 1957, and 1958 in the manner provided in section 172 of the Code of 1954. However, the petitioner contends on brief that the foregoing would represent the situation which would result from an adverse decision by us in issue 5, supra (issue III, as designated in petitioner's brief). Issue 5 herein presented the question of whether income accruals by petitioner for expense charges to Ar-Tik during 1955 through 1958 in stated amounts and reported by petitioner as sales in its income tax returns for the respective years should be eliminated from the income reported by petitioner in its income tax returns for such years. There we concluded that in 1959 *304 petitioner received payment of its accruals of the charges it had made to Ar-Tik and held that the amounts of such accruals should not be eliminated from petitioner's income for such years. In view of the foregoing, we are unable to find any basis for concluding that the above-mentioned transactions between Lark and Ar-Tik resulted in a net operating loss to petitioner of $101,919.54, or any other amount, in 1959, or in any other year. Accordingly the contention of the petitioner is not sustained. Alternative issues, contentions, and arguments of petitioner respecting matters involved in issues 3 through 9, supra, and not hereinbefore disposed of are not sustained for lack of support in the record. tDecisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Cecil R. Medd and Mildred I. Medd, docket No. 4577-63; Robert R. Medd and Nancy M. Medd, docket No. 4578-63; Ralph C. Medd and Jean A. Medd, docket No. 4579-63; Ronald A. Medd and Roma J. Medd, docket No. 4580-63; and Lark Sales Company, docket No. 4582-63.↩
2. As stated by Lark on brief, the national interests encompassed (a) the 4-cent-gallon interests of Ar-Tik, shared with the McCullough interests in the eastern portion of the United States, and (b) the so-called McCullough overrides representing continuing per gallonage sums due from various state and district operators by virtue of the McCullough contracts with those parties.↩
1. Amount computed at 1 5/8 cents per gallon and represented the recording of the amount by Ar-Tik for 1954 gallonage. ↩
2. Reverse entry on Jester check for $1,647.80 reducing the total amount for the month ended 8/31/55 from $15,642.32 to $13,994.52.↩